# IN RE: FRC, LLC
# BANKRUPTCY NO. 11-19466

### EXHIBIT A TO

### DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING THE SALE OF CERTAIN BUSINESS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this *"Agreement"*), dated as of October 3, 2011 (the *"Effective Date"*), is by and between FRC LLC, a Delaware limited liability company (*"Seller"*) and Asset International, Inc., a Delaware corporation (*"Buyer"*).

## WITNESSETH

WHEREAS, Seller plans to file for protection as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the *"Bankruptcy Court"*);

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Acquired Assets (as defined below), but excluding the Excluded Assets (as defined below), subject to the terms and conditions of this Agreement; and

WHEREAS, the Acquired Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving and authorizing such sale under Section 363 of the Bankruptcy Code pursuant to a Sale Approval Order (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## Article I
## Definitions

1.1     Defined Terms.  In addition to terms that are used and otherwise defined in this Agreement or the Bankruptcy Code, the terms below shall have the following meanings:

*"Auction"* shall mean the auction that shall, subject to the terms of this Agreement, be scheduled to take place for the sale of the Acquired Assets pursuant to a Motion to be filed by Seller with the Bankruptcy Court.

*"Assumed Contract"* shall mean all of the contracts, agreements, leases, and/or licenses that (i) are listed on Exhibit A to this Agreement, as such exhibit may be amended from time to time by mutual agreement; (ii) are subject to an order entered by the Bankruptcy Court that authorizes Seller to assume and assign the contract, agreement, lease and/or license to Buyer; and (iii) are actually assumed by Seller and assigned to Buyer.

*"Bankruptcy Code"* shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq., as amended.

*"Business Day"* shall mean any day excluding Saturday, Sunday, and any day that is a legal holiday within the meaning of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

*"Encumbrance"* shall mean any interest, pledge, lien, mortgage, security interest, judgment, demand, successor liability claim, restriction, charge of any kind or nature, claim (as

and to the full extent that term is defined in Bankruptcy Code Section 101(5) of the Bankruptcy Code), obligation, option, right, or restriction whether imposed by agreement, understanding, law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) in or with respect to any assets of Seller and/or against Seller.

*"Person"* shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind whatsoever.

*"Sale Approval Order"* shall mean an order of the Bankruptcy Court approving consummation of the transactions contemplated hereby by Buyer and Seller, certified by the clerk of the Bankruptcy Court as a true and correct copy of such order, reasonably satisfactory in form and substance to Buyer, Seller and their respective counsel, entered after a hearing conducted on adequate notice given in Seller's bankruptcy case (the *"Bankruptcy Case"*).

**Article II**
**Purchase and Sale of Assets By Buyer,**
**Assumption of Liabilities and Purchase Price**

2.1     <u>Purchase and Sale of Assets</u>.  Upon the terms and subject to the conditions and provisions contained herein and in the Sale Approval Order, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall acquire and accept from Seller, free and clear of any and all Encumbrances, the assets specifically identified on <u>Exhibit A</u> to this Agreement (collectively, the *"Acquired Assets"*) that are owned and held by Seller and associated solely with the following business segments of Seller's business being acquired: (a) the Investments – Mutual Funds (with the exception of the Mutual Fund Quarterly Market Review and the Mutual Fund Quarterly Sales Review), (b) Investments – Subadvisory, (c) Alternatives, (d) 529 College Savings, and (e) Monitor (the *"Business"*).

2.2     <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained in this Agreement, all assets of Seller that are not described in Section 2.1 as Acquired Assets shall be retained by Seller for all purposes as the *"Excluded Assets"*, including Seller's *Mutual Fund Quarterly Market Review, Mutual Fund Quarterly Sales Review*, and Retirement business segments, Direct Access hours and service associated with the Business, all causes of action arising under Sections 544, 545, 547, 548, 549, 553(b) or 724(a) of the Bankruptcy Code, accounts and notes receivable, cash, cash equivalents, and all payments made to Seller prior to the Closing for all business of Seller, including all payments made under the Assumed Contracts for products or services to be delivered by Buyer under the Assumed Contracts following the Closing.

2.3     <u>Assumption of Assumed Contracts</u>.  Upon the terms and subject to the conditions and provisions contained herein, Buyer shall assume all of the liabilities and obligations of Seller arising under the Assumed Contracts with respect to the period after the Closing, but not including any obligation or liability for any breach thereof occurring prior to the Closing.  Seller shall be responsible to pay any pre-petition cure amounts and perform any pre-petition cure obligations due under the Assumed Contracts as ordered by the Bankruptcy Court.  Buyer shall cooperate in demonstrating adequate assurance of future performance of the Assumed Contracts

2

required for assumption and assignment, but such cooperation shall not include making any payments or other similar performance (such as posting security or other financial support) by Buyer.

      2.4    <u>Liabilities Not Assumed</u>.  Except as expressly set forth in this Agreement, Buyer shall not assume or perform any liability or obligation of Seller.

      2.5    <u>Deposit; Purchase Price; Debtor In Possession Financing</u>.

      (a)    <u>Deposit</u>.  Contemporaneously with the execution of this Agreement, Buyer is depositing into escrow a good faith deposit equal to $50,000.00 in immediately available funds (the *"Deposit"*) with Murphy & King, P.C., counsel to Seller, as escrow agent (*"Escrow Agent"*), with such amount to be held in escrow in a non-interest bearing escrow account and paid as provided in this Agreement, and as may be provided in any Order issued by the Bankruptcy Court with respect to this transaction.  In no event shall Escrow Agent be precluded from continuing its legal representation of Seller as a result of its role as Escrow Agent, even in the instance of a dispute between Seller and Buyer under this Agreement.

      (b)    <u>Purchase Price</u>.  The Purchase Price shall be an amount equal to $500,000.00 (which amount shall include the Deposit), payable to Seller at Closing by wire transfer of immediately available funds and subject to adjustment as provided in this Section 2.5.

      (c)    <u>Adjustment of the Purchase Price</u>.  The Purchase Price shall be subject to adjustment for certain matters that arise between the date of filing of the bankruptcy petition and the Closing (the *"Interim Period"*) as follows:

      (i)    If, at Closing, the actual aggregate amount paid or payable to Seller (the *"Actual Transaction Amount"*) arising from customer transactions with the business segments that are included in the Business, that are either invoiced, or for which there is issuance and acceptance or acknowledgement of a sales order, and in each case evidenced by written or electronic customer acceptance or acknowledgement (*"Customer Transactions"*), during the period from September 1, 2011 through and including the Closing Date (the *"Adjustment Period"*) is less than $477,600.00 (reduced, if at all, by the product of the number of days between the day following the Closing Date and November 30, 2011, including both such end-dates, multiplied by $4,203.33) (the *"Projected Transaction Amount"*),

then the Purchase Price shall be reduced on a dollar-for-dollar basis equal to any difference between the Projected Transaction Amount and the Actual Transaction Amount.

      For example, if (A) the Closing Date is November 21, 2011, and (B) the Actual Transaction Amounts during the Adjustment Period are $425,000.00, then the Purchase Price will be reduced by the positive difference between (i) the adjusted Projected Transaction Amount (i.e., $477,600.00 less (9 x $4,203.33), or $439,770.03, <u>minus</u> (ii) the Actual Transaction Amount ($425,000.00), for an adjustment of $14,770.03.

      (ii)    In addition to the adjustment (if any) to the Purchase Price pursuant to clause (i) above, the Purchase Price shall be reduced at Closing by an amount equal to fifty percent (50%) of the sum of (A) the amount of accounts receivable of Seller existing at Closing,

3

which arose from Customer Transactions during the Interim Period, and (B) any amounts paid to Seller during the Interim Period in payment for Customer Transactions that arose during the Interim Period.

> For example, if during the Interim Period, Customer Transactions generated accounts receivable of $115,000.00, of which $60,000.00 remained uncollected at the Closing and of which $55,000.00 Seller collected during the Interim Period, then the Purchase Price will be adjusted (reduced) by 50% of the sum of such remaining accounts receivable plus 50% of such collections, for an aggregate adjustment of $57,500.00.

(d)     Debtor-In-Possession Financing.  Promptly following the commencement of the Bankruptcy Case, Seller shall seek interim and final Orders of the Bankruptcy Court permitting Seller to borrow from Mercatus RC, LLC (the *"DIP Lender"*) up to a maximum aggregate amount of $110,000 (the *"DIP Loan"*) to meet Seller's working capital needs prior to the Closing, with the terms of such loan to be as provided in the interim and final DIP Orders, which shall be in a form reasonably satisfactory to Seller, Buyer, and the DIP Lender (the *"DIP Order"*).  To the extent that the interim DIP Order is not entered prior to 5:00 p.m. on the fourth (4th) Business Day following commencement of the Bankruptcy Case, Buyer may, at its option, terminate this Agreement and receive the return of its deposit.  Following entry of the DIP Order, the DIP Lender shall lend Seller amounts necessary from time to time for its working capital needs funded in accordance with the DIP Order.  To the extent that DIP Lender, in its discretion, agrees to loan additional amounts to Seller as debtor-in-possession financing, and such additional loans are approved by the Bankruptcy Court, such additional amounts shall be part of the DIP Loan.

## Article III
## The Closing

3.1     Closing.  The consummation of the transactions contemplated hereby (the *"Closing"*) shall occur at the offices of Murphy & King, P.C., One Beacon Street, Boston, Massachusetts 02110, or at another location mutually agreed to by the parties, on the date (the *"Closing Date"*) that is fifteen (15) calendar days after the date of entry of the Sale Approval Order (or, if such day is not a Business Day, the next succeeding Business Day), provided no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal, and all other conditions to Closing set forth in Article VII and Article VIII shall have been satisfied or waived.  If the Sale Approval Order specifies that the provisions of 11 U.S.C § 363(m) apply and that the conditions set forth in Article VII and Article VIII shall have been satisfied or waived, then the Closing Date shall be the second (2nd) Business Day following the date of entry of the Sale Approval Order, and provided no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.  In no event shall the Closing Date be later than November 25, 2011.

3.2     Conveyances at Closing.

(a)     At the Closing, and in connection with effecting and consummating the transactions contemplated hereby, Seller shall, to the extent necessary to deliver title, in Buyer's reasonable discretion, deliver the following to Buyer:

4

      (i)     an executed Bill of Sale;

      (ii)    an executed counterpart of an Assumption and Assignment Agreement with respect to all of the Assumed Contracts;

      (iii)   a certified copy of the Sale Approval Order;

      (iv)   assignment documentation necessary for the conveyance of any intellectual property to Buyer; and

      (v)    such other instruments as shall be reasonably requested by Buyer to vest in Buyer title in and to the Acquired Assets in accordance with the provisions hereof and the Sale Approval Order.

    (b)    At the Closing, and in connection with effectuating and consummating the transactions contemplated hereby, Buyer shall deliver the following to Seller:

      (i)     the Purchase Price by wire transfer of immediately available funds, net of the Deposit, and as adjusted, if at all, under this Agreement; and

      (ii)    an executed counterpart of the Assumption and Assignment Agreement.

To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

3.3    <u>Payment of the Deposit to Seller.</u>  At Closing, the Deposit shall be released to Seller by Escrow Agent.

3.4    <u>Transaction Expenses</u>.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant, and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

3.5    <u>Other Closing Matters</u>.  Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on the Closing Date, subject to applicable law and any Order of the Bankruptcy Court, but consistent with the terms and conditions of this Agreement.

## <u>Article IV</u>
## Representations and Warranties of Seller

As an inducement to Buyer to enter into this Agreement, Seller hereby makes, as of the Effective Date, the following representations and warranties to Buyer, but such representations and warranties shall not survive the Closing of the transactions contemplated by this Agreement for any reason whatsoever:

01633171.DOCX\

4.1     Authorization.  Seller has all necessary right, power, capacity, and authority to commence the Bankruptcy Case, to execute and deliver this Agreement and, subject to entry of the Sale Approval Order, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other corporate proceedings on the part of Buyer are necessary to authorize the commencement of the Bankruptcy Case, the execution, delivery, the performance of this Agreement, and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and, subject to entry of the Sale Approval Order, is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.2     Organization.  Seller is an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has the power and authority to operate its properties and to carry on its business as it is now being conducted.

4.3     Title to Assets; Absence of Liens and Encumbrances, etc.  Seller will, upon the entry of the Sale Approval Order and the consummation of the transactions contemplated hereby, transfer all of its right, title, and interest in and to the Acquired Assets to Buyer, free and clear of any and all Encumbrances.

4.4     Consents and Approvals.  To the best of Seller's knowledge, after due inquiry (a) other than the Sale Approval Order, no consent, approval, or authorization of any court, regulatory authority, governmental body, or any other entity or Person not a party to this Agreement is required for the consummation of the transactions described in this Agreement by Seller; (b) Seller has obtained, or shall have obtained prior to the Closing, all consents, authorizations, or approvals of any third parties required in connection with the execution, delivery, or performance of this Agreement by Seller or the consummation of the transactions contemplated by this Agreement; and (c) Seller has made all registrations or filings with any governmental authority required for the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

**Article V**
**Representations and Warranties of Buyer**

As an inducement to Seller to enter into this Agreement, Buyer hereby makes the following representations and warranties as of the Effective Date hereof to Seller, but such representations and warranties shall not survive the Closing of the transactions contemplated by this Agreement for any reason whatsoever:

5.1     Authorization.  Buyer has all necessary power and authority to enter into this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other corporate proceedings on the part of Buyer are necessary to authorize the execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited or affected by applicable bankruptcy, insolvency, reorganization, or other laws of general application relating to or affecting the rights

6

of creditors and except as enforceability may be limited by rules of law governing specific performance, injunctive relief, or other equitable remedies.

5.2   <u>Organization</u>. Buyer is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has the power and authority to operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted.

5.3   <u>Financing</u>. On the Closing Date, Buyer will have sufficient cash or other immediately available funds on hand to deliver the Purchase Price. The closing of any financing shall not be a condition to Closing of the transactions contemplated by this Agreement.

**<u>Article VI</u>**
**Covenants**

6.1   <u>Chapter 11 Filing</u>. On, or promptly following the Effective Date, Seller shall file a petition for protection pursuant to Chapter 11 of the United States Bankruptcy Code, as amended. In the event that Seller has not filed such petition by 11:59 p.m. on October 4, 2011, Buyer may, at its option, terminate this Agreement and receive the return of its Deposit.

6.2   <u>Access</u>. Between the Effective Date hereof and the Closing Date, Buyer and its representatives shall, during regular business hours and upon reasonable notice, have access to business records and operations of Seller related to the Business and the Acquired Assets, provided, however, Buyer shall not unreasonably interfere with the business operations of Seller. Representatives of Seller and Buyer shall have weekly meetings to discuss ongoing progress with the publication calendar of Seller.

6.3   <u>Employees</u>. Buyer may, in its discretion, offer employment to employees of Seller, but Buyer shall not be responsible for any compensation or benefits, including payroll, employee benefits (e.g., pension, severance and insurance benefits), or severance, in respect of any employee of Seller relating to any period prior to the Closing. Seller shall be responsible for payment of all amounts due and owing to employees for periods prior to the Closing.

6.4   <u>Further Assurances</u>. In addition to the provisions of this Agreement, from time to time after the Closing Date, Seller and Buyer will use commercially reasonable efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other actions as may be necessary or reasonably requested to implement more effectively the transactions contemplated by this Agreement, and the conveyance and transfer of the Acquired Assets.

6.5   <u>Condition of the Acquired Assets</u>. Buyer agrees and acknowledges that (a) Buyer's decision to proceed with the transactions contemplated by this Agreement is based upon Buyer's own inspection and investigation of the Acquired Assets and the Business; (b) Buyer is familiar with the Acquired Assets and the Business and has been afforded the full opportunity, to the extent it desired to do so, to fully inspect and review (i) the books and records of Seller, (ii) the Acquired Assets, (iii) such other operational and financial information as Buyer has found appropriate, including sales, production, and employment matters; and (c) Buyer is satisfied with each of the foregoing matters, and will, at Closing, acquire the Acquired Assets,

7

without representation or warranty, express or implied, other than as set forth in Article IV of this Agreement (which will not survive the Closing), in their then AS-IS, WHERE-IS condition. This provision shall survive the Closing or earlier termination of this Agreement.

6.6     Assumption of Executory Contracts.  In the Sale Motion, Seller shall seek an order of the Court approving the assumption and assignment of all of the Assumed Contracts. The Sale Order shall provide that the assumption and assignment of the Assumed Contracts shall be free and clear of all Encumbrances, except for obligations of Buyer under Section 365 of the Bankruptcy Code.

6.7     Access to Information; Maintenance of Records.  At all times following the Closing, each party shall provide the other party (at such other party's expense) with such reasonable assistance, including the provision of available relevant records or other information and reasonable access to and cooperation of any employees, as may be reasonably requested by either of them, in connection with the preparation of any financial statement or tax return, any audit or examination by any taxing authority, or any judicial or administrative proceeding.

6.8     Exclusivity.  For a period of sixty (60) days following the Effective Date, neither FRC nor any of its representatives shall, directly or indirectly, communicate, solicit, initiate, entertain, encourage, or otherwise engage (including by way of furnishing any non-public information concerning the Business or the Acquired Assets) in any discussions or negotiations concerning the sale of the Acquired Assets outside the ordinary course of its business with any party other than Buyer; provided, however, such exclusivity shall be suspended upon entry of an Order of the Bankruptcy Court approving a break-up fee and bid procedures, but reinstated if such order is rescinded within such 60-day period for any reason other than breach by the Acquirer.  In the event that the Bankruptcy case is converted to a Chapter 7 case or a Sale Approval Order is entered by the Bankruptcy Court, the provisions of this Section 6.8 shall terminate immediately.

6.9     Indemnification by Robert Hedges.  Robert Hedges *("Mr. Hedges")* shall indemnify Buyer for damages suffered by Buyer, which directly arise from any intentional fraud committed by Mr. Hedges or John Murphy ( *"Mr. Murphy")* in the communication (written or verbal) to Buyer by Mr. Hedges or Mr. Murphy of information related to the Business or the Acquired Assets, including Seller's company documents, financials, schedules and work papers, product samples, communications to and/or from customers, senior management strategy, and operating plan documents, related to the Business and which Mr. Hedges knew to contain any untrue statement of a material fact, or which Mr. Hedges knew failed to state a material fact that would give rise to a material adverse change in the Business or the Acquired Assets.  If Buyer has received or hereafter receives any communication from Mr. Hedges or Mr. Murphy that Buyer believes presents incorrect information, Buyer shall promptly address such inaccuracy with Mr. Hedges for clarification; provided, however, that no delay on Buyer's part in notifying Mr. Hedges will relieve Mr. Hedges from his indemnification obligation, except to the extent such delay actually and materially prejudices Mr. Hedges.  For clarity, Mr. Hedges' indemnity shall not include claims arising from, or related to (a) Buyer's direct conversations with employees or agents of Seller (other than Mr. Hedges or Mr. Murphy) or written communications from employees or agents of Seller (other than Mr. Hedges or Mr. Murphy), or (b) sales and financial projections of the Business for which there are no assurances.

8

6.10    Restrictive Covenants.

(a)    In order to induce Buyer to purchase the Business and Acquired Assets pursuant to this Agreement, for a period of two (2) years from and after the Closing Date, each of Seller and each of Mr. Hedges and Teresa Epperson ( *"Ms. Epperson"* and, together with Mr. Hedges, the *"Principals"*) agrees, severally and not jointly, that he, she or it will not (i) engage, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, or otherwise, in all or any portion of the Business of Seller as conducted as of the Closing Date; and (ii) directly or indirectly, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in any other manner persuade or attempt to persuade, any Person who is an employee of Buyer to leave the employ of Buyer.  In no event shall the prohibition in clause (ii) of this Section 6.10(a) restrict either Principal hiring the other Principal and/or Mr. Murphy.

(b)    Each of Seller and the Principals hereby agrees, severally and not jointly, with Buyer that neither he, she, or it, nor any of his, hers, or its affiliates will, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of Buyer, disclose or use, any confidential or proprietary information involving or relating to the Business or the Acquired Assets; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information that (i) is at the time of disclosure or later becomes available to the public without violation of any of the obligations hereunder, (ii) after the date hereof is received by Seller or a Principal from a third party that is under no confidentiality obligation with respect thereto, or (iii) is independently developed without use of such information; and provided, further, that the provisions of this subsection (b) will not prohibit any retention of copies of records, or disclosure (A) required by any applicable legal requirement, provided that the disclosing party will provide reasonable prior notice to the other party of such disclosure, or (B) made in connection with the enforcement of any right or remedy relating to this Agreement or the transactions contemplated by this Agreement.

(c)    If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.10 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision without expanding upon it, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

6.11    Conduct of Business.  During the Interim Period, Seller shall exercise commercially reasonable efforts, in each case taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code, other than as permitted in writing by Buyer, to preserve, in all material respects, the Business and the Acquired Assets.  Seller shall regularly consult with Buyer on conduct of the Business prior to the Closing Date.  Without limiting the generality of the foregoing, prior to Closing Date, Seller shall:

(a)    not sell, lease (as lessor), transfer, or otherwise dispose of any of the Acquired Assets, other than sales of newsletters and other products comprising the Business in the ordinary course of business of Seller,

9

(b)     use good faith, commercially reasonable efforts to prevent the abandonment of any intellectual property comprising a portion of the Acquired Assets, taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code, unless Seller first obtains the written consent of Buyer approving any such abandonment, and

(c)     not, absent the written consent of Buyer, (i) in the case of the accounts receivable arising during the Interim Period, change the terms of such accounts receivable in a manner that is inconsistent with current practices, or (ii) in the case of all sales subsequent to the Effective Date, provide for any customer or type of customer terms for sales that are materially inconsistent with current practices for such customer or type of customer.

6.12    Certain Collections of Accounts Receivable.  For purposes of this Section 6.12, the accounts receivable of Seller pertaining to the Business and outstanding at Closing are referred to as the "***Outstanding Receivables***".  If a customer contacts Buyer following the Closing with respect to payment of an Outstanding Receivable, Buyer shall notify the customer to make payment thereof directly to Seller.  In the event Buyer receives any payment from a customer designated as payment of an Outstanding Receivable, such amount shall be remitted promptly to Seller.

**Article VII**
**Conditions to Seller's Obligations**

The obligation of Seller to consummate the transactions contemplated hereby is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 9.6 hereof:

7.1    Entry of Sale Approval Order.  The Sale Approval Order naming Buyer as the successful bidder shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.

7.2    Instruments of Conveyance.  Buyer shall have executed and delivered to Seller at the Closing all of the documents provided for in Section 3.2(b) hereof.

7.3    Absence of Litigation.  No court action or proceeding shall have been commenced to restrain or prohibit the transactions contemplated by this Agreement, or the acquisition by Buyer of the Acquired Assets.

7.4    Payment of the Purchase Price.  Buyer shall have paid the Purchase Price via wire transfer of immediately available funds, as adjusted, if at all, under this Agreement.

10

## Article VIII
## Conditions to Buyer's Obligations

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Buyer in accordance with Section 9.6 hereof:

8.1     Form and Content of Pleadings, Other Documents. Any provision of this Agreement to the contrary notwithstanding, all pleadings, orders, and other documents used in the proposed transaction shall have been in a form and substance reasonably satisfactory to Buyer.

8.2     Filing of Motions. Within two (2) Business Days following the Effective Date, Seller shall have filed an application for an order with the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, fixing the date of a hearing to consider the approval of each of the Bidding Procedures (as hereinafter defined) (the *"Bidding Procedures Motion"*) which shall contain the terms set forth in Section 9.1 below, and the sale of the Acquired Assets to Buyer pursuant to the terms of this Agreement (the *"Sale Motion"*).

8.3     Entry of Orders. Within fifteen (15) calendar day following the Effective Date, an Order approving the Bidding Procedures (the *"Bidding Procedures Order"*) shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer and implementing the terms of the Bidding Procedures Motion; and within thirty-eight (38) calendar days following the Effective Date, the Sale Approval Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer.

8.4     Absence of Litigation. No court of competent jurisdiction shall have entered an order staying the Sale Approval Order pending appeal or otherwise enjoining the consummation of the transactions contemplated by this Agreement.

8.5     Instruments of Conveyance. Seller shall have executed and delivered to Buyer at the Closing all of the documents provided for in Section 3.2(a) hereof.

8.6     Representation and Warranties. The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct at Closing in all material respects.

8.7     Conduct of Seller's Business. Between the Effective Date and the Closing Date, there shall have been no material adverse change in the operation of the Business. Solely for purposes of this Section 8.7, a material adverse change in the operation of the Business arises only if:

(a)     the total dollar amount of Customer Transactions during the Interim Period is less than $50,000.00; or

11

(b)     during the Interim Period, three (3) or more of the top ten (10) customers of the Business listed on Exhibit B terminate their entire business relationship with Seller in the product segments included in the Business.

8.8     Key Employees. Each of Lynette DeWitt, Larry Petrone, Paul Curley, and Kathy Marshall shall have terminated their employment with Seller and agreed upon mutually agreeable terms of employment with Buyer, so long as such terms include compensation and benefits comparable to those provided by Seller prior to the Closing.

## Article IX
## Miscellaneous

9.1     Bidding Procedures; Termination Fee.

(a)     Bidding Procedures. As set forth in Section 8.3, the Bankruptcy Court must enter the Bidding Procedures Order, on or prior to the dates specified in Section 8.3 above, expressly approving the following bidding procedures in connection with the purchase of assets of Seller upon the following terms and provisions (collectively, the *"Bidding Procedures"*):

(i)     Any competing bid, offer, plan of reorganization, or other arrangement shall be deemed to qualify as a competing bid (a *"Competing Bid"*) only if made upon terms and provisions as those set forth in this Agreement (or with non-material modifications thereto) by the execution of a form of this Agreement, and in respect of the sale and purchase of substantially all of the Acquired Assets and assumption of all of the Assumed Contracts and for an aggregate purchase price in an aggregate amount of at least ten percent (10%) in excess of the Purchase Price hereunder, as adjusted.

(ii)     The Bidding Procedures shall set a deadline for the submission of a Competing Bid which shall be 5:00 p.m. on the third (3rd) Business Day prior to the hearing on the Sale Motion.

(iii)     Any competing bidder must deliver a deposit to Seller in an amount equal to $50,000.00 at the time of submission of its Competing Bid and satisfy Seller of the bidder's ability to consummate the transaction.

(iv)     An Auction for the Acquired Assets shall be held only if there is a Competing Bid, and the Auction, if necessary, shall be conducted by the Bankruptcy Court at the time of the hearing on the Sale Approval Order. The Bidding Procedures shall provide that if there is no Competing Bid, then Buyer and Seller shall proceed to seek approval of the Sale Approval Order.

(v)     Only Persons that have submitted a timely qualified Competing Bid may participate in any Auction for the Acquired Assets. Anything herein to the contrary notwithstanding, Buyer may participate in any Auction.

(vi)     Bidding at any Auction for the Acquired Assets shall be conducted as an open bidding process, with any incremental bid made subsequent to the initial overbid to be at least $10,000.00 greater than the most recent bid.

01633171.DOCX\

(vii)    Buyer shall be entitled to improve its offer at any Auction for the Acquired Assets.

(b)    Termination Fee.  The Bidding Procedures Order shall approve the payment to Buyer of a termination fee (*"Termination Fee"*) in the event: (i) Seller accepts a Competing Bid, (ii) the Bankruptcy Court enters an order approving any counter-offer as the highest and best offer (other than a sale to Buyer), or (iii) Seller concludes a sale of the Business and Acquired Assets outside of the Bankruptcy Case to a third party that submitted a Competing Bid (each, a *"Competing Transaction"*).  The Termination Fee shall equal (a) the actual out-of-pocket costs and expenses incurred by Buyer in connection with the transactions contemplated hereby, before and after the Effective Date (including professionals' fees), up to an aggregate amount of $20,000.00, plus (b) $20,000.00.  The Bidding Procedures Order shall also provide, without limitation, that any Termination Fee shall only be paid from the proceeds from a Competing Transaction and within one (1) Business Day following the Closing of the Competing Transaction.

9.2    Termination.

(a)    Termination.  In addition to any other rights of termination of Buyer expressly provided in this Agreement, this Agreement may be terminated prior to the Closing:

(i)    by the mutual written consent of Buyer and Seller (subject to the approval of the Bankruptcy Court) at any time, in which case the Deposit and all interest thereon shall be returned to Buyer;

(ii)    by Buyer if (A) Buyer is not the winning bidder at the Auction, or (B) one or more of the conditions set forth in Article VIII is not satisfied on or before the date specified or the Closing Date (as the case may be) for any reason other than a breach of this Agreement by Buyer, or (C) the Sale Approval Order is not entered by the Bankruptcy Court on or before November 10, 2011, through no fault of Buyer, or (D) the Closing has not occurred on or before November 25, 2011, through no fault of Buyer, and in each such case the Deposit and any interest thereon shall be returned to Buyer;

(iii)    by Seller (A) if Buyer is not the winning bidder at the Auction, or (B) if the condition set forth in Section 7.3 is not satisfied on the Closing Date, or (C) if the Closing has not occurred on or before November 25, 2011, through no fault of Seller, and in each case the Deposit and any interest thereon shall be returned to Buyer;

(iv)    by Seller if the conditions set forth in Section 7.2 or Section 7.4 are not satisfied on or before the Closing Date (for any reason other than breach of this Agreement by Seller), or a breach of this Agreement by Buyer occurs, and in each case the Deposit and any interest thereon shall be paid to and retained by Seller for breach of this Agreement as liquidated damages.  The retention of the Deposit by Seller shall be Seller's sole and exclusive remedy in the event of any breach of this Agreement by Buyer.

(b)    Event of Termination; Remedies.  In the event of termination of this Agreement pursuant to Section 9.2(a):

13

01633171.DOCX\

(i)      all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made;

(ii)      each party shall return all documents, work papers, and other material of any other party, or those prepared by a party from the review of such documents, work papers and other material of the other party, relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same;

(iii)      no confidential information received by any party with respect to the business of any other party or its affiliates shall be used or disclosed to any third party, unless required by law; and

(iv)      Buyer shall be entitled to payment of the Termination Fee, to the extent the Termination Fee is payable under Section 9.1(b) and the Bidding Procedures Order.

9.3      Assignment; Successors.  Except for an assignment by Buyer to an affiliate of Buyer prior to Closing, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties to this Agreement.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any Chapter 11 or Chapter 7 trustee appointed in the Bankruptcy Case, and no other Person shall have any right, benefit, or obligation hereunder.

9.4      Notices.  All notices, requests, consents, demands, and other communications which are required or may be given under this Agreement shall be in writing and shall be delivered: (i) by hand delivery; (ii) by facsimile or telecopy(with written confirmation of delivery; (iii) by recognized overnight delivery service (including Federal Express); or (iv) by certified or registered mail, return receipt requested and postage prepaid.  In each case notice shall be sent to:

| | |
|---|---|
| If to Seller, addressed to: | FRC, LLC<br>One Faneuil Hall<br>Boston, MA 02110<br>Attn.: Robert Hedges<br>Fax: (617) 742-4410 |
| with a copy to: | Harold B. Murphy, Esq.<br>Murphy & King, P.C.<br>One Beacon Street<br>Boston, MA 02108<br>Fax: (617) 423-0498 |

14

If to Buyer, addressed to:    Asset International, Inc.
805 Third Avenue
New York, NY 10022
Attn.: Thomas L. Wright, CFO
Fax: (212) 644-8650

with a copy to:    David Amidon, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Fax: (617) 345-3299

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

9.5    <u>Choice of Law; Jurisdiction</u>. This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with the laws of The Commonwealth of Massachusetts (without regard to its conflicts of laws principles) and by the laws of the United States of America. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified in Section 9.4 in a manner provided for in Section 9.4. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such courts or any defense of inconvenient forum in connection therewith.

9.6    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. No amendment, supplement, modification, or waiver of this Agreement shall be binding unless executed in writing by on or behalf of the party to be bound thereby. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

9.7    <u>Construction</u>. The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement. All Exhibits and schedules attached are made a part hereof.

15

All terms defined herein shall have the same meaning in the exhibits, except as otherwise provided therein. The terms "hereby", "hereof", "hereto", "hereunder", and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The term "including" when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. Unless otherwise indicated, references to Articles and Sections refer to Articles and Sections of this Agreement.

      9.8    Third Party Beneficiaries. No Person other than the parties hereto, shall have any rights or claims under this Agreement.

      9.9    No Waiver. The failure or delay of either party hereto to seek redress for any breach, or to insist upon the strict performance of any covenant or condition of the Agreement by the other shall not be, or be deemed to be a waiver of the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. No waiver on the part of any party of any such right, power or privilege, and no single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege.

      9.10    Multiple Counterparts. This Agreement may be executed in one or more counterparts, which may be delivered electronically, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

      9.11    Invalidity. In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, then such provision shall remain valid and enforceable to the maximum extent permitted by law. Such invalidity, illegality, or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

      9.12    Publicity. Each party shall consult with the other prior to issuing any press release or otherwise making any public statements with respect to the transactions contemplated hereby, and no party shall issue any such press release or make any such public statements or comments relating to these transactions without the prior written consent of the other (which shall not be unreasonably withheld), except as may be required by applicable law or an Order of the Bankruptcy Court.

      9.13    Cumulative Remedies. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies, including the right to specific performance of the terms hereof, except in the circumstance of a breach of this Agreement by

01633171.DOCX\

Buyer in which event, Seller shall be entitled to retain the deposit as liquidated damages and as Seller's sole and exclusive remedy at law or equity.

9.14   <u>Representation by Counsel; Mutual Negotiation</u>.   Each party has been represented by counsel of its choice in negotiating this Agreement.   This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the parties, at arm's length with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

9.15   <u>Time</u>.   Time is of the essence in respect of all matters under this Agreement.

*[Signatures follow on next page]*

17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

**FRC LLC**

By: _____
    Name:   Robert Hedges, Manager

**Asset International, Inc.**

By: _____
    Name:   Jim Casella
    Title:    President / CEO

By: _____
    Name:   Thomas L. Wright
    Title:    Chief Financial Officer

The undersigned executes this Agreement solely for purposes of his obligations and undertakings under Sections 6.9 and 6.10 of this Agreement.

_____
Robert Hedges, individually

The undersigned executes this Agreement solely for purposes of her obligations and undertakings under Section 6.10 of this Agreement.

_____
Teresa Epperson, individually

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

FRC LLC

By: _____
Name:   Robert Hedges, Manager

Asset International, Inc.

By: _____
Name:   Jim Casella
Title:   President / CEO

By: _____
Name:   Thomas L. Wright
Title:   Chief Financial Officer

Each of the undersigned executes this Agreement solely for purposes of his/her obligations and undertakings under Section 6.9 of this Agreement.

_____
Robert Hedges, individually

_____
Teresa Epperson, individually

18

0603171.DOCX\

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

**FRC LLC**

By: _____
    Name:   Robert Hedges, Manager

**Asset International, Inc.**

By: _____
    Name:   Jim Casella
    Title:    President / CEO

By: _____
    Name:   Thomas L. Wright
    Title:    Chief Financial Officer

The undersigned executes this Agreement solely for purposes of his obligations and undertakings under Section 6.9 and 6.10 of this Agreement.

_____
Robert Hedges, individually

The undersigned executes this Agreement solely for purposes of her obligations and undertakings under Section 6.10 of this Agreement.

_____
Teresa Epperson, individually

# EXHIBIT A
## Acquired Assets[1]

1.    <u>Assumed Contracts</u>.  All of the rights of Seller under the following Assumed Contracts (including all goodwill associated therewith), but limited to Seller's rights therein solely for periods following the Closing:

    (a)   <u>Customer Contracts</u>.

       (i)   Attached hereto as <u>Annex 1(a)(i)</u> is a correct and complete list of all contracts with customers of the Business for products of the Business as of the Effective Date (***"Customer Contracts"***).  This list will be updated during the Interim Period and through and including the Closing Date to reflect (a) additions thereto, arising during the Interim Period, in the ordinary course of the Business and (b) expirations during the Interim Period.

    (b)   <u>Data Contracts / Licenses</u>.

       (i)   Attached hereto as <u>Annex 1(b)(i)</u> is a correct and complete copy of that certain Subscription Agreement & Data Feed Product License, dated as of April 1, 2010, by and between FRC and NewRiver, Inc.

    (c)   <u>Equipment Lease(s)</u>.

       (i)   Attached hereto as <u>Annex 1(c)(i)</u> is a correct and complete copy of that certain Equipment Lease Agreement (#38934), dated as of March 16, 2009, by and between FRC and CoActiv Capital Partners, Inc. [unsigned by counter-party CoActiv]

       (ii)   Attached hereto as <u>Annex 1(c)(ii)</u> is a correct and complete copy of that certain Equipment Lease Agreement (#39373), dated as of March 23, 2009, by and between FRC and CoActiv Capital Partners, Inc. [unsigned by counter-party CoActiv]

    (d)   <u>Other Assumed Contracts</u>.

       (i)   Attached hereto as <u>Annex 1(d)(i)</u> is a correct and complete copy of that certain Hosting Services Agreement, dated as of March 18, 2009, by and between FRC (as successor-in-interest to Channel Mining) and Rackspace US, Inc.

---

[1] The parties acknowledge that the below description of the Acquired Assets is necessarily broad, intended to capture the intent that the Business is being sold to Buyer on a going-concern basis, but that in some instances, Seller may not have possession of certain assets that would fall within the below definition (e.g., historical data that no longer exists). So, Seller's obligation to deliver the Acquired Assets shall be limited to that portion of the Acquired Assets in Seller's possession, after due inquiry and review of its business records and operations.

    (ii)      Attached hereto as <u>Annex 1(d)(ii)</u> is a correct and complete copy of the documentation comprising that certain CSF Quarterly Collection Data & Analysis Relationship, dated as of March 10, 2010.

    (iii)      Attached hereto as <u>Annex 1(d)(iii)</u> is the most recent invoice reflecting the extant hosting arrangement with Interactive Palette, Inc., for the three (3) web sites comprising a portion of the Acquired Assets. This arrangement is quarter-to-quarter, and contemplates an aggregate quarterly hosting fee of approximately $75.00.

2.    <u>Other Acquired Assets</u>: All rights of Seller in and to the following assets:

    (a)    Seller's current legal name, "FRC, LLC", Seller's trade name, "Financial Research Corporation", and all goodwill associated therewith.

    (b)    Any registered and unregistered trademarks and service marks, and any goodwill associated with:

        (i)      Monitor (excluding any content included in the Excluded Assets)

        (ii)      Investment – Mutual Funds; for clarity Seller's *Mutual Fund Quarterly Market Review* and *Mutual Fund Quarterly Sales Review* are excluded.

        (iii)      Mutual Fund Lifecycle Quarterly Review

        (iv)      Seller's one-off Mutual Fund Research Reports.

        (v)      529 College Savings

        (vi)      529 Quarterly Quantitative Review

        (vii)      529 Quarterly Qualitative Review

        (viii)      529 Quarterly Fee Review

        (ix)      Seller's one-off 529 Research Reports.

        (x)      Investments – Subadvisory

        (xi)      Subadvisory Semi-Annual Data Book

        (xii)      Subadvisory Quarterly Review

        (xiii)      Subadvisory Mandate Change Report

        (xiv)      Seller's one-off Subadvisory Research Reports.

        (xv)      Alternatives

2

      (xvi)   Alternatives Quarterly Review

      (xvii)  Seller's one-off Alternatives Research Reports.

(c)     The following FRC-branded web sites, URLs, and Internet domain names, all of the associated content on all such web sites related to the Business, and all goodwill associated therewith:

      (i)     Frcnet.com

      (ii)    FRClibrary.com

      (iii)   FRCimpact.com

In some cases, content on the foregoing web sites may include that which is related to the Business and that which is not related to the Business. During the Interim Period, Seller and Buyer will cooperate to identify any items which are not part of the Acquired Assets and which will be retained by Seller or otherwise removed from the FRClibrary.com web site, and develop a plan to migrate any such unrelated content from the FRClibrary.com web site promptly following the Closing, all in a manner reasonably intended to minimize, if not eliminate disruption to, or confusion within the Business segments.

(d)     One (1) Dell minitower PC with 2 monitors; all software (including all internal- and customer-facing database tools, data, and source code related to the Business), and all available passwords and other access and operation protocols required to run the Business processes (e.g., access data) related to the Business and/or the Acquired Assets, residing on such Dell minitower or on equipment (including computers and/or storage devices) leased under the Assumed Contracts; and including the data, technology, and source code related to Seller's database product.

(e)     All historical and/or previously-published data and research for the product segments included in the Business (the *"Assigned Research"*) and all goodwill associated with the Assigned Research, and associated back-up and source data, research processes, and intellectual property rights;

(f)     All past and present contact information for, billing history of, and correspondence with data providers of the Business;

(g)     All past and present contact information for, billing history of, and correspondence with, customers of the Business, including records of products to be delivered, and all written materials describing prospects and marketing leads, including contact information and products of the Business being marketed to such prospects and marketing leads.

(h)     All financial data related to the operation of the Business, including all e-mail archives related to the Business.

3

(i)     All other intellectual property assets, not otherwise enumerated herein, required to run the Business, as may be designated by Buyer and agreed to and reasonably deliverable by Seller (such agreement not to be unreasonably withheld, delayed, or conditioned).

4

**Annex 1(a)(i) to EXHIBIT A**
**CUSTOMER CONTRACTS**

| Doc Num | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| SO100477 | | | | |
| 9/30/2010 | ING US Financial Services | CSV-QUPDATE | $ 3,750.00 | 9/30/2011 |
| 9/30/2010 | ING US Financial Services | FRC-MONITOR | $ 7,500.00 | 9/30/2011 |
| 9/30/2010 | ING US Financial Services | MUF-LIFECYCLE | $ 3,750.00 | 9/30/2011 |
| SO100481 | | | | |
| 10/4/2010 | Credit Suisse | FRC-MONITOR | $ 7,000.00 | 9/30/2011 |
| SO100483 | | | | |
| 10/19/2010 | Pershing | CSV-DUPDATE | $ 7,500.00 | 9/30/2011 |
| 10/19/2010 | Pershing | CSV-QUPDATE | $ 7,500.00 | 9/30/2011 |
| SO100484 | | | | |
| 10/20/2010 | Pacific Life Insurance Company | MUF-LIFECYCLE | $ 8,500.00 | 11/30/2011 |
| SO100519 | | | | |
| 12/6/2010 | Principal Financial Group | MUF-LIFECYCLE | $ 6,800.00 | 12/1/2011 |
| 12/6/2010 | Principal Financial Group | SUB-QUARTERLY | $ 6,800.00 | 12/1/2011 |
| 12/6/2010 | Principal Financial Group | FRC-MONITOR | $ 5,500.00 | 12/31/2011 |
| SO100491 | | | | |
| 11/11/2010 | Nationwide Financial Services | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| SO100509 | | | | |
| 11/30/2010 | UBS Global Asset Management | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 11/30/2010 | UBS Global Asset Management | MUF-LIFECYCLE | $ 8,500.00 | 12/31/2011 |
| SO100529 | | | | |
| 12/20/2010 | MFS Investment Management | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| SO100488 | | | | |
| 11/2/2010 | Vanguard Group Inc. | CSV-DUPDATE | $ 3,300.00 | 12/31/2011 |
| 11/2/2010 | Vanguard Group Inc. | CSV-QUPDATE | $ 3,300.00 | 12/31/2011 |
| SO100502 | | | | |
| 11/17/2010 | Upromise Investments, Inc. | CSV-DUPDATE | $ 5,000.00 | 11/30/2011 |
| SO100518 | | | | |
| 12/6/2010 | Calvert Group | FRC-MONITOR | $ 3,900.00 | 12/31/2011 |
| SO100528 | | | | |
| 12/20/2010 | Hartford (The) | CSV-DUPDATE | $ 4,500.00 | 12/31/2011 |
| 12/20/2010 | Hartford (The) | CSV-QUPDATE | $ 4,500.00 | 12/31/2011 |
| SO100531 | | | | |
| 12/23/2010 | Wellington Management | FRC-MONITOR | $ 8,000.00 | 12/31/2011 |
| SO100534 | | | | |
| 1/6/2011 | T. Rowe Price | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| SO100535 | | | | |
| 1/7/2011 | DWS Investments | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| SO100537 | | | | |
| 1/10/2011 | Vanguard Group Inc. | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| SO100543 | | | | |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | SUB-MNDTCHG | $ - | 12/31/2011 |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | SUB-QUARTERLY | $ 10,000.00 | 12/31/2011 |
| SO100547 | | | | |
| 1/25/2011 | Fidelity Consulting Group | CSV-DUPDATE | $ 6,750.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | CSV-QUPDATE | $ 6,750.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | MUF-LIFECYCLE | $ 9,000.00 | 12/31/2011 |
| SO100549 | | | | |
| 1/28/2011 | TIAA-CREF | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| SO100538 | | | | |
| 1/12/2011 | ING US Financial Services : ING Investment Management Gr | FRC-MONITOR | $ 10,000.00 | 1/31/2012 |
| SO100536 | | | | |
| 1/7/2011 | Merrill Lynch Retirement Group | CSV-DUPDATE | $ 6,250.00 | 2/28/2012 |
| 1/7/2011 | Merrill Lynch Retirement Group | CSV-QUPDATE | $ 6,250.00 | 2/28/2012 |
| 1/7/2011 | Merrill Lynch Retirement Group | CSV-VIEWS | $ 3,000.00 | 2/28/2012 |
| SO100542 | | | | |
| 1/19/2011 | Janus Capital Group | FRC-MONITOR | $ 10,000.00 | |
| SO100565 | | | | |
| 3/8/2011 | BlackRock\iShares | CSV-DUPDATE | $ 6,000.00 | 12/31/2011 |
| 3/8/2011 | BlackRock\iShares | CSV-QUPDATE | $ 6,000.00 | 12/31/2011 |
| SO100581 | | | | |
| 3/28/2011 | First National Bank of Omaha | CSV-DUPDATE | $ 3,750.00 | 3/30/2012 |
| 3/28/2011 | First National Bank of Omaha | CSV-QUPDATE | $ 3,750.00 | 3/30/2012 |

Rev. 4:15 PM 10/3/2011

| Doc Num | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| SO100563 | | | | |
| 3/1/2011 | State Farm Insurance Company | FRC-MONITOR | $ 7,500.00 | 3/31/2012 |
| SO100567 | | | | |
| 3/9/2011 | Putnam Investments | CSV-DUPDATE | $ 5,000.00 | 4/30/2011 |
| 3/9/2011 | Putnam Investments | CSV-DUPDATE | $ 5,000.00 | 4/30/2011 |
| SO100569 | | | | |
| 3/10/2011 | AllianceBernstein Investment | CSV-DUPDATE | $ 5,000.00 | 3/31/2012 |
| 3/10/2011 | AllianceBernstein Investment | CSV-QUARTERLYFEE | $ 10,000.00 | 3/31/2012 |
| 3/10/2011 | AllianceBernstein Investment | CSV-QUPDATE | $ 5,000.00 | 3/31/2012 |
| SO100582 | | | | |
| 3/28/2011 | John Hancock Funds, Inc. | CSV-DUPDATE | $ 7,500.00 | 3/31/2012 |
| 3/28/2011 | John Hancock Funds, Inc. | CSV-QUPDATE | $ 7,500.00 | 3/31/2012 |
| SO100586 | | | | |
| 4/4/2011 | Ohio Tuition Trust Authority | CSV-DUPDATE | $ 5,250.00 | 3/31/2012 |
| SO100587 | | | | |
| 4/6/2011 | Columbia Management Group | CSV-DUPDATE | $ 6,750.00 | 3/31/2012 |
| 4/6/2011 | Columbia Management Group | CSV-QUARTERLYFEE | $ 13,500.00 | 3/31/2012 |
| 4/6/2011 | Columbia Management Group | CSV-QUPDATE | $ 6,750.00 | 3/31/2012 |
| SO100517 | | | | |
| 12/6/2010 | American Century Companies | 529 Quarterly Qualitative Update | $ 10,000.00 | 3/31/2012 |
| 12/6/2010 | American Century Companies | 529 Views on the News | $ 3,000.00 | 3/31/2012 |
| 12/6/2010 | American Century Companies | Sub Advisory Quarterly Update | $ 10,000.00 | 3/31/2012 |
| SO100593 | | | | |
| 5/6/2011 | OppenheimerFunds, Inc. | CSV-QUARTERLYFEE | $ 3,500.00 | 12/31/2011 |
| 5/6/2011 | OppenheimerFunds, Inc. | CSV-DUPDATE | $ 7,500.00 | 6/30/2012 |
| 5/6/2011 | OppenheimerFunds, Inc. | CSV-QUPDATE | $ 7,500.00 | 6/30/2012 |
| SO100604 | | | | |
| 5/23/2011 | Legg Mason, Inc. | CSV-DUPDATE | $ 6,375.00 | 3/31/2012 |
| 5/23/2011 | Legg Mason, Inc. | CSV-QUARTERLYFEE | $ 12,750.00 | 3/31/2012 |
| 5/23/2011 | Legg Mason, Inc. | CSV-QUPDATE | $ 6,375.00 | 3/31/2012 |
| 5/23/2011 | Legg Mason, Inc. | FRC-MONITOR | $ 8,500.00 | 3/31/2012 |
| SO100595 | | | | |
| 5/9/2011 | BMO Bank of Montreal | FRC-MONITOR | $ 10,000.00 | 5/31/2012 |
| SO100597 | | | | |
| 5/9/2011 | Transamerica Capital Inc. | SUB-QUARTERLY | $ 10,000.00 | 5/31/2012 |
| SO100612 | | | | |
| 5/31/2011 | Union Bank & Trust Company | CSV-DUPDATE | $ 4,500.00 | 9/30/2012 |
| 5/31/2011 | Union Bank & Trust Company | CSV-QUPDATE | $ 4,500.00 | 9/30/2012 |
| SO100611 | | | | |
| 5/27/2011 | Jennison Associates LLC | SUB-QUARTERLY | $ 8,000.00 | 10/1/2012 |
| SO100605 | | | | |
| 5/23/2011 | Capital Group Companies, Inc. | CSV-DUPDATE | $ 7,500.00 | 10/31/2012 |
| SO100606 | | | | |
| 5/23/2011 | Putnam Investments | FRC-MONITOR | $ 10,000.00 | 10/31/2012 |
| SO100609 | | | | |
| 5/24/2011 | Capital Group Companies, Inc. | FRC-MONITOR | $ 6,500.00 | 10/31/2012 |
| SO100613 | | | | |
| 5/31/2011 | Franklin Templeton Investments | CSV-DUPDATE | $ 7,500.00 | 10/31/2012 |
| SO100624 | | | | |
| 6/16/2011 | T. Rowe Price | CSV-QUPDATE | $ 6,000.00 | 5/30/2012 |
| SO100627 | | | | |
| 6/16/2011 | T. Rowe Price | MUF-LIFECYCLE | $ 7,500.00 | 5/30/2012 |
| SO100629 | | | | |
| 6/16/2011 | T. Rowe Price | CSV-DUPDATE | $ 6,000.00 | 5/30/2012 |
| SO100616 | | | | |
| 6/3/2011 | Virginia College Savings Plan | CSV-DUPDATE | $ 4,875.00 | 6/30/2012 |
| 6/3/2011 | Virginia College Savings Plan | CSV-QUPDATE | $ 4,875.00 | 6/30/2012 |
| SO100617 | | | | |
| 6/6/2011 | Hatteras Funds | ALTERNATIVES-QUPDATE | $ 4,000.00 | 3/31/2012 |
| SO100639 | | | | |
| 6/30/2011 | TIAA-CREF | CSV-DUPDATE | $ 6,000.00 | 12/1/2012 |
| 6/30/2011 | TIAA-CREF | CSV-QUPDATE | $ 6,000.00 | 12/1/2012 |
| SO100635 | | | | |
| 6/29/2011 | Fidelity Consulting Group | ALTERNATIVES-QUPDATE | $ 4,687.50 | 6/30/2012 |
| SO100644 | | | | |

Rev. 4:15 PM 10/3/2011

| Doc Num | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| 7/13/2011 | First Trust Advisors L.P. | ALTERNATIVES-QUPDATE | $ 6,000.00 | 6/30/2012 |
| 7/13/2011 | First Trust Advisors L.P. | FRC-MONITOR | $ 6,000.00 | 7/31/2012 |
| SO100650 | | | | |
| 7/21/2011 | Hartford (The) | FRC-MONITOR | $ 9,000.00 | 8/31/2012 |
| SO100653 | | | | |
| 7/25/2011 | PNC Financial Services Group Inc. | FRC-MONITOR | $ 10,000.00 | 8/31/2012 |
| SO100665 | | | | |
| 8/16/2011 | Pershing | CSV-DUPDATE | $ 7,500.00 | 9/30/2012 |
| 8/16/2011 | Pershing | CSV-QUPDATE | $ 7,500.00 | 9/30/2012 |
| SO100678 | | | | |
| 9/19/2011 | Jackson National Life | ALTERNATIVES-QUPDATE | $ 10,000.00 | 9/30/2012 |
| SO100683 | | | | |
| 9/22/2011 | John Hancock Funds, Inc. | MUF-LIFECYCLE | $ 9,000.00 | 9/30/2012 |
| | | | $ 623,787.50 | |

Rev. 4:15 PM 10/3/2011

**Annex 1(b)(i) to EXHIBIT A**
**Subscription Agreement & Data Feed Product License (NewRiver, Inc.)**

**Annex 1(c)(i) to EXHIBIT A**
**CoActiv Equipment Lease (#38934)**

01633986.DOCX\

**Annex 1(c)(ii) to EXHIBIT A**
**CoActiv Equipment Lease (#39373)**

01633986.DOCX\

**Annex 1(d)(i) to EXHIBIT A**
**Rackspace Hosting Services Agreement**

01633986.DOCX\

**Annex 1(d)(ii) to EXHIBIT A**
**CSF Quarterly Collection Data & Analysis Relationship**

**Annex 1(d)(iii) to EXHIBIT A**
**Interactive Palette Hosting Arrangement**

**EXHIBIT B**
**TOP 10 CUSTOMERS**

1.  Fidelity

2.  Legg Mason

3.  Columbia Management Group

4.  American Century

5.  Alliance Bernstein

6.  GE Asset Management

7.  T Rowe Price

8.  Principal Financial Group

9.  TIAA CREF

10. Putnam Investment