## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
#### (Eastern Division)

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| **FRC, LLC,** | ) | **Case No. 11-19466** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

## ORDER (I) AUTHORIZING THE SALE OF CERTAIN BUSINESS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated October 4, 2011 (the "Sale

Motion")[1] (Docket No. 2), of Debtor FRC, LLC (the "Debtor") for, among other things, the entry

of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004 and

6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1,

2002-5 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

District of Massachusetts (i) authorizing and approving the Asset Purchase Agreement, dated as

of October 3, 2011, as amended by that certain Amendment #1 To Asset Purchase Agreement

dated November 17, 2011 (including all exhibits, schedules and ancillary agreements related

thereto, the "Agreement"), substantially in the form attached hereto as Exhibit 1, by and between

Asset International, Inc., as purchaser (the "Purchaser"), and the Debtor, as seller, whereby the

---

[1]    Unless otherwise stated, all capitalized terms not defined herein shall have the meanings ascribed to them in the
Sale Motion.

Debtor and the Purchaser have agreed (a) that the Debtor will sell to Purchaser, and Purchaser

has agreed to purchase from the Debtor the "Acquired Assets" (as defined in the Agreement);

(b) the Debtor will assume and assign to the Purchaser, and the Purchaser will assume the

"Assumed Contracts" (as defined in the Agreement) (collectively, the "Sale Transaction"),

(ii) authorizing and approving the sale by the Debtor of the Acquired Assets, free and clear of all

liens, claims, encumbrances and interests (other than liabilities expressly assumed by the

Purchaser pursuant to the Agreement (the "Assumed Liabilities")), (iii) authorizing the

assumption and assignment to the Purchaser of the Assumed Contracts identified on Exhibit 2 to

this Sale Order in connection with the Sale Transaction, and (iv) granting other related relief; the

Debtor and the Purchaser having executed the Amendment #1 To Asset Purchase Agreement

limiting adjustments to the purchase price provided in the Agreement such that said purchase

price shall not be less than $300,000.00; the Court having conducted a hearing on the Sale

Motion on November 18, 2011 (the "Sale Hearing") at which time all interested parties were

offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed

and considered (A) the Sale Motion and all of the exhibits thereto, (B) the Agreement attached

hereto as Exhibit 1, (C) this Court's prior order (Docket No. 40), dated October 17, 2011 (the

"Sale Procedures Order") approving certain procedures for the sale of the Acquired Assets (the

"Sale Procedures"), (D) any objections to the Sale Motion, the Agreement, or the Sale

Transaction filed in accordance with the Sale Procedures Order, and (E) the arguments of

counsel made, and the evidence proffered or adduced, at the Sale Hearing; and due notice of the

Sale Motion and the Sale Procedures Order having been provided to all parties who requested or

are entitled to such notice; and the Court having concluded that the relief requested in the Sale

Motion is in the best interests of the Debtor in this chapter 11 case, its estate and creditors, and

2

all other parties in interest; and upon the complete record of the Sale Hearing and this chapter 11

case; and after due deliberation thereon; and good cause appearing therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

A.     This Court has jurisdiction over the Sale Motion, the transactions

contemplated by the Agreement and all other ancillary documents and agreements related thereto

pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This matter is a core proceeding pursuant to 28

U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue of this case and the Sale Motion in this district is

proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Sale Order constitutes a final and appealable order within the

meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the

Court expressly finds that there is no just reason for delay in the implementation of this Sale

Order, and expressly directs entry of judgment as set forth herein.

C.     The statutory predicates for the relief sought in the Sale Motion are

sections 105(a), 363(b), (f) and (m) and 365(a), (b) and (f) of the Bankruptcy Code and

Bankruptcy Rules 2002, 6004 and 6006.

### SOUND BUSINESS PURPOSE

D.     The Debtor seeks to convey the Acquired Assets.

E.     The Debtor has demonstrated, and the Agreement reflects, both (1) good,

sufficient, and sound business purposes and justifications for the Sale Transaction, and

(2) compelling circumstances for the Sale Transaction outside of the ordinary course of the

Debtor's business pursuant to Section 363(b) of the Bankruptcy Code prior to, and outside of, a

plan of reorganization inasmuch as the value to be obtained as a result of the Sale Transaction

#612238

3

will maximize the value of the Debtor's estate for the benefit of all creditors. Accordingly, time is of the essence in consummating the Sale Transaction.

F.     The consummation of the Sale Transaction pursuant to the Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan of reorganization of the Debtor. The Sale Transaction does not constitute a *sub rosa* or *de facto* plan of reorganization.

G.     The Agreement was not entered into, and neither the Debtor nor the Purchaser have entered into the Agreement or propose to consummate the Sale Transaction, for the purpose of hindering, delaying or defrauding the Debtor's creditors. Neither the Debtor nor the Purchaser has entered into the Agreement or propose to consummate the Sale Transaction fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory or possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

## HIGHEST AND BEST OFFERS

H.     On October 17, 2011, this Court entered the Sale Procedures Order approving the Sale Procedures for the Acquired Assets. The Sale Procedures provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets. The Debtors and the Purchaser complied with the Sale Procedures Order in all respects.

I.     As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing, (1) the Debtor has adequately marketed the Acquired Assets for sale; (2) the purchase price contained in the Agreement constitutes the highest and otherwise best offer for the Acquired Assets and provides fair and reasonable consideration for the Acquired

#612238

4

Assets; (3) the Sale Transaction will provide a greater recovery for the Debtor's creditors than would be provided by any other practically available alternative including, without limitation, liquidation under chapter 7 or chapter 11 of the Bankruptcy Code; (4) the Sale Transaction under Section 363 of the Bankruptcy Code is preferable to a sale under a plan of reorganization because, among other reasons, there is no assurance that the Purchaser will be willing to await the outcome of a lengthy plan confirmation process and hearing; (5) a private sale of the Acquired Assets pursuant to the Sale Transaction is more efficient and will generate a greater recovery than a public sale and, therefore, is in the best interests of the Debtor's estate; (6) no other party has offered to purchase the Acquired Assets for greater economic value to the Debtor or its estate; and (7) the Agreement and the consideration to be paid by the Purchaser under the Agreement constitute reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia. The Debtor's determination that the Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

## BEST INTERESTS OF CREDITORS

J.      Approval of the Agreement and the consummation of the Sale Transaction to the Purchaser at this time are in the best interests of the Debtor, its creditors, its estate and other parties in interest in this chapter 11 case.

## GOOD FAITH

K.      The Purchaser is not an "insider" of the Debtor, as that term is defined by Section 101(31) of the Bankruptcy Code.

L.     The Agreement and each of the transactions contemplated therein were

negotiated, proposed and entered into by the Debtor and the Purchaser in good faith, without

collusion and from arm's-length bargaining positions.  The Purchaser has proceeded in good

faith in all respects in connection with this proceeding, is a "good faith purchaser" within the

meaning of section 363(m) of the Bankruptcy Code in that, among other things (a) the Purchaser

recognized that the Debtor was free to deal with any other party interested in acquiring the

Acquired Assets; (b) the Purchaser agreed to provisions in the Notice of Private Sale that

subjected the Agreement and the Sale Transaction to higher and better offers; (c) all payments to

be made by the Purchaser, and other agreements or arrangements entered into by the Purchaser in

connection with the transactions set forth in the Agreement, have been disclosed; (d) the

Purchaser has not violated 11 U.S.C. § 363(n) by any action or inaction; (e) the Purchaser is a

third-party purchaser unrelated to the Debtor; and (f) the negotiation and execution of the

Agreement and any other agreements or instruments related thereto were without collusion, from

arm's-length bargaining positions, and in good faith and, as such, is entitled to all the protections

afforded thereby.  Neither the Debtor nor the Purchaser have engaged in any conduct that would

cause or permit the Agreement to be avoided; that would tend to hinder or delay creditors; or

impose costs and damages under Section 363(n) of the Bankruptcy Code.

### NOTICE OF THE SALE MOTION, THE AUCTION AND THE CURE AMOUNTS

M.     As evidenced by the certificates of service filed with the Court, (1) proper,

timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided

by the Debtor; (2) such notice was good, sufficient and appropriate under the particular

circumstances of this case; and (3) no other or further notice of the Sale Motion, the proposed

Sale Transaction, the Sale Procedures, or the Sale Hearing is necessary or shall be required.  A

#612238

6

reasonable opportunity to object or be heard with respect to the Sale Motion and the relief

requested therein has been afforded to all interested persons and entities.

N.    With regard to (1) all parties who have claims against the Debtor but

whose identities are not reasonably ascertainable by the Debtor, and (2) all other persons or

entities, the Court finds that notice of the Sale Transaction was sufficient and reasonably

calculated under the circumstances to reach such parties, persons and entities.

O.    In accordance with the provisions of the Sales Procedures Order, the

Debtor has served notice of its intent to assume and assign the Assumed Contracts and of the

related proposed Cure Costs (the "Contract and Cure Schedule") upon each non-Debtor

counterparty to the Assumed Contracts. The service of such notice was good, sufficient and

appropriate under the circumstances and no further notice need be given with respect to the Cure

Costs for the Assumed Contracts listed in the Contract and Cure Schedule and the assumption

and assignment of the Assumed Contracts. All non-Debtor parties to the Assumed Contracts

have had an opportunity to object to both the Cure Costs listed in the Contract and Cure

Schedule and the assumption and assignment of the Assumed Contracts (including objections

related to adequate assurance of future performance and objections based on whether applicable

law excuses the non-debtor counterparty to each such contract from accepting performance by,

or rendering performance to, the Purchaser for purposes of Section 365(c)(1) of the Bankruptcy

Code).

### SECTION 363(f) REQUIREMENTS MET FOR FREE AND CLEAR SALES

P.    The Debtors may sell the Acquired Assets free and clear of all liens,

claims, interests and Encumbrances (as defined below) of any kind or nature whatsoever (except

for any Assumed Liabilities), because, in each case, one or more of the standards set forth in

7

#612238

Sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. "Encumbrance" and "Encumbrances" means any claim (as that term is defined in Section 101(5) of the Bankruptcy Code), community property interest, condition, equitable interest, lien (statutory or otherwise), license, option, mortgage, pledge, encumbrance, easement, covenant, right of way or similar restrictions, security interest, restriction under any applicable bulk sales law, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and including easements, covenants, rights of way and other similar restrictions, mortgage, pledge, security interest, encumbrance, tax, charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against Seller, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such creditor had prior to the Sale Transaction, subject to any defenses of the Debtor.

Q.     The Debtor is the sole and lawful owner of the Acquired Assets and no other person has any ownership right, title or interest therein.

R.     All holders of Encumbrances are adequately protected, and the Sale Transaction thus satisfies Section 363(e) of the Bankruptcy Code, by having their Encumbrances,

8

if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property

against which they have an Encumbrances, in the same order of priority and with the same

validity, force and effect that such Encumbrance-holder had prior to the Sale Transaction, subject

to any rights, claims and defenses of the Debtor and its estate.

S.     The Purchaser would not have entered into the Agreement and would not

consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate

and its creditors, if the sale of the Acquired Assets were not free and clear of all Encumbrances

other than Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any

such Encumbrances.

T.     Except for the Assumed Liabilities, the Sale Transaction shall not impose

or result in the imposition of any liability or responsibility on the Purchaser or its affiliates,

successors or assigns or any of their assets (including the Acquired Assets), and the transfer of

the Acquired Assets to the Purchaser does not and will not subject the Purchaser or its affiliates,

successors or assigns or any of their assets (including the Acquired Assets), to any liability for

any Encumbrances including, without limitation, successor liability or any products liability.

## ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

U.     The Purchaser would not have entered into the Agreement, and will not

consummate the transactions contemplated thereby, if it could not be assigned certain executory

contracts and unexpired leases of the Debtor, i.e., the Assumed Contracts.  The assumption and

assignment of the Assumed Contracts are integral to the Agreement, are in the best interests of

the Debtor and its estate, and represents the reasonable exercise of the Debtor's sound business

judgment.

#612238

V.       With respect to the assumption and assignment of each of the Assumed

Contracts, the Debtor has met all requirements of Section 365(b) of the Bankruptcy Code.

Further, the Purchaser has provided all necessary adequate assurance of future performance

under the Assumed Contracts in satisfaction of Sections 365(b) and 365(f) of the Bankruptcy

Code.  Accordingly, the Assumed Contracts can be assumed by the Debtor and assigned to the

Purchaser, as provided for in the Sale Procedures Order, the Sale Motion and the Agreement.

These procedures are found to be fair and reasonable to parties to the Assumed Contracts.

### VALIDITY OF THE TRANSFER

W.       As of the closing of the Sale Transaction (the "Closing"), the transfer of

the Acquired Assets to the Purchaser will be a full and final legal, valid, and effective transfer of

the Acquired Assets, and will vest the Purchaser with all right, title and interest in and to the

Acquired Assets, free and clear of (1) all Encumbrances other than Assumed Liabilities, and

(2) all debts arising under or out of, in connection with, or in any way relating to, any acts of the

Debtor, claims (as that term is defined in Section 101(5) of the Bankruptcy Code), rights or

causes of action (whether in law or in equity, including, but not limited to, any rights or causes of

action based on theories of transferee or successor liability under any law, statute, rule or

regulation of the United States, any state, territory, or possession thereof or the District of

Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions,

interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to

the commencement of these cases, and whether imposed by agreement, understanding, law,

equity or otherwise.

X.       The Debtor (1) has full corporate power and authority to execute the

Agreement and all other documents contemplated thereby, and the Sale Transaction has been

duly and validly authorized by all necessary corporate action of the Debtor, (2) has all of the

corporate power and authority necessary to consummate the transactions contemplated by the

Agreement, (3) has taken all actions necessary to authorize and approve the Agreement and the

consummation by the Debtor of the transactions contemplated thereby and (4) no consents or

approvals, other than those expressly provided for in the Agreement, are required for the Debtor

to consummate such transactions.

### No Successor Liability

Y.    The Purchaser would not have entered into the Agreement and will not

consummate the transactions contemplated thereby if the sale of the Acquired Assets was not

free and clear of all liens, claims, interests, or encumbrances of any kind or nature whatsoever

(other than the Assumed Liabilities) or if the Purchaser would, or in the future could, be liable

for any such liens, claims, interests, or encumbrances.

Z.    Based on the record of the Sale Hearing, (i) the Purchaser does not constitute a

successor to the Debtor or its estate; (ii) the Sale Transaction does not constitute a consolidation

or merger, or de facto merger or consolidation, of the Purchaser and the Debtor or its estate;

(iii) the Purchaser and its businesses, are not merely a continuation or substantial continuation of

the Debtor or its businesses in that there is not substantial continuity between the Purchaser and

the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the

Debtor or its estate; and (iv) the Purchaser does not have any common incorporators, directors,

or shareholders with the Debtor.

AA.    Based on the foregoing, the Purchaser shall not have any successor or other

liability for any liens, claims, interests, or encumbrances of any kind or nature against or related

#612238

to the Debtor, the Debtor's estate, or the Acquired Assets whatsoever (other than the Assumed

Liabilities).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED
THAT:**

### GENERAL PROVISIONS

1.    The Sale Motion is granted in full and the Sale Transaction is approved as

set forth in this Sale Order.

2.    The findings of fact set forth above and conclusions of law stated herein

shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule

7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any

finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to

the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so

deemed.

3.    All objections, if any, to the Sale Motion or the relief requested therein

that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or

by stipulation filed with the Court, and all reservations of rights included therein, are hereby

overruled on the merits, except as expressly provided herein.

### APPROVAL OF THE AGREEMENT

4.    The Agreement, all transactions contemplated therein and all of the terms

and conditions thereof are hereby approved.

5.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Debtor

is authorized to perform its obligations under and comply with the terms of the Agreement and

#612238

consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions

of the Agreement and this Sale Order.

6.    The Debtor, as well as its affiliates, officers, employees and agents, are

authorized to execute and deliver, and empowered to perform under, consummate and

implement, the Agreement in substantially the same form as the Agreement attached hereto as

Exhibit 1, together with all additional instruments and documents that may be reasonably

necessary or desirable to implement the Agreement and to take all further actions as may be

(a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting,

conveying and conferring to the Purchaser, or reducing to possession, the Acquired Assets,

(b) necessary or appropriate to the performance of the obligations contemplated by the

Agreement, and (c) as may be reasonably requested by the Purchaser to implement the

Agreement and consummate the Sale Transaction in accordance with the terms thereof, all

without further order of the Court.

7.    This Sale Order and the Agreement shall be binding in all respects upon

the Purchaser, the Debtor, any trustee appointed in the Debtor's bankruptcy case (whether under

chapter 7 or chapter 11 of the Bankruptcy Code), all creditors (both known and unknown) of the

Debtor, all interested parties and their successors and assigns including, but not limited to, any

person or entity asserting an Encumbrance, and any non-debtor counterparty to one of the

Assumed Contracts.

8.    Nothing contained in any chapter 11 plan confirmed in these bankruptcy

cases, or any order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the Agreement and this Sale Order, and to the extent of any conflict or derogation

#612238

between the Agreement and this Sale Order and any such future plans or orders, the terms of the

Agreement and this Sale Order shall control.

### TRANSFER OF DEBTOR'S ASSETS

9.      Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the

Debtor is authorized to transfer the Acquired Assets in accordance with the terms of the

Agreement. The Acquired Assets shall be transferred to the Purchaser, and upon consummation

of the Agreement, such transfer shall (a) be valid, legal, binding and effective; (b) vest the

Purchaser with all right, title and interest of the Debtor in the Acquired Assets; and (c) be free

and clear of all Encumbrances except for Assumed Liabilities with all Encumbrances to attach to

the net proceeds of the Sale Transaction, in the order of their priority and with the same validity,

force and effect which they now have against the Acquired Assets, subject to any claims and

defenses the Debtor may possess with respect thereto.

10.      Except as otherwise provided in the Agreement, all persons and entities

(and their respective successors and assigns) including, but not limited to, all debt security

holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and

other creditors holding Encumbrances (whether legal or equitable, secured or unsecured, matured

or unmatured, contingent or non-contingent, senior or subordinated) except for Assumed

Liabilities, arising under or out of, in connection with, or in any way relating to, the Debtor, the

Acquired Assets, or the transfer of the Acquired Assets to the Purchaser, are hereby forever

barred, estopped and permanently enjoined from asserting such Encumbrances against the

Purchaser, its successors or assigns, its property or the Acquired Assets. No such persons or

entities shall assert against the Purchaser or its successors in interest any liability, debt, claim or

14

#612238

obligation arising from, related to or in connection with the ownership or operation of the Acquired Assets prior to the Closing, except for Assumed Liabilities.

11.     This Sale Order (a) shall be effective as a determination that, as of Closing, all Encumbrances other than Assumed Liabilities relating to the Acquired Assets have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

12.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the Debtor or the Acquired Assets shall not have delivered to the Debtor prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor or the Acquired Assets or otherwise, then only with regard to Acquired Assets that are purchased by the Purchaser pursuant to the Agreement and this Sale Order (a) the Debtor and the Purchaser are hereby authorized and directed to execute and file

15

#612238

such statements, instruments, releases and other documents on behalf of the person or entity with

respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register or

otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Encumbrances against the

Acquired Assets other than the Assumed Liabilities.  This Sale Order is deemed to be in

recordable form sufficient to be placed in the filing or recording system of each and every

federal, state or local government agency, department or office.

13.    The Purchaser is hereby authorized to execute and deliver such other

documents, statements, instruments and notices which may be necessary or desirable to fully

consummate the Sale Transaction and the other transactions contemplated the Agreement.

14.    All persons or entities in possession of some or all of the Acquired Assets

are directed to surrender possession of such assets to the Purchaser or its designee at the time of

Closing of the Sale Transaction.

15.    Following the Closing of the Sale Transaction, no holder of any

Encumbrance shall interfere with the Purchaser's title to or use and enjoyment of the Acquired

Assets based on or related to any such Encumbrance, or based on any actions the Debtor may

take in this chapter 11 case.

16.    All persons and entities are prohibited and enjoined from taking any action

to adversely affect or interfere with the ability of the Debtor to transfer the Acquired Assets to

the Purchaser in accordance with the Agreement and this Sale Order.

17.    To the extent provided by Section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

#612238

Acquired Assets sold, transferred and conveyed to the Purchaser on account of the filing or

pendency of these chapter 11 cases or the consummation of the Sale Transaction.

### ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS

18.     Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, the Debtor's

assumption and assignment to the Purchaser of the Assumed Contracts listed on Exhibit 2, is

hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby deemed

satisfied.

19.     The Debtor is hereby authorized in accordance with Sections 105(a) and

365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Purchaser free

and clear of all Encumbrances, and to execute and deliver to the Purchaser such documents or

other instruments as may be necessary to assign and transfer the Assumed Contracts to the

Purchaser.

20.     The Assumed Contracts shall be transferred to, and remain in full force

and effect for the benefit of, the Purchaser in accordance with their respective terms,

notwithstanding any provision in any such Assumed Contract (including those of the type

described in Sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or

conditions such assignment or transfer.  There shall be no rent accelerations, assignment fees,

increases or any other fees charged to the Purchaser or the Debtor as a result of the assumption or

assignment of the Assumed Contracts.  No Assumed Contract may be terminated, or the rights of

any party modified in any respect, including pursuant to any "change of control" clause, by any

other party thereto as a result of the transactions contemplated by the Agreement.

21.     The Cure Costs under the Assumed Contracts arising or accruing prior to

the date of this Sale Order are shown on Exhibit 2.  Before the Closing (as defined in the

17

#612238

Agreement), the Debtor is authorized and directed to, and therefore shall, pay all Cure Costs in accordance with the terms of this Order and the Agreement, and Section 365 of the Bankruptcy Code.

22.     Payment of the Cure Costs shall be a full and final satisfaction of any and all defaults by the Debtor under the Assumed Contracts, whether monetary or non-monetary. Each non-Debtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtor or the Purchaser, their successors or assigns or the property of any of them, any default based on all known and unknown facts and circumstances existing as of the date of the Sale Hearing regardless of whether such default was raised or asserted prior to or at the Sale Hearing. Notwithstanding the foregoing and for the avoidance of doubt, except as provided in the Agreement, all of the Debtor's rights to assert, and interests in, all credits, chargebacks, setoffs, recoupments, rebates and other claims under and/or relating to the Assumed Contracts are purchased by and assigned to the Purchaser, and are preserved for the Purchaser's benefit.

23.     The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtor's and the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

24.     Upon the Closing of the Sale Transaction, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor in and to the Assumed Contracts.

25.     The assignments of each of the Assumed Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

#612238

## ADDITIONAL PROVISIONS

26.    The Purchaser is not a successor to the Debtor or its estate by reason of

any theory of law or equity, and the Purchaser shall not assume or in any way be responsible or

liable for any liability or obligation of the Debtor or its estate, except as may otherwise expressly

be provided in the Agreement.  Except as expressly set forth in the Agreement, the Purchaser and

its successors or assigns shall have no liability for any claim (as that term is defined in Section

101(5) of the Bankruptcy Code), damages or other obligation of or against the Debtor related to

the Acquired Assets by reason of the transfer of the Acquired Assets to the Purchaser.  The

Purchaser shall not be deemed, as a result of any action taken in connection with the purchase of

the Acquired Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the

Debtor (other than with respect to any obligations arising under the Assumed Contracts from and

after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtor; (c) be a mere

continuation or substantial continuation of the Debtor or the enterprise of the Debtor; or (d) have

any liability whatsoever, other than the Assumed Liabilities, under any theory of, without

limitation, environmental, labor and employment, products, patent, trademark, or any applicable

revenue or tax or antitrust liability, whether known or unknown at the Closing, now existing or

hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

27.    Effective upon the Closing, all persons and entities are forever prohibited

and enjoined from commencing or continuing any action or proceeding, at law or in equity,

against the Purchaser, its affiliates, successors and assigns, or the Acquired Assets, with respect

to any (a) Encumbrance other than Assumed Liabilities or (b) successor liability of the Purchaser

for the Debtor.

19

#612238

28.    Effective upon the Closing, no default shall exist under any of the Assumed Contracts and no non-Debtor counterparty to any of the Assumed Contracts shall be permitted to declare a default by the Purchaser or otherwise take action against the Purchaser as a result of the Debtor's financial condition, bankruptcy, or failure to perform any duty or obligation under any of the Assumed Contracts.

29.    While the Debtor's bankruptcy case, or any subsequent chapter 7 bankruptcy case of the Debtor, is pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes related to this Sale Order or the Agreement.

30.    Pursuant to 11 U.S.C. 1146(c), no transfer, sales, stamp, or similar tax shall apply to the Sale Transaction or to any documents or instruments recorded or executed to evidence or effect the Sale.

31.    No employee or former employee of the Debtor shall be deemed to be an employee of the Purchaser absent an agreement between the Purchaser and the employee or former employee establishing new terms of employment.

32.    Nothing in this Sale Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order. The provisions of the foregoing sentence notwithstanding, nothing in this Sale Order shall be interpreted to deem the Purchaser as the successor to the Debtor under any state law

20

#612238

successor liability doctrine with respect to any liabilities under environmental statutes or

regulations for penalties for days of violation prior to entry of this Sale Order or for liabilities

relating to off-site disposal of waste by the Debtor prior to entry of this Sale Order.

33.    No bulk sales law, or similar law of any state or other jurisdiction shall

apply in any way to the transactions contemplated by the Agreement, the Sale Motion and this

Sale Order.

34.    The transactions contemplated by the Agreement are undertaken by the

Purchaser in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the Sale Transaction shall not affect the validity of the Sale Transaction to the

Purchaser, unless such authorization is duly stayed pending such appeal.

35.    The terms and provisions of the Agreement and this Sale Order shall be

binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate and creditors,

the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties

including, but not limited to, all persons asserting claims in the Acquired Assets to be sold to the

Purchaser pursuant to the Agreement, notwithstanding any subsequent appointment of any

trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all

such provisions and terms shall likewise be binding on such trustee (whether under chapter 7 or

chapter 11 of the Bankruptcy Code), examiner or receiver and shall not be subject to rejection or

avoidance by the Debtor, its estate and creditors, holders of equity interests or any trustee,

examiner or receiver.

21

#612238

36.    The failure specifically to include any particular provisions of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

37.    The Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Agreement.

38.    In the event that there is a direct conflict between the terms of this Sale Order and the Agreement, the terms of this Sale Order shall control.

39.    Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

40.    As provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Sale Order shall not be stayed for 14 days after the entry of the Sale Order and shall be effective immediately upon entry, and the Debtor and the Purchaser are authorized to close the Sale Transaction immediately upon entry of this Sale Order.

Dated:  Boston, Massachusetts
_____ Nov . 18 , 2011

_Joan N. Feeney_
UNITED STATES BANKRUPTCY JUDGE

#612238

## EXHIBIT 1

## AGREEMENT

## [See Attached]

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this *"Agreement"*), dated as of October 3, 2011 (the *"Effective Date"*), is by and between FRC LLC, a Delaware limited liability company (*"Seller"*) and Asset International, Inc., a Delaware corporation (*"Buyer"*).

## WITNESSETH

WHEREAS, Seller plans to file for protection as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the *"Bankruptcy Court"*);

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Acquired Assets (as defined below), but excluding the Excluded Assets (as defined below), subject to the terms and conditions of this Agreement; and

WHEREAS, the Acquired Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving and authorizing such sale under Section 363 of the Bankruptcy Code pursuant to a Sale Approval Order (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### Article I
### Definitions

1.1    Defined Terms. In addition to terms that are used and otherwise defined in this Agreement or the Bankruptcy Code, the terms below shall have the following meanings:

*"Auction"* shall mean the auction that shall, subject to the terms of this Agreement, be scheduled to take place for the sale of the Acquired Assets pursuant to a Motion to be filed by Seller with the Bankruptcy Court.

*"Assumed Contract"* shall mean all of the contracts, agreements, leases, and/or licenses that (i) are listed on Exhibit A to this Agreement, as such exhibit may be amended from time to time by mutual agreement; (ii) are subject to an order entered by the Bankruptcy Court that authorizes Seller to assume and assign the contract, agreement, lease and/or license to Buyer; and (iii) are actually assumed by Seller and assigned to Buyer.

*"Bankruptcy Code"* shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq., as amended.

*"Business Day"* shall mean any day excluding Saturday, Sunday, and any day that is a legal holiday within the meaning of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

*"Encumbrance"* shall mean any interest, pledge, lien, mortgage, security interest, judgment, demand, successor liability claim, restriction, charge of any kind or nature, claim (as

01633171.DOCX\

and to the full extent that term is defined in Bankruptcy Code Section 101(5) of the Bankruptcy Code), obligation, option, right, or restriction whether imposed by agreement, understanding, law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) in or with respect to any assets of Seller and/or against Seller.

*"Person"* shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind whatsoever.

*"Sale Approval Order"* shall mean an order of the Bankruptcy Court approving consummation of the transactions contemplated hereby by Buyer and Seller, certified by the clerk of the Bankruptcy Court as a true and correct copy of such order, reasonably satisfactory in form and substance to Buyer, Seller and their respective counsel, entered after a hearing conducted on adequate notice given in Seller's bankruptcy case (the *"Bankruptcy Case"*).

### Article II
### Purchase and Sale of Assets By Buyer,
### Assumption of Liabilities and Purchase Price

2.1     <u>Purchase and Sale of Assets</u>. Upon the terms and subject to the conditions and provisions contained herein and in the Sale Approval Order, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall acquire and accept from Seller, free and clear of any and all Encumbrances, the assets specifically identified on <u>Exhibit A</u> to this Agreement (collectively, the *"Acquired Assets"*) that are owned and held by Seller and associated solely with the following business segments of Seller's business being acquired: (a) the Investments – Mutual Funds (with the exception of the Mutual Fund Quarterly Market Review and the Mutual Fund Quarterly Sales Review), (b) Investments – Subadvisory, (c) Alternatives, (d) 529 College Savings, and (e) Monitor (the *"Business"*).

2.2     <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained in this Agreement, all assets of Seller that are not described in Section 2.1 as Acquired Assets shall be retained by Seller for all purposes as the *"Excluded Assets"*, including Seller's *Mutual Fund Quarterly Market Review*, *Mutual Fund Quarterly Sales Review*, and Retirement business segments, Direct Access hours and service associated with the Business, all causes of action arising under Sections 544, 545, 547, 548, 549, 553(b) or 724(a) of the Bankruptcy Code, accounts and notes receivable, cash, cash equivalents, and all payments made to Seller prior to the Closing for all business of Seller, including all payments made under the Assumed Contracts for products or services to be delivered by Buyer under the Assumed Contracts following the Closing.

2.3     <u>Assumption of Assumed Contracts</u>. Upon the terms and subject to the conditions and provisions contained herein, Buyer shall assume all of the liabilities and obligations of Seller arising under the Assumed Contracts with respect to the period after the Closing, but not including any obligation or liability for any breach thereof occurring prior to the Closing. Seller shall be responsible to pay any pre-petition cure amounts and perform any pre-petition cure obligations due under the Assumed Contracts as ordered by the Bankruptcy Court. Buyer shall cooperate in demonstrating adequate assurance of future performance of the Assumed Contracts

2

required for assumption and assignment, but such cooperation shall not include making any payments or other similar performance (such as posting security or other financial support) by Buyer.

2.4     Liabilities Not Assumed. Except as expressly set forth in this Agreement, Buyer shall not assume or perform any liability or obligation of Seller.

2.5     Deposit; Purchase Price; Debtor In Possession Financing.

(a)     Deposit. Contemporaneously with the execution of this Agreement, Buyer is depositing into escrow a good faith deposit equal to $50,000.00 in immediately available funds (the *"Deposit"*) with Murphy & King, P.C., counsel to Seller, as escrow agent (*"Escrow Agent"*), with such amount to be held in escrow in a non-interest bearing escrow account and paid as provided in this Agreement, and as may be provided in any Order issued by the Bankruptcy Court with respect to this transaction. In no event shall Escrow Agent be precluded from continuing its legal representation of Seller as a result of its role as Escrow Agent, even in the instance of a dispute between Seller and Buyer under this Agreement.

(b)     Purchase Price. The Purchase Price shall be an amount equal to $500,000.00 (which amount shall include the Deposit), payable to Seller at Closing by wire transfer of immediately available funds and subject to adjustment as provided in this Section 2.5.

(c)     Adjustment of the Purchase Price. The Purchase Price shall be subject to adjustment for certain matters that arise between the date of filing of the bankruptcy petition and the Closing (the *"Interim Period"*) as follows:

(i)     If, at Closing, the actual aggregate amount paid or payable to Seller (the *"Actual Transaction Amount"*) arising from customer transactions with the business segments that are included in the Business, that are either invoiced, or for which there is issuance and acceptance or acknowledgement of a sales order, and in each case evidenced by written or electronic customer acceptance or acknowledgement (*"Customer Transactions"*), during the period from September 1, 2011 through and including the Closing Date (the *"Adjustment Period"*) is less than $477,600.00 (reduced, if at all, by the product of the number of days between the day following the Closing Date and November 30, 2011, including both such end-dates, multiplied by $4,203.33) (the *"Projected Transaction Amount"*),

then the Purchase Price shall be reduced on a dollar-for-dollar basis equal to any difference between the Projected Transaction Amount and the Actual Transaction Amount.

> For example, if (A) the Closing Date is November 21, 2011, and (B) the Actual Transaction Amounts during the Adjustment Period are $425,000.00, then the Purchase Price will be reduced by the positive difference between (i) the adjusted Projected Transaction Amount (i.e., $477,600.00 less (9 x $4,203.33), or $439,770.03, minus (ii) the Actual Transaction Amount ($425,000.00), for an adjustment of $14,770.03.

(ii)     In addition to the adjustment (if any) to the Purchase Price pursuant to clause (i) above, the Purchase Price shall be reduced at Closing by an amount equal to fifty percent (50%) of the sum of (A) the amount of accounts receivable of Seller existing at Closing,

3

which arose from Customer Transactions during the Interim Period, and (B) any amounts paid to Seller during the Interim Period in payment for Customer Transactions that arose during the Interim Period.

> For example, if during the Interim Period, Customer Transactions generated accounts receivable of $115,000.00, of which $60,000.00 remained uncollected at the Closing and of which $55,000.00 Seller collected during the Interim Period, then the Purchase Price will be adjusted (reduced) by 50% of the sum of such remaining accounts receivable plus 50% of such collections, for an aggregate adjustment of $57,500.00.

(d)     Debtor-In-Possession Financing.  Promptly following the commencement of the Bankruptcy Case, Seller shall seek interim and final Orders of the Bankruptcy Court permitting Seller to borrow from Mercatus RC, LLC (the "*DIP Lender*") up to a maximum aggregate amount of $110,000 (the "*DIP Loan*") to meet Seller's working capital needs prior to the Closing, with the terms of such loan to be as provided in the interim and final DIP Orders, which shall be in a form reasonably satisfactory to Seller, Buyer, and the DIP Lender (the "*DIP Order*").  To the extent that the interim DIP Order is not entered prior to 5:00 p.m. on the fourth (4th) Business Day following commencement of the Bankruptcy Case, Buyer may, at its option, terminate this Agreement and receive the return of its deposit. Following entry of the DIP Order, the DIP Lender shall lend Seller amounts necessary from time to time for its working capital needs funded in accordance with the DIP Order. To the extent that DIP Lender, in its discretion, agrees to loan additional amounts to Seller as debtor-in-possession financing, and such additional loans are approved by the Bankruptcy Court, such additional amounts shall be part of the DIP Loan.

### Article III
### The Closing

3.1     Closing.  The consummation of the transactions contemplated hereby (the "*Closing*") shall occur at the offices of Murphy & King, P.C., One Beacon Street, Boston, Massachusetts 02110, or at another location mutually agreed to by the parties, on the date (the "*Closing Date*") that is fifteen (15) calendar days after the date of entry of the Sale Approval Order (or, if such day is not a Business Day, the next succeeding Business Day), provided no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal, and all other conditions to Closing set forth in Article VII and Article VIII shall have been satisfied or waived.  If the Sale Approval Order specifies that the provisions of 11 U.S.C § 363(m) apply and that the conditions set forth in Article VII and Article VIII shall have been satisfied or waived, then the Closing Date shall be the second (2nd) Business Day following the date of entry of the Sale Approval Order, and provided no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.  In no event shall the Closing Date be later than November 25, 2011.

3.2     Conveyances at Closing.

(a)     At the Closing, and in connection with effecting and consummating the transactions contemplated hereby, Seller shall, to the extent necessary to deliver title, in Buyer's reasonable discretion, deliver the following to Buyer:

01633171.DOCX\

(i)       an executed Bill of Sale;

(ii)       an executed counterpart of an Assumption and Assignment Agreement with respect to all of the Assumed Contracts;

(iii)      a certified copy of the Sale Approval Order;

(iv)      assignment documentation necessary for the conveyance of any intellectual property to Buyer; and

(v)       such other instruments as shall be reasonably requested by Buyer to vest in Buyer title in and to the Acquired Assets in accordance with the provisions hereof and the Sale Approval Order.

(b)      At the Closing, and in connection with effectuating and consummating the transactions contemplated hereby, Buyer shall deliver the following to Seller:

(i)       the Purchase Price by wire transfer of immediately available funds, net of the Deposit, and as adjusted, if at all, under this Agreement; and

(ii)      an executed counterpart of the Assumption and Assignment Agreement.

To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

3.3      Payment of the Deposit to Seller.  At Closing, the Deposit shall be released to Seller by Escrow Agent.

3.4      Transaction Expenses.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant, and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

3.5      Other Closing Matters.  Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on the Closing Date, subject to applicable law and any Order of the Bankruptcy Court, but consistent with the terms and conditions of this Agreement.

## Article IV
### Representations and Warranties of Seller

As an inducement to Buyer to enter into this Agreement, Seller hereby makes, as of the Effective Date, the following representations and warranties to Buyer, but such representations and warranties shall not survive the Closing of the transactions contemplated by this Agreement for any reason whatsoever:

5

4.1    Authorization. Seller has all necessary right, power, capacity, and authority to commence the Bankruptcy Case, to execute and deliver this Agreement and, subject to entry of the Sale Approval Order, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other corporate proceedings on the part of Buyer are necessary to authorize the commencement of the Bankruptcy Case, the execution, delivery, the performance of this Agreement, and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller and, subject to entry of the Sale Approval Order, is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.2    Organization. Seller is an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has the power and authority to operate its properties and to carry on its business as it is now being conducted.

4.3    Title to Assets; Absence of Liens and Encumbrances, etc. Seller will, upon the entry of the Sale Approval Order and the consummation of the transactions contemplated hereby, transfer all of its right, title, and interest in and to the Acquired Assets to Buyer, free and clear of any and all Encumbrances.

4.4    Consents and Approvals. To the best of Seller's knowledge, after due inquiry (a) other than the Sale Approval Order, no consent, approval, or authorization of any court, regulatory authority, governmental body, or any other entity or Person not a party to this Agreement is required for the consummation of the transactions described in this Agreement by Seller; (b) Seller has obtained, or shall have obtained prior to the Closing, all consents, authorizations, or approvals of any third parties required in connection with the execution, delivery, or performance of this Agreement by Seller or the consummation of the transactions contemplated by this Agreement; and (c) Seller has made all registrations or filings with any governmental authority required for the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

## Article V
### Representations and Warranties of Buyer

As an inducement to Seller to enter into this Agreement, Buyer hereby makes the following representations and warranties as of the Effective Date hereof to Seller, but such representations and warranties shall not survive the Closing of the transactions contemplated by this Agreement for any reason whatsoever:

5.1    Authorization. Buyer has all necessary power and authority to enter into this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other corporate proceedings on the part of Buyer are necessary to authorize the execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited or affected by applicable bankruptcy, insolvency, reorganization, or other laws of general application relating to or affecting the rights

01633171.DOCX\

of creditors and except as enforceability may be limited by rules of law governing specific performance, injunctive relief, or other equitable remedies.

    5.2    <u>Organization</u>. Buyer is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has the power and authority to operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted.

    5.3    <u>Financing</u>. On the Closing Date, Buyer will have sufficient cash or other immediately available funds on hand to deliver the Purchase Price. The closing of any financing shall not be a condition to Closing of the transactions contemplated by this Agreement.

**<u>Article VI</u>**
**Covenants**

    6.1    <u>Chapter 11 Filing</u>. On, or promptly following the Effective Date, Seller shall file a petition for protection pursuant to Chapter 11 of the United States Bankruptcy Code, as amended. In the event that Seller has not filed such petition by 11:59 p.m. on October 4, 2011, Buyer may, at its option, terminate this Agreement and receive the return of its Deposit.

    6.2    <u>Access</u>. Between the Effective Date hereof and the Closing Date, Buyer and its representatives shall, during regular business hours and upon reasonable notice, have access to business records and operations of Seller related to the Business and the Acquired Assets, provided, however, Buyer shall not unreasonably interfere with the business operations of Seller. Representatives of Seller and Buyer shall have weekly meetings to discuss ongoing progress with the publication calendar of Seller.

    6.3    <u>Employees</u>. Buyer may, in its discretion, offer employment to employees of Seller, but Buyer shall not be responsible for any compensation or benefits, including payroll, employee benefits (e.g., pension, severance and insurance benefits), or severance, in respect of any employee of Seller relating to any period prior to the Closing. Seller shall be responsible for payment of all amounts due and owing to employees for periods prior to the Closing.

    6.4    <u>Further Assurances</u>. In addition to the provisions of this Agreement, from time to time after the Closing Date, Seller and Buyer will use commercially reasonable efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other actions as may be necessary or reasonably requested to implement more effectively the transactions contemplated by this Agreement, and the conveyance and transfer of the Acquired Assets.

    6.5    <u>Condition of the Acquired Assets</u>. Buyer agrees and acknowledges that (a) Buyer's decision to proceed with the transactions contemplated by this Agreement is based upon Buyer's own inspection and investigation of the Acquired Assets and the Business; (b) Buyer is familiar with the Acquired Assets and the Business and has been afforded the full opportunity, to the extent it desired to do so, to fully inspect and review (i) the books and records of Seller, (ii) the Acquired Assets, (iii) such other operational and financial information as Buyer has found appropriate, including sales, production, and employment matters; and (c) Buyer is satisfied with each of the foregoing matters, and will, at Closing, acquire the Acquired Assets,

7

without representation or warranty, express or implied, other than as set forth in Article IV of this Agreement (which will not survive the Closing), in their then AS-IS, WHERE-IS condition. This provision shall survive the Closing or earlier termination of this Agreement.

6.6   Assumption of Executory Contracts. In the Sale Motion, Seller shall seek an order of the Court approving the assumption and assignment of all of the Assumed Contracts. The Sale Order shall provide that the assumption and assignment of the Assumed Contracts shall be free and clear of all Encumbrances, except for obligations of Buyer under Section 365 of the Bankruptcy Code.

6.7   Access to Information; Maintenance of Records. At all times following the Closing, each party shall provide the other party (at such other party's expense) with such reasonable assistance, including the provision of available relevant records or other information and reasonable access to and cooperation of any employees, as may be reasonably requested by either of them, in connection with the preparation of any financial statement or tax return, any audit or examination by any taxing authority, or any judicial or administrative proceeding.

6.8   Exclusivity. For a period of sixty (60) days following the Effective Date, neither FRC nor any of its representatives shall, directly or indirectly, communicate, solicit, initiate, entertain, encourage, or otherwise engage (including by way of furnishing any non-public information concerning the Business or the Acquired Assets) in any discussions or negotiations concerning the sale of the Acquired Assets outside the ordinary course of its business with any party other than Buyer; provided, however, such exclusivity shall be suspended upon entry of an Order of the Bankruptcy Court approving a break-up fee and bid procedures, but reinstated if such order is rescinded within such 60-day period for any reason other than breach by the Acquirer. In the event that the Bankruptcy case is converted to a Chapter 7 case or a Sale Approval Order is entered by the Bankruptcy Court, the provisions of this Section 6.8 shall terminate immediately.

6.9   Indemnification by Robert Hedges. Robert Hedges ("Mr. Hedges") shall indemnify Buyer for damages suffered by Buyer, which directly arise from any intentional fraud committed by Mr. Hedges or John Murphy ("Mr. Murphy") in the communication (written or verbal) to Buyer by Mr. Hedges or Mr. Murphy of information related to the Business or the Acquired Assets, including Seller's company documents, financials, schedules and work papers, product samples, communications to and/or from customers, senior management strategy, and operating plan documents, related to the Business and which Mr. Hedges knew to contain any untrue statement of a material fact, or which Mr. Hedges knew failed to state a material fact that would give rise to a material adverse change in the Business or the Acquired Assets. If Buyer has received or hereafter receives any communication from Mr. Hedges or Mr. Murphy that Buyer believes presents incorrect information, Buyer shall promptly address such inaccuracy with Mr. Hedges for clarification; provided, however, that no delay on Buyer's part in notifying Mr. Hedges will relieve Mr. Hedges from his indemnification obligation, except to the extent such delay actually and materially prejudices Mr. Hedges. For clarity, Mr. Hedges' indemnity shall not include claims arising from, or related to (a) Buyer's direct conversations with employees or agents of Seller (other than Mr. Hedges or Mr. Murphy) or written communications from employees or agents of Seller (other than Mr. Hedges or Mr. Murphy), or (b) sales and financial projections of the Business for which there are no assurances.

8

01633171.DOCX\

6.10    Restrictive Covenants.

(a)     In order to induce Buyer to purchase the Business and Acquired Assets pursuant to this Agreement, for a period of two (2) years from and after the Closing Date, each of Seller and each of Mr. Hedges and Teresa Epperson (*"Ms. Epperson"* and, together with Mr. Hedges, the *"Principals"*) agrees, severally and not jointly, that he, she or it will not (i) engage, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, or otherwise, in all or any portion of the Business of Seller as conducted as of the Closing Date; and (ii) directly or indirectly, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in any other manner persuade or attempt to persuade, any Person who is an employee of Buyer to leave the employ of Buyer. In no event shall the prohibition in clause (ii) of this Section 6.10(a) restrict either Principal hiring the other Principal and/or Mr. Murphy.

(b)     Each of Seller and the Principals hereby agrees, severally and not jointly, with Buyer that neither he, she, or it, nor any of his, hers, or its affiliates will, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of Buyer, disclose or use, any confidential or proprietary information involving or relating to the Business or the Acquired Assets; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information that (i) is at the time of disclosure or later becomes available to the public without violation of any of the obligations hereunder, (ii) after the date hereof is received by Seller or a Principal from a third party that is under no confidentiality obligation with respect thereto, or (iii) is independently developed without use of such information; and provided, further, that the provisions of this subsection (b) will not prohibit any retention of copies of records, or disclosure (A) required by any applicable legal requirement, provided that the disclosing party will provide reasonable prior notice to the other party of such disclosure, or (B) made in connection with the enforcement of any right or remedy relating to this Agreement or the transactions contemplated by this Agreement.

(c)     If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.10 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision without expanding upon it, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

6.11    Conduct of Business. During the Interim Period, Seller shall exercise commercially reasonable efforts, in each case taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code, other than as permitted in writing by Buyer, to preserve, in all material respects, the Business and the Acquired Assets. Seller shall regularly consult with Buyer on conduct of the Business prior to the Closing Date. Without limiting the generality of the foregoing, prior to Closing Date, Seller shall:

(a)     not sell, lease (as lessor), transfer, or otherwise dispose of any of the Acquired Assets, other than sales of newsletters and other products comprising the Business in the ordinary course of business of Seller,

9

(b) use good faith, commercially reasonable efforts to prevent the abandonment of any intellectual property comprising a portion of the Acquired Assets, taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code, unless Seller first obtains the written consent of Buyer approving any such abandonment, and

(c) not, absent the written consent of Buyer, (i) in the case of the accounts receivable arising during the Interim Period, change the terms of such accounts receivable in a manner that is inconsistent with current practices, or (ii) in the case of all sales subsequent to the Effective Date, provide for any customer or type of customer terms for sales that are materially inconsistent with current practices for such customer or type of customer.

6.12  Certain Collections of Accounts Receivable. For purposes of this Section 6.12, the accounts receivable of Seller pertaining to the Business and outstanding at Closing are referred to as the "*Outstanding Receivables*". If a customer contacts Buyer following the Closing with respect to payment of an Outstanding Receivable, Buyer shall notify the customer to make payment thereof directly to Seller. In the event Buyer receives any payment from a customer designated as payment of an Outstanding Receivable, such amount shall be remitted promptly to Seller.

## Article VII
### Conditions to Seller's Obligations

The obligation of Seller to consummate the transactions contemplated hereby is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 9.6 hereof:

7.1  Entry of Sale Approval Order. The Sale Approval Order naming Buyer as the successful bidder shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Approval Order pending appeal.

7.2  Instruments of Conveyance. Buyer shall have executed and delivered to Seller at the Closing all of the documents provided for in Section 3.2(b) hereof.

7.3  Absence of Litigation. No court action or proceeding shall have been commenced to restrain or prohibit the transactions contemplated by this Agreement, or the acquisition by Buyer of the Acquired Assets.

7.4  Payment of the Purchase Price. Buyer shall have paid the Purchase Price via wire transfer of immediately available funds, as adjusted, if at all, under this Agreement.

01633171.DOCX\

## Article VIII
### Conditions to Buyer's Obligations

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Buyer in accordance with Section 9.6 hereof:

8.1     Form and Content of Pleadings, Other Documents. Any provision of this Agreement to the contrary notwithstanding, all pleadings, orders, and other documents used in the proposed transaction shall have been in a form and substance reasonably satisfactory to Buyer.

8.2     Filing of Motions. Within two (2) Business Days following the Effective Date, Seller shall have filed an application for an order with the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, fixing the date of a hearing to consider the approval of each of the Bidding Procedures (as hereinafter defined) (the *"Bidding Procedures Motion"*) which shall contain the terms set forth in Section 9.1 below, and the sale of the Acquired Assets to Buyer pursuant to the terms of this Agreement (the *"Sale Motion"*).

8.3     Entry of Orders. Within fifteen (15) calendar day following the Effective Date, an Order approving the Bidding Procedures (the *"Bidding Procedures Order"*) shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer and implementing the terms of the Bidding Procedures Motion; and within thirty-eight (38) calendar days following the Effective Date, the Sale Approval Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer.

8.4     Absence of Litigation. No court of competent jurisdiction shall have entered an order staying the Sale Approval Order pending appeal or otherwise enjoining the consummation of the transactions contemplated by this Agreement.

8.5     Instruments of Conveyance. Seller shall have executed and delivered to Buyer at the Closing all of the documents provided for in Section 3.2(a) hereof.

8.6     Representation and Warranties. The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct at Closing in all material respects.

8.7     Conduct of Seller's Business. Between the Effective Date and the Closing Date, there shall have been no material adverse change in the operation of the Business. Solely for purposes of this Section 8.7, a material adverse change in the operation of the Business arises only if:

(a)     the total dollar amount of Customer Transactions during the Interim Period is less than $50,000.00; or

11

01633171.DOCX\

(b)     during the Interim Period, three (3) or more of the top ten (10) customers of the Business listed on Exhibit B terminate their entire business relationship with Seller in the product segments included in the Business.

8.8    Key Employees. Each of Lynette DeWitt, Larry Petrone, Paul Curley, and Kathy Marshall shall have terminated their employment with Seller and agreed upon mutually agreeable terms of employment with Buyer, so long as such terms include compensation and benefits comparable to those provided by Seller prior to the Closing.

## Article IX
## Miscellaneous

9.1    Bidding Procedures; Termination Fee.

(a)     Bidding Procedures. As set forth in Section 8.3, the Bankruptcy Court must enter the Bidding Procedures Order, on or prior to the dates specified in Section 8.3 above, expressly approving the following bidding procedures in connection with the purchase of assets of Seller upon the following terms and provisions (collectively, the *"Bidding Procedures"*):

(i)     Any competing bid, offer, plan of reorganization, or other arrangement shall be deemed to qualify as a competing bid (a *"Competing Bid"*) only if made upon terms and provisions as those set forth in this Agreement (or with non-material modifications thereto) by the execution of a form of this Agreement, and in respect of the sale and purchase of substantially all of the Acquired Assets and assumption of all of the Assumed Contracts and for an aggregate purchase price in an aggregate amount of at least ten percent (10%) in excess of the Purchase Price hereunder, as adjusted.

(ii)    The Bidding Procedures shall set a deadline for the submission of a Competing Bid which shall be 5:00 p.m. on the third (3rd) Business Day prior to the hearing on the Sale Motion.

(iii)   Any competing bidder must deliver a deposit to Seller in an amount equal to $50,000.00 at the time of submission of its Competing Bid and satisfy Seller of the bidder's ability to consummate the transaction.

(iv)    An Auction for the Acquired Assets shall be held only if there is a Competing Bid, and the Auction, if necessary, shall be conducted by the Bankruptcy Court at the time of the hearing on the Sale Approval Order. The Bidding Procedures shall provide that if there is no Competing Bid, then Buyer and Seller shall proceed to seek approval of the Sale Approval Order.

(v)     Only Persons that have submitted a timely qualified Competing Bid may participate in any Auction for the Acquired Assets. Anything herein to the contrary notwithstanding, Buyer may participate in any Auction.

(vi)    Bidding at any Auction for the Acquired Assets shall be conducted as an open bidding process, with any incremental bid made subsequent to the initial overbid to be at least $10,000.00 greater than the most recent bid.

01633171.DOCX\

(vii)   Buyer shall be entitled to improve its offer at any Auction for the Acquired Assets.

(b)   _Termination Fee._ The Bidding Procedures Order shall approve the payment to Buyer of a termination fee (_"**Termination Fee**"_) in the event: (i) Seller accepts a Competing Bid, (ii) the Bankruptcy Court enters an order approving any counter-offer as the highest and best offer (other than a sale to Buyer), or (iii) Seller concludes a sale of the Business and Acquired Assets outside of the Bankruptcy Case to a third party that submitted a Competing Bid (each, a _"**Competing Transaction**"_). The Termination Fee shall equal (a) the actual out-of-pocket costs and expenses incurred by Buyer in connection with the transactions contemplated hereby, before and after the Effective Date (including professionals' fees), up to an aggregate amount of $20,000.00, plus (b) $20,000.00. The Bidding Procedures Order shall also provide, without limitation, that any Termination Fee shall only be paid from the proceeds from a Competing Transaction and within one (1) Business Day following the Closing of the Competing Transaction.

9.2   _Termination._

(a)   _Termination._ In addition to any other rights of termination of Buyer expressly provided in this Agreement, this Agreement may be terminated prior to the Closing:

(i)   by the mutual written consent of Buyer and Seller (subject to the approval of the Bankruptcy Court) at any time, in which case the Deposit and all interest thereon shall be returned to Buyer;

(ii)   by Buyer if (A) Buyer is not the winning bidder at the Auction, or (B) one or more of the conditions set forth in Article VIII is not satisfied on or before the date specified or the Closing Date (as the case may be) for any reason other than a breach of this Agreement by Buyer, or (C) the Sale Approval Order is not entered by the Bankruptcy Court on or before November 10, 2011, through no fault of Buyer, or (D) the Closing has not occurred on or before November 25, 2011, through no fault of Buyer, and in each such case the Deposit and any interest thereon shall be returned to Buyer;

(iii)   by Seller (A) if Buyer is not the winning bidder at the Auction, or (B) if the condition set forth in Section 7.3 is not satisfied on the Closing Date, or (C) if the Closing has not occurred on or before November 25, 2011, through no fault of Seller, and in each case the Deposit and any interest thereon shall be returned to Buyer;

(iv)   by Seller if the conditions set forth in Section 7.2 or Section 7.4 are not satisfied on or before the Closing Date (for any reason other than a breach of this Agreement by Seller), or a breach of this Agreement by Buyer occurs, and in each case the Deposit and any interest thereon shall be paid to and retained by Seller for breach of this Agreement as liquidated damages. The retention of the Deposit by Seller shall be Seller's sole and exclusive remedy in the event of any breach of this Agreement by Buyer.

(b)   _Event of Termination; Remedies._ In the event of termination of this Agreement pursuant to Section 9.2(a):

13

01633171.DOCX\

(i)    all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made;

(ii)    each party shall return all documents, work papers, and other material of any other party, or those prepared by a party from the review of such documents, work papers and other material of the other party, relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same;

(iii)    no confidential information received by any party with respect to the business of any other party or its affiliates shall be used or disclosed to any third party, unless required by law; and

(iv)    Buyer shall be entitled to payment of the Termination Fee, to the extent the Termination Fee is payable under Section 9.1(b) and the Bidding Procedures Order.

9.3    Assignment; Successors. Except for an assignment by Buyer to an affiliate of Buyer prior to Closing, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any Chapter 11 or Chapter 7 trustee appointed in the Bankruptcy Case, and no other Person shall have any right, benefit, or obligation hereunder.

9.4    Notices. All notices, requests, consents, demands, and other communications which are required or may be given under this Agreement shall be in writing and shall be delivered: (i) by hand delivery; (ii) by facsimile or telecopy(with written confirmation of delivery; (iii) by recognized overnight delivery service (including Federal Express); or (iv) by certified or registered mail, return receipt requested and postage prepaid. In each case notice shall be sent to:

If to Seller, addressed to:    FRC, LLC
                              One Faneuil Hall
                              Boston, MA 02110
                              Attn.: Robert Hedges
                              Fax: (617) 742-4410

with a copy to:    Harold B. Murphy, Esq.
                   Murphy & King, P.C.
                   One Beacon Street
                   Boston, MA 02108
                   Fax: (617) 423-0498

14

01633171.DOCX\

If to Buyer, addressed to:   Asset International, Inc.
           805 Third Avenue
           New York, NY 10022
           Attn.: Thomas L. Wright, CFO
           Fax: (212) 644-8650

with a copy to:      David Amidon, Esq.
           Burns & Levinson LLP
           125 Summer Street
           Boston, MA 02110
           Fax: (617) 345-3299

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

   9.5  Choice of Law; Jurisdiction. This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with the laws of The Commonwealth of Massachusetts (without regard to its conflicts of laws principles) and by the laws of the United States of America. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified in Section 9.4 in a manner provided for in Section 9.4. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such courts or any defense of inconvenient forum in connection therewith.

   9.6  Entire Agreement; Amendments and Waivers. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. No amendment, supplement, modification, or waiver of this Agreement shall be binding unless executed in writing by on or behalf of the party to be bound thereby. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

   9.7  Construction. The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement. All Exhibits and schedules attached are made a part hereof.

01633171.DOCX\

All terms defined herein shall have the same meaning in the exhibits, except as otherwise provided therein. The terms "hereby", "hereof", "hereto", "hereunder", and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The term "including" when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. Unless otherwise indicated, references to Articles and Sections refer to Articles and Sections of this Agreement.

9.8    Third Party Beneficiaries. No Person other than the parties hereto, shall have any rights or claims under this Agreement.

9.9    No Waiver. The failure or delay of either party hereto to seek redress for any breach, or to insist upon the strict performance of any covenant or condition of the Agreement by the other shall not be, or be deemed to be a waiver of the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. No waiver on the part of any party of any such right, power or privilege, and no single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege.

9.10    Multiple Counterparts. This Agreement may be executed in one or more counterparts, which may be delivered electronically, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.11    Invalidity. In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, then such provision shall remain valid and enforceable to the maximum extent permitted by law. Such invalidity, illegality, or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

9.12    Publicity. Each party shall consult with the other prior to issuing any press release or otherwise making any public statements with respect to the transactions contemplated hereby, and no party shall issue any such press release or make any such public statements or comments relating to these transactions without the prior written consent of the other (which shall not be unreasonably withheld), except as may be required by applicable law or an Order of the Bankruptcy Court.

9.13    Cumulative Remedies. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies, including the right to specific performance of the terms hereof, except in the circumstance of a breach of this Agreement by

16

Buyer in which event, Seller shall be entitled to retain the deposit as liquidated damages and as Seller's sole and exclusive remedy at law or equity.

9.14   <u>Representation by Counsel; Mutual Negotiation</u>. Each party has been represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the parties, at arm's length with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

9.15   <u>Time</u>. Time is of the essence in respect of all matters under this Agreement.

*[Signatures follow on next page]*

17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

### FRC LLC

By: _____
      Name:   Robert Hedges, Manager

### Asset International, Inc.

By: _____
      Name:   Jim Casella
      Title:   President / CEO

By: _____
      Name:   Thomas L. Wright
      Title:   Chief Financial Officer

The undersigned executes this Agreement solely for purposes of his obligations and undertakings under Sections 6.9 and 6.10 of this Agreement.

_____
Robert Hedges, individually

The undersigned executes this Agreement solely for purposes of her obligations and undertakings under Section 6.10 of this Agreement.

_____
Teresa Epperson, individually

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

**FRC LLC**

By: _____
      Name:   Robert Hedges, Manager

**Asset International, Inc.**

By: _____
      Name:   Jim Casella
      Title:   President / CEO

By: _____
      Name:   Thomas L. Wright
      Title:   Chief Financial Officer

The undersigned executes this Agreement solely for purposes of his obligations and undertakings under Sections 6.9 and 6.10 of this Agreement.

_____
Robert Hedges, individually

The undersigned executes this Agreement solely for purposes of her obligations and undertakings under Section 6.10 of this Agreement.

_____
Teresa Epperson, individually

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

FRC LLC

By: _____
        Name:    Robert Hedges, Manager

Asset International, Inc.

By: _____
        Name:    Jim Casella
        Title:    President / CEO

By: _____
        Name:    Thomas L. Wright
        Title:    Chief Financial Officer

Each of the undersigned executes this Agreement solely for purposes of his/her obligations and undertakings under Section 6.9 of this Agreement.

_____
Robert Hedges, individually

_____
Teresa Epperson, individually

18

01831171.DOCX

Doc. ric. da:781 237 4712                    02-18-11 00:34   Pag: 3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

**FRC LLC**

By: _____

Name:    Robert Hedges, Manager

**Asset International, Inc.**

By: _____

Name:    Jim Casella
Title:    President / CEO

By: _____

Name:    Thomas L. Wright
Title:    Chief Financial Officer

The undersigned executes this Agreement solely for purposes of his obligations and undertakings under Section 6.9 and 6.10 of this Agreement.

_____

Robert Hedges, individually

The undersigned executes this Agreement solely for purposes of her obligations and undertakings under Section 6.10 of this Agreement.

_____

Teresa Epperson, individually

18

# EXHIBIT A
## Acquired Assets[1]

1.  Assumed Contracts. All of the rights of Seller under the following Assumed Contracts (including all goodwill associated therewith), but limited to Seller's rights therein solely for periods following the Closing:

    (a)   Customer Contracts.

        (i)   Attached hereto as Annex 1(a)(i) is a correct and complete list of all contracts with customers of the Business for products of the Business as of the Effective Date *("Customer Contracts")*. This list will be updated during the Interim Period and through and including the Closing Date to reflect (a) additions thereto, arising during the Interim Period, in the ordinary course of the Business and (b) expirations during the Interim Period.

    (b)   Data Contracts / Licenses.

        (i)   Attached hereto as Annex 1(b)(i) is a correct and complete copy of that certain Subscription Agreement & Data Feed Product License, dated as of April 1, 2010, by and between FRC and NewRiver, Inc.

    (c)   Equipment Lease(s).

        (i)   Attached hereto as Annex 1(c)(i) is a correct and complete copy of that certain Equipment Lease Agreement (#38934), dated as of March 16, 2009, by and between FRC and CoActiv Capital Partners, Inc. [unsigned by counter-party CoActiv]

        (ii)   Attached hereto as Annex 1(c)(ii) is a correct and complete copy of that certain Equipment Lease Agreement (#39373), dated as of March 23, 2009, by and between FRC and CoActiv Capital Partners, Inc. [unsigned by counter-party CoActiv]

    (d)   Other Assumed Contracts.

        (i)   Attached hereto as Annex 1(d)(i) is a correct and complete copy of that certain Hosting Services Agreement, dated as of March 18, 2009, by and between FRC (as successor-in-interest to Channel Mining) and Rackspace US, Inc.

---

[1] The parties acknowledge that the below description of the Acquired Assets is necessarily broad, intended to capture the intent that the Business is being sold to Buyer on a going-concern basis, but that in some instances, Seller may not have possession of certain assets that would fall within the below definition (e.g., historical data that no longer exists). So, Seller's obligation to deliver the Acquired Assets shall be limited to that portion of the Acquired Assets in Seller's possession, after due inquiry and review of its business records and operations.

(ii)    Attached hereto as Annex 1(d)(ii) is a correct and complete copy of the documentation comprising that certain CSF Quarterly Collection Data & Analysis Relationship, dated as of March 10, 2010.

(iii)    Attached hereto as Annex 1(d)(iii) is the most recent invoice reflecting the extant hosting arrangement with Interactive Palette, Inc., for the three (3) web sites comprising a portion of the Acquired Assets. This arrangement is quarter-to-quarter, and contemplates an aggregate quarterly hosting fee of approximately $75.00.

2.    Other Acquired Assets:  All rights of Seller in and to the following assets:

(a)    Seller's current legal name, "FRC, LLC", Seller's trade name, "Financial Research Corporation", and all goodwill associated therewith.

(b)    Any registered and unregistered trademarks and service marks, and any goodwill associated with:

    (i)    Monitor (excluding any content included in the Excluded Assets)

    (ii)    Investment – Mutual Funds; for clarity Seller's *Mutual Fund Quarterly Market Review* and *Mutual Fund Quarterly Sales Review* are excluded.

    (iii)    Mutual Fund Lifecycle Quarterly Review

    (iv)    Seller's one-off Mutual Fund Research Reports.

    (v)    529 College Savings

    (vi)    529 Quarterly Quantitative Review

    (vii)    529 Quarterly Qualitative Review

    (viii)    529 Quarterly Fee Review

    (ix)    Seller's one-off 529 Research Reports.

    (x)    Investments – Subadvisory

    (xi)    Subadvisory Semi-Annual Data Book

    (xii)    Subadvisory Quarterly Review

    (xiii)    Subadvisory Mandate Change Report

    (xiv)    Seller's one-off Subadvisory Research Reports.

    (xv)    Alternatives

2

01633986.DOCX\

(xvi)   Alternatives Quarterly Review

(xvii)  Seller's one-off Alternatives Research Reports.

(c)     The following FRC-branded web sites, URLs, and Internet domain names, all of the associated content on all such web sites related to the Business, and all goodwill associated therewith:

(i)     Frcnet.com

(ii)    FRClibrary.com

(iii)   FRCimpact.com

In some cases, content on the foregoing web sites may include that which is related to the Business and that which is not related to the Business. During the Interim Period, Seller and Buyer will cooperate to identify any items which are not part of the Acquired Assets and which will be retained by Seller or otherwise removed from the FRClibrary.com web site, and develop a plan to migrate any such unrelated content from the FRClibrary.com web site promptly following the Closing, all in a manner reasonably intended to minimize, if not eliminate disruption to, or confusion within the Business segments.

(d)     One (1) Dell minitower PC with 2 monitors; all software (including all internal- and customer-facing database tools, data, and source code related to the Business), and all available passwords and other access and operation protocols required to run the Business processes (e.g., access data) related to the Business and/or the Acquired Assets, residing on such Dell minitower or on equipment (including computers and/or storage devices) leased under the Assumed Contracts; and including the data, technology, and source code related to Seller's database product.

(e)     All historical and/or previously-published data and research for the product segments included in the Business (the "Assigned Research") and all goodwill associated with the Assigned Research, and associated back-up and source data, research processes, and intellectual property rights;

(f)     All past and present contact information for, billing history of, and correspondence with data providers of the Business;

(g)     All past and present contact information for, billing history of, and correspondence with, customers of the Business, including records of products to be delivered, and all written materials describing prospects and marketing leads, including contact information and products of the Business being marketed to such prospects and marketing leads.

(h)     All financial data related to the operation of the Business, including all e-mail archives related to the Business.

3

01633986.DOCX\

(i)    All other intellectual property assets, not otherwise enumerated herein, required to run the Business, as may be designated by Buyer and agreed to and reasonably deliverable by Seller (such agreement not to be unreasonably withheld, delayed, or conditioned).

4

**Annex 1(a)(i) to EXHIBIT A
CUSTOMER CONTRACTS**

01633986.DOCX\

| Doc Num | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| SO100477 | | CSV-QUPDATE | $ 3,750.00 | 9/30/2011 |
| 9/30/2010 | ING US Financial Services | FRC-MONITOR | $ 7,500.00 | 9/30/2011 |
| 9/30/2010 | ING US Financial Services | MUF-LIFECYCLE | $ 3,750.00 | 9/30/2011 |
| 9/30/2010 | ING US Financial Services | | | |
| SO100481 | | FRC-MONITOR | $ 7,000.00 | 9/30/2011 |
| 10/4/2010 | Credit Suisse | | | |
| SO100483 | | CSV-DUPDATE | $ 7,500.00 | 9/30/2011 |
| 10/19/2010 | Pershing | CSV-QUPDATE | $ 7,500.00 | 9/30/2011 |
| 10/19/2010 | Pershing | | | |
| SO100484 | | MUF-LIFECYCLE | $ 8,500.00 | 11/30/2011 |
| 10/20/2010 | Pacific Life Insurance Company | | | |
| SO100519 | | MUF-LIFECYCLE | $ 6,800.00 | 12/1/2011 |
| 12/8/2010 | Principal Financial Group | SUB-QUARTERLY | $ 6,800.00 | 12/1/2011 |
| 12/8/2010 | Principal Financial Group | FRC-MONITOR | $ 5,500.00 | 12/31/2011 |
| 12/8/2010 | Principal Financial Group | | | |
| SO100491 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 11/11/2010 | Nationwide Financial Services | | | |
| SO100509 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 11/30/2010 | UBS Global Asset Management | MUF-LIFECYCLE | $ 8,500.00 | 12/31/2011 |
| 11/30/2010 | UBS Global Asset Management | | | |
| SO100529 | | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| .12/20/2010 | MFS Investment Management | | | |
| SO100488 | | CSV-DUPDATE | $ 3,300.00 | 12/31/2011 |
| 11/2/2010 | Vanguard Group Inc. | CSV-QUPDATE | $ 3,300.00 | 12/31/2011 |
| 11/2/2010 | Vanguard Group Inc. | | | |
| SO100502 | | CSV-DUPDATE | $ 5,000.00 | 11/30/2011 |
| 11/17/2010 | Upromise Investments, Inc. | | | |
| SO100518 | | FRC-MONITOR | $ 3,900.00 | 12/31/2011 |
| 12/8/2010 | Calvert Group | | | |
| SO100528 | | CSV-DUPDATE | $ 4,500.00 | 12/31/2011 |
| 12/20/2010 | Hartford [The] | CSV-QUPDATE | $ 4,500.00 | 12/31/2011 |
| 12/20/2010 | Hartford [The] | | | |
| SO100531 | | FRC-MONITOR | $ 8,000.00 | 12/31/2011 |
| 12/23/2010 | Wellington Management | | | |
| SO100534 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 1/6/2011 | T. Rowe Price | | | |
| SO100535 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 1/7/2011 | DWS Investments | | | |
| SO100537 | | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| 1/10/2011 | Vanguard Group Inc. | | | |
| SO100543 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | SUB-MNDTCHG | $ - | 12/31/2011 |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | SUB-QUARTERLY | $ 10,000.00 | 12/31/2011 |
| 1/20/2011 | GE Asset Management : GE Investment Distributors Inc. | | | |
| SO100547 | | CSV-DUPDATE | $ 6,750.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | CSV-QUPDATE | $ 6,750.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | FRC-MONITOR | $ 9,000.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | MUF-LIFECYCLE | $ 9,000.00 | 12/31/2011 |
| 1/25/2011 | Fidelity Consulting Group | | | |
| SO100549 | | FRC-MONITOR | $ 10,000.00 | 12/31/2011 |
| 1/28/2011 | TIAA-CREF | | | |
| SO100538 | | FRC-MONITOR | $ 10,000.00 | 1/31/2012 |
| 1/12/2011 | ING US Financial Services : ING Investment Management Grc | | | |
| SO100536 | | CSV-DUPDATE | $ 6,250.00 | 2/28/2012 |
| 1/7/2011 | Merrill Lynch Retirement Group | CSV-QUPDATE | $ 6,250.00 | 2/28/2012 |
| 1/7/2011 | Merrill Lynch Retirement Group | CSV-VIEWS | $ 3,000.00 | 2/28/2012 |
| 1/7/2011 | Merrill Lynch Retirement Group | | | |
| SO100542 | | FRC-MONITOR | $ 10,000.00 | |
| 1/19/2011 | Janus Capital Group | | | |
| SO100565 | | CSV-DUPDATE | $ 6,000.00 | 12/31/2011 |
| 3/8/2011 | BlackRockIIShares | CSV-QUPDATE | $ 6,000.00 | 12/31/2011 |
| 3/8/2011 | BlackRockIIShares | | | |
| SO100581 | | CSV-DUPDATE | $ 3,750.00 | 3/30/2012 |
| 3/28/2011 | First National Bank of Omaha | CSV-QUPDATE | $ 3,750.00 | 3/30/2012 |
| 3/28/2011 | First National Bank of Omaha | | | |

1

| Doc Num / Date | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| SO100563 3/1/2011 | State Farm Insurance Company | FRC-MONITOR | $ 7,500.00 | 3/31/2012 |
| SO100567 3/9/2011 3/9/2011 | Putnam Investments Putnam Investments | CSV-DUPDATE CSV-QUPDATE | $ 5,000.00 $ 5,000.00 | 4/30/2011 4/30/2011 |
| SO100569 3/10/2011 3/10/2011 3/10/2011 | AllianceBernstein Investment AllianceBernstein Investment AllianceBernstein Investment | CSV-DUPDATE CSV-QUARTERLYFEE CSV-QUPDATE | $ 5,000.00 $ 10,000.00 $ 5,000.00 | 3/31/2012 3/31/2012 3/31/2012 |
| SO100582 3/28/2011 3/28/2011 | John Hancock Funds, Inc. John Hancock Funds, Inc. | CSV-DUPDATE CSV-QUPDATE | $ 7,500.00 $ 7,500.00 | 3/31/2012 3/31/2012 |
| SO100586 4/4/2011 | Ohio Tuition Trust Authority | CSV-QUPDATE | $ 5,250.00 | 3/31/2012 |
| SO100587 4/6/2011 4/6/2011 4/6/2011 | Columbia Management Group Columbia Management Group Columbia Management Group | CSV-DUPDATE CSV-QUARTERLYFEE CSV-QUPDATE | $ 6,750.00 $ 13,500.00 $ 6,750.00 | 3/31/2012 3/31/2012 3/31/2012 |
| SO100517 12/6/2010 12/6/2010 12/6/2010 | American Century Companies American Century Companies American Century Companies | 529 Quarterly Qualitative Update 529 Views on the News Sub Advisory Quarterly Update | $ 10,000.00 $ 3,000.00 $ 10,000.00 | 3/31/2012 3/31/2012 3/31/2012 |
| SO100593 5/6/2011 5/6/2011 5/6/2011 | OppenheimerFunds, Inc. OppenheimerFunds, Inc. OppenheimerFunds, Inc. | CSV-QUARTERLYFEE CSV-DUPDATE CSV-QUPDATE | $ 3,500.00 $ 7,500.00 $ 7,500.00 | 12/31/2011 6/30/2012 6/30/2012 |
| SO100604 5/23/2011 5/23/2011 5/23/2011 5/23/2011 | Legg Mason, Inc. Legg Mason, Inc. Legg Mason, Inc. Legg Mason, Inc. | CSV-DUPDATE CSV-QUARTERLYFEE CSV-QUPDATE FRC-MONITOR | $ 6,375.00 $ 12,750.00 $ 6,375.00 $ 8,500.00 | 3/31/2012 3/31/2012 3/31/2012 3/31/2012 |
| SO100595 5/9/2011 | BMO Bank of Montreal | FRC-MONITOR | $ 10,000.00 | 5/31/2012 |
| SO100597 5/9/2011 | Transamerica Capital Inc. | SUB-QUARTERLY | $ 10,000.00 | 5/31/2012 |
| SO100612 5/31/2011 5/31/2011 | Union Bank & Trust Company Union Bank & Trust Company | CSV-DUPDATE CSV-QUPDATE | $ 4,500.00 $ 4,500.00 | 9/30/2012 9/30/2012 |
| SO100611 5/27/2011 | Jennison Associates LLC | SUB-QUARTERLY | $ 8,000.00 | 10/1/2012 |
| SO100605 5/23/2011 | Capital Group Companies, Inc. | CSV-DUPDATE | $ 7,500.00 | 10/31/2012 |
| SO100606 5/23/2011 | Putnam Investments | FRC-MONITOR | $ 10,000.00 | 10/31/2012 |
| SO100609 5/24/2011 | Capital Group Companies, Inc. | FRC-MONITOR | $ 6,500.00 | 10/31/2012 |
| SO100613 5/31/2011 | Franklin Templeton Investments | CSV-DUPDATE | $ 7,500.00 | 10/31/2012 |
| SO100624 6/16/2011 | T. Rowe Price | CSV-QUPDATE | $ 6,000.00 | 5/30/2012 |
| SO100627 6/16/2011 | T. Rowe Price | MUF-LIFECYCLE | $ 7,500.00 | 5/30/2012 |
| SO100629 6/16/2011 | T. Rowe Price | CSV-QUPDATE | $ 6,000.00 | 5/30/2012 |
| SO100616 6/3/2011 6/3/2011 | Virginia College Savings Plan Virginia College Savings Plan | CSV-DUPDATE CSV-QUPDATE | $ 4,875.00 $ 4,875.00 | 6/30/2012 6/30/2012 |
| SO100617 6/6/2011 | Hatteras Funds | ALTERNATIVES-QUPDATE | $ 4,000.00 | 3/31/2012 |
| SO100639 6/30/2011 6/30/2011 | TIAA-CREF TIAA-CREF | CSV-DUPDATE CSV-QUPDATE | $ 6,000.00 $ 6,000.00 | 12/1/2012 12/1/2012 |
| SO100635 6/29/2011 | Fidelity Consulting Group | ALTERNATIVES-QUPDATE | $ 4,687.50 | 6/30/2012 |
| SO100644 | | | | |

2

| Doc Num | Customer | Item | Amount (Gross) | End Date |
|---|---|---|---|---|
| 7/13/2011 | First Trust Advisors L.P. | ALTERNATIVES-QUPDATE | $ 6,000.00 | 6/30/2012 |
| 7/13/2011 | First Trust Advisors L.P. | FRC-MONITOR | $ 6,000.00 | 7/31/2012 |
| SO100850 | | | | |
| 7/21/2011 | Hartford (The) | FRC-MONITOR | $ 9,000.00 | 8/31/2012 |
| SO100853 | | | | |
| 7/25/2011 | PNC Financial Services Group Inc. | FRC-MONITOR | $ 10,000.00 | 8/31/2012 |
| SO100866 | | | | |
| 8/16/2011 | Pershing | CSV-DUPDATE | $ 7,500.00 | 9/30/2012 |
| 8/16/2011 | Pershing | CSV-QUPDATE | $ 7,500.00 | 9/30/2012 |
| SO100878 | | | | |
| 9/19/2011 | Jackson National Life | ALTERNATIVES-QUPDATE | $ 10,000.00 | 9/30/2012 |
| SO100883 | | | | |
| 9/22/2011 | John Hancock Funds, Inc. | MUF-LIFECYCLE | $ 9,000.00 | 9/30/2012 |
| | | | $ 623,787.50 | |

3

**Annex 1(b)(i) to EXHIBIT A**
**Subscription Agreement & Data Feed Product License (NewRiver, Inc.)**

SUBSCRIPTION AGREEMENT

    This binding agreement (the "Agreement") between Financial Research Corporation, a Massachusetts corporation with offices located at One Faneuil Hall, Boston, MA 02109 ("Company") and NewRiver, Inc., a Massachusetts corporation with offices located at 200 Brickstone Square, Suite 504, Andover, MA 01810 ("NewRiver") sets forth the terms and conditions under which NewRiver shall provide certain products, services, data, and/or applications to Company as described more fully below.  The parties agree as follows:

**1.**    **Term & Termination**
The term of this Agreement shall commence on April 1st, 2010 (the "Effective Date") and shall continue in full force and effect for one year (the "Initial Term").  Thereafter, this Agreement shall automatically renew for up to an unlimited number of additional one-year renewal terms unless either party provides the other with written notice of non-renewal at least ninety days prior to commencement of a renewal term.  In the event that the term of any Product License (defined in Section 2 below) continues beyond the term of this Agreement, then the terms and conditions of this Agreement shall survive solely with respect to such Product License for the duration of the term (including any renewals) of such Product License.  In the event that a party (the "Defaulting Party") materially breaches this Agreement or any Product License(s) and fails to cure such breach within thirty days after receiving written notice that specifies in reasonable detail the nature of such breach (such thirty-day period hereinafter referred to as the "Cure Period"), then the other party may terminate this Agreement and/or such Product License(s) upon written notice within thirty days after expiration of the Cure Period.

**2.**    **Product Licenses**
NewRiver shall provide Company the services, products, data and/or applications set forth in the product licenses that may be executed by the parties from time to time (each such service, product or application, and all data, documents, content, or information provided therewith or accessible thereby, collectively a "Product", and each such product license a "Product License").  Such Product Licenses may be set forth in exhibits to this Agreement, and are incorporated by reference into this Agreement in their entirety, as if fully set forth herein.  The Products shall materially conform to the applicable specifications set forth in the Product License.  Prior to providing any Product, Company shall provide NewRiver, via electronic transmission protocols that are mutually acceptable to the parties, with all information that may be requested to enable NewRiver to provide the Product.

**3.**    **Pricing**
Company shall pay NewRiver the fees and amounts set forth in this Agreement and all Product Licenses.  The fees set forth in this Agreement or any Product License are those currently in effect.  NewRiver may modify such fees with respect to any renewal term by providing Company with written notice of such modification at least ninety (90) days prior to commencement of such renewal term.

**4.**    **Payment**
All amounts payable hereunder shall be paid in full within thirty (30) days of date of invoice.  NewRiver shall invoice Company annually in advance unless otherwise specified in the applicable Product License.  All amounts remaining unpaid when due shall accrue interest at the rate of one percent (1%) per month, but in no event shall the interest charge exceed the maximum amount permissible under applicable law.  In the event that any amount due hereunder remains unpaid sixty (60) days after date of invoice, NewRiver shall be entitled to (a) terminate this Agreement without further obligation upon written notice, or (b) suspend its performance under this Agreement until such unpaid amount has been paid in full.  Such suspension of performance shall not relieve Company of its obligations under this Agreement, including without limitation its obligation to pay all fees and amounts set forth herein (or in a Product License).  All fees and amounts hereunder are exclusive of state, federal and local taxes, and Company shall pay or reimburse NewRiver for all such taxes except those based on NewRiver's income.  Company shall promptly reimburse NewRiver for all costs and expenses, including but not limited to reasonable attorneys' fees, that may be incurred in the collection of any undisputed amounts payable under this Agreement.

**5.**    **Out-of-Scope Services**
In the event that Company requests that NewRiver perform any custom service or any service that is outside the scope of services(s) that are expressly set forth in the applicable Product License(s) (collectively "Out-of-Scope Services"), Company shall request a written estimate for such Out-of-Scope Services.  NewRiver may accept or reject the opportunity to provide such Out-of-Scope Services in its sole discretion.  In the event that NewRiver agrees to provide Out-of-Scope Services requested by Company, NewRiver shall use commercially reasonable efforts to provide a written estimate, based on the table of hourly fees set forth below (as adjusted for inflation based on CPI), and any additional terms or conditions applicable to such Out-of-Scope Services, as soon thereafter as reasonably practicable.  Company shall pay NewRiver the fees and amounts specified in the estimate, plus NewRiver's out-of-pocket expenses, and shall be subject to any additional terms and conditions specified therein.  In the event that an estimate is not provided for Out-of-Scope Services, then Company shall pay NewRiver's then-current pricing plus out-of-pocket expenses.

| Role | Hourly Rate |
|---|---|
| Project Manager | $225 |
| Business Analyst | $200 |
| Implementation Engineer | $200 |
| Implementation Consultant | $175 |

**6.**    **Service Usage**
NewRiver hereby grants Company a non-exclusive, non-transferable, non-sublicensable, revocable, limited license to use the Products during the term of this Agreement and the applicable Product License(s) for the sole purpose(s) expressly set forth in such Product License(s) (the "Permitted Uses") and subject to all usage restrictions and limitations set forth in this Agreement and the applicable Product License(s).  In no event shall Company, or any employee or agent of Company, use any Product, or any portion thereof, for any purpose other than the Permitted Uses.  Without broadening the scope of the Permitted Uses, unless otherwise expressly permitted by the applicable Product License, in no event shall Company, or any employee or agent of Company, resell, redistribute, license, or provide access to any Product, or any portion thereof, (regardless of whether via a data feed or any tool, product, process, or service) to any third party.  In the event that Company, or any employee or agent thereof, uses a Product, or any portion thereof, in any manner or for any purpose that is not expressly permitted by this limited license or the Permitted Uses (or that is prohibited by usage restrictions), Company shall immediately notify NewRiver in writing of such use ("Misuse").  In the event of any Misuse, in addition to any other remedies that may be available, Company shall promptly pay NewRiver's then-current licensing fees for the entire period of such Misuse.

**7.**    **Audit Rights**

NewRiver (or its agent) shall have the right to audit Company upon seven days prior notice in order to ensure Company's compliance with the terms of this Agreement, including without limitation the limited license set forth in Section 5 above. NewRiver or its agent shall use commercially reasonable efforts not to disrupt Company's business, and while on Company's premises, shall comply with Company's reasonable security policies.

8.    **Ownership**
Except for the limited license rights expressly set forth in this Agreement or a Product License, this Agreement grants Company no rights or licenses in any Product, or any portion thereof. This Agreement does not grant Company any ownership rights in any Product, or any other product, process, service or intellectual property of NewRiver (collectively "NewRiver IP"), and all rights, title and interest in and to such NewRiver IP are hereby retained solely by NewRiver.

9.    **NewRiver Warranties**
NewRiver represents and warrants that (a) it has all rights and licenses necessary to provide the Products hereunder, and (b) each Product does not infringe on any valid U.S. copyright, patent, trademark, or trade secret of any third party.

10.    **Disclaimer of Warranties**
EXCEPT FOR THE WARRANTIES SET FORTH IN SECTION 9 ABOVE, AND EXCEPT FOR ANY EXPRESS "WARRANTY" OBLIGATIONS IN A PRODUCT LICENSE, (I) THE PRODUCTS ARE PROVIDED ON AN "AS IS" BASIS WITH ALL FAULTS, AND (II) NEWRIVER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND HEREUNDER, WHETHER SUCH REPRESENTATIONS OR WARRANTIES ARE EXPRESS OR IMPLIED, WRITTEN OR ORAL. ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED.

11.    **Limitation of Liability**
NEWRIVER'S ENTIRE LIABILITY UNDER THIS AGREEMENT, OR IN CONNECTION WITH THE SUBJECT MATTER OR PERFORMANCE HEREOF, ARISING FROM ANY CAUSE WHATSOEVER, WHETHER BASED IN WARRANTY, CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AGGREGATE FEES PAID BY COMPANY WITHIN SIX MONTHS PRIOR TO THE FIRST CLAIM FILED. SUCH LIMITATION IS CUMULATIVE, WITH ALL PAYMENTS AND LIABILITIES BEING AGGREGATED TO DETERMINE SATISFACTION OF THE LIMIT. THE EXISTENCE OF MULTIPLE CLAIMS, WHETHER BROUGHT CONCURRENTLY OR SEPARATELY, SHALL NOT ENLARGE THE LIMIT. ANY CLAIMS NOT BROUGHT AGAINST NEWRIVER WITHIN ONE YEAR AFTER THE OCCURRENCE OF THE ACT (OR FAILURE TO ACT) GIVING RISE TO SUCH CLAIM SHALL BE DEEMED WAIVED AND RELEASED. IN NO EVENT SHALL NEWRIVER BE LIABLE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, OR INDIRECT DAMAGES HEREUNDER, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR LOSS OF USE DAMAGES, EVEN IF NEWRIVER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE LIMITATIONS OF LIABILITY ARE REASONABLE, ESSENTIAL TO THIS AGREEMENT, AND REFLECTED IN THE PRICES SET FORTH HEREIN. NEWRIVER WOULD NOT ENTER INTO THIS AGREEMENT WITHOUT SUCH LIMITATIONS ON ITS LIABILITY.

12.    **Company Warranties**
Company represents and warrants that it shall not (i) use or access any Product, or any portion thereof, for any purpose except as expressly permitted by the limited license and Permissible Uses set forth herein, (ii) copy, transfer, create derivative works of, reverse engineer, or otherwise reproduce or modify any Product, or any portion thereof, for any purpose, (iii) attempt to obtain, or exploit for the benefit of itself or any third party, NewRiver's proprietary database structure, indices, computer programs, programming techniques, trade secrets, intellectual property, or other proprietary information, or (iv) use any Product, or any portion thereof, in connection with any unlawful purpose or activity, including without limitation any use that violates any state or federal securities law or regulation.

13.    **Indemnification**
Company shall indemnify, defend and hold harmless NewRiver, and all officers, directors, employees and agents thereof, from all liabilities, claims, damages, losses, costs, expenses, judgments, arbitration awards, demands, suits, and actions (including without limitation legal expenses, settlement costs, and reasonable attorneys' fees) arising from or in connection with Company's (i) breach of license, warranty, or any use restriction, or (ii) use of a Product, or any portion thereof, in connection with any purpose other than the Permitted Uses. NewRiver shall indemnify, defend and hold harmless Company, and all officers, directors, employees and agents thereof, from all liabilities, claims, damages, losses, costs, expenses, judgments, arbitration awards, demands, suits, and actions (including without limitation legal expenses, settlement costs, and reasonable attorneys' fees) arising from any third party claim that a Product, or any portion thereof, infringes any valid U.S. copyright, patent, trademark, or trade secret. NewRiver's foregoing obligation to indemnify for claims of third party intellectual property infringement shall not apply if Company has used the Product, or any portion thereof, in any manner or for any purpose that is not expressly permitted (or that is prohibited) by this Agreement, or has combined the Product, or any portion thereof, with any hardware, software, process, system, or method not provided by NewRiver under the Product License for such Product. Each party hereby agrees that the indemnifying party shall have sole control and authority with respect to the defense or settlement of any indemnified claims, and the indemnified party shall fully cooperate with the indemnifying party, at the indemnifying party's sole cost and expense, in the defense or settlement of any such claims. The indemnifying party shall obtain the written consent of the indemnified party prior to entering into any settlement that imposes any limitation, liability, or other detriment on the indemnified party.

14.    **General**

    (a) **Entire Agreement; Severability.** This Agreement, together with any written non-disclosure, confidentiality, non-compete, or non-solicitation agreements that may have been executed by the parties in connection herewith, contain the entire and exclusive agreement of the parties regarding the subject matter hereof, and supersede all prior agreements, drafts, communications, discussions, and understandings, whether oral or written, with respect thereto. If any provision hereof should be held invalid, illegal, or unenforceable, such provision shall be reformed to most nearly give effect to the intentions of the parties as originally expressed in such provision and this Agreement, and all other provisions hereof shall remain in full force and effect, and shall be liberally construed in order to most nearly give effect to the intentions of the parties as expressed in this Agreement.

    (b) **Assignment.** Neither party may assign, delegate, or transfer this Agreement, or any of its rights or obligations hereunder, in any way (whether by contract, operation of law, or otherwise), except with the prior written consent of the other party or in connection with a sale of the business to which this Agreement relates. Such consent shall not be unreasonably withheld or delayed. Any assignment, delegation, or transfer in violation of this section shall be void.

(c) **Failure to Perform.** No failure or omission by either party hereto in the performance of any obligation of this Agreement (other than payment obligations) shall be deemed a breach of this Agreement or create any liability if the same shall arise from any cause or causes beyond the reasonable control of the party, including, but not limited to, the following: acts of God; acts or omissions of any governmental agency; any rules, regulations or orders issued by any governmental authority or by any officer, department, agency or instrumentality thereof; fire; storm; flood; earthquake; war; rebellion; insurrection; riot; or invasion.

(d) **Survival.** The parties agree that Sections 3, 4, 6, 7, 8, 10, 11, 12, 13 and 14 shall survive the termination or expiration of this Agreement. Additionally, any outstanding obligations of Company at the time of termination or expiration of this Agreement, including without limitation any unpaid payment obligations, shall survive. This section shall not prevent either party from bringing any claim or taking any other action after the termination or expiration of this Agreement in order to enforce this Agreement, or any section or provision hereof, with respect to any breach, non-performance, or other dispute that occurred during the term hereof.

(e) **Headings.** The captions or headings of the sections or other subdivisions hereof are inserted only as a matter of convenience or for reference and shall have no effect on the meaning of the provisions hereof.

(f) **Amendments; Waivers.** This Agreement may only be amended in a written agreement or amendment that expressly references and amends this Agreement and that is signed in ink by both parties. No failure on the part of either party to exercise, and no delay in exercising, any right, power, remedy or privilege under this Agreement shall impair, or constitute a waiver of, any such right, power, remedy or privilege, or constitute a waiver of any breach of this Agreement. Nor shall any single or partial exercise of any right, power, remedy or privilege preclude any further exercise thereof, or the exercise of any other right, power, remedy or privilege. All waivers must be stated expressly in a written agreement or amendment and be signed in ink by both parties. Unless expressly stated otherwise in the waiver, any waiver shall be limited to the particular instance for which it was provided.

(g) **Public Announcements.** Company hereby authorizes NewRiver to include Company's name and logo on its customer lists during the term of this Agreement. Any other use of Company's name or logo shall require Company's prior written approval. NewRiver may make a public announcement of this Agreement upon Company's written approval of the content of such announcement, which shall not be unreasonably withheld or delayed.

(h) **Execution in Counterparts.** This Agreement may be executed in counterparts, each of which, when so executed and delivered (including by facsimile), shall be deemed to be an original, and all of which, taken together, shall constitute one and the same instrument.

(i) **Notices.** Any communication, consent or notice required or permitted by this Agreement shall be in writing and shall be deemed given upon (a) delivery by registered or certified mail, postage prepaid, return receipt requested, or (b) delivery by a nationally recognized express delivery service, or (c) confirmed facsimile transmission; in each case addressed to the attention of the other party's "President", and with a copy to its "General Counsel", at the address set forth in this Agreement or at such other address as may be provided in accordance with the provisions of this section.

(j) **Governing Law & Venue.** This Agreement shall be governed and construed under the laws of the Commonwealth of Massachusetts without regard to conflict of law principles. Any dispute, controversy or claim arising under this Agreement, or in connection with the subject matter or performance hereof, shall be brought and resolved in the state or federal courts located in the Commonwealth of Massachusetts, and the parties hereby consent to the jurisdiction and venue of such courts for such purpose. Any judgment of such courts may be enforced in any court of competent jurisdiction.

(k) **Relationship of the Parties.** For purposes of this Agreement, the parties shall be independent contractors. This Agreement does not establish a partnership, joint venture, agency, or any form of legal relationship other than that of independent contractors.

(l) **Benefit of the Parties**
This contract is intended for the sole benefit of the parties hereto, and no third party shall have any rights under this Agreement, or any right to enforce any provision hereof.

(m) **Negotiated Agreement**
This Agreement has been fully and fairly negotiated by both parties, and shall not be interpreted or construed against either party by virtue of the degree to which each party drafted or negotiated this Agreement or any section or provision hereof.

The parties hereby execute this Agreement under their hands and seals as set forth below.

AGREED & ACCEPTED;
FINANCIAL RESEARCH CORPORATION
By its Authorized Representative:

Signature: _Lawrence Petrone_

Name: _Lawrence Petrone_

Title: _VP - Director of Research_

Date: _3/24/2010_

AGREED & ACCEPTED;
NEWRIVER, INC.
By its Authorized Representative:

Signature: _____

Name: _____

Title: _____

Date: _____

**EXHIBIT A**

_Data Feed Product License_

This Product License is made this April 1, 2010 (the "License Effective Date"). NewRiver agrees to furnish the Product specified in this Product License (the "Data Feed Product") in accordance with the terms and conditions hereof and the Agreement, and Company agrees to the terms and conditions hereof and the Agreement, including without limitation to pay NewRiver all applicable fees and amounts.

I.      Product

NewRiver shall provide the Data Feed Product specified herein (i) in a pipe or tab delimited file via FTP, or in a mutually agreed electronic format, and (ii) in accordance with the terms and conditions of this Product License. The Data Feed Product shall materially conform to the specifications set forth in Exhibit A-1, and shall be subject to the service level specifications set forth in Exhibit A-2. Company's sole remedies for any failure of NewRiver to perform in accordance with the provisions set forth in Exhibit A-2 shall be the remedies expressly set forth in Section 3 thereof.

II.     Permitted Use

Company may internally use the Data Feed Product solely to generate a 529 Plan Data Report (the "Report"), which it may distribute to its customers (each such customer an "Authorized User"). Company may not use the Data Feed Product for any purpose other than as expressly permitted by this paragraph. For the avoidance of doubt, and without expanding the scope of the foregoing permitted use, Company may not (i) distribute the Data Feed Product (or any portion thereof) to the Authorized Users or to any third party, and (ii) may not extract data (or any other portion or component of the Data Feed Product) from the Data Feed Product, except to the extent necessary for, and for the sole purpose of, generating the Report.

III.    Term

This Product License shall commence on the License Effective Date set forth herein, and shall continue in full force and effect for a period of thirty-six (36) months. Thereafter this Product License shall automatically renew for up to an unlimited number of subsequent one-year renewal terms unless either party provides the other with ninety days prior written notice of non-renewal. The term of this Product License shall be subject to the termination provisions set forth in Section 1 of the Agreement. The subscription to the Data Feed Product shall commence on the License Effective Date (the "Subscription Date"), and all fees and amounts paid shall be applied against amounts due for the period from the Subscription Date to the termination or expiration of this Product License (the "Subscription Period"). In the event that the Data Feed Product does not materially conform to the specifications set forth in this Exhibit A on or before the Subscription Date, then Company may terminate this Product License by written notice within ten (10) days after the Subscription Date. If Company does not terminate this Product License as permitted in this Section III, then Company shall be deemed to have accepted the Data Feed Product and shall be obligated for all fees and amounts with respect to the Subscription Period.

IV.     Pricing

NewRiver's set-up fee of two thousand dollars ($2,000) for the Data Feed Product is hereby waived. Company shall pay NewRiver an annual fee of ten thousand dollars ($10,000.00) for the Data Feed Product. Notwithstanding the foregoing, in the event that Company distributes the Report to more than one (1) Authorized User, the total annual fee for the Data Feed Product shall be fifteen thousand dollars ($15,000.00), regardless of how many Authorized Users receive the Report. The set-up fee shall be invoiced upon execution of this Product License. The annual fee shall be invoiced annually in advance as of the commencement of each contract year. If one or more additional Authorized Users beyond the first are added during a contract year, Company shall provide NewRiver with prompt written notice thereof, and NewRiver shall invoice Company for five thousand dollars ($5,000.00), the full amount of the difference. For subsequent contract years, the full amount of the annual fee shall be invoiced annually in advance.

V.      Warranty

NewRiver represents and warrants that the data contained within the Data Feed Product (the "Data") (i) is based upon information in documents obtained from the Municipal Securities Rulemaking Board ("MSRB") or EDGAR for a 529 plan ("Source Documents"), and (ii) will be accurately obtained from the Source Document, or accurately calculated or otherwise reasonably determined or characterized from information in the Source Document.

IN WITNESS WHEREOF, the parties have executed this Product License as of the License Effective Date. Each party hereby represents and warrants that its respective signatory whose signature appears below is duly authorized by all necessary and appropriate corporate action to execute this Product License.

FINANCIAL RESEARCH CORPORATION            NEWRIVER, INC.
By its Authorized Representative:                      By its Authorized Representative:

Signature: _Lawrence Petrone_                         Signature: _____

Name: _Lawrence Petrone_                              Name: _____

Title: _VP - Director of Research_                    Title: _____

Date: _3/24/2010_                                      Date: _____

**EXHIBIT A-1**

Data Feed Product Specifications

NewRiver shall provide Authorized Users with 529 plan data for the following data points on a monthly basis:

| | |
|---|---|
| Fees | Distribution Fee |
| | Program Management Fee |
| | State Administration Fee |
| | Weighted Average Underlying Fund Expense Ratio With Fee Waivers and Expense Reimbursements |
| | MISC_FEES_EXPENSES |
| | TOTAL_ASSET_BASED_FEES |
| | ACCOUNT_MAINTENANCE_FEE |
| General | STATE |
| | PLAN_ID |
| | PLAN_NAME |
| | PLAN_INCEPTION_DATE |
| | PRGM_MNGR_CONTRACT_EXPIR_DATE |
| | UNDERLYING_FUND_FAMILIES |
| | IO_NAME |
| | IO_CUSIP |
| | IO_CLASS |
| | LOAD_STRUCTURE_ID |
| Performance | 1 Year |
| | 5 Year |
| | Since Inception |
| | Inception Date |
| | |
| | Optional |
| | DIRECT_PURCHASE_BOOL_ID |
| | FINANCIAL_ADVSR_PURCH_BOOL_ID |

**EXHIBIT A-2**

Data Feed Service Level Specifications

1.  NEWRIVER SERVICE STANDARDS
    NewRiver shall use commercially reasonable efforts to adhere to its then-current Client Support Policy, which shall be provided to Company upon request.

2.  AVAILABILITY AND PERFORMANCE
    a)      Data Delivery: Excluding Scheduled Maintenance, the Product shall be provided in accordance with the delivery frequency set forth in Exhibit A-1.
    b)      Timing: On days that the New York Stock Exchange is open for business (an "NYSE Business Day"), and subject to the delivery frequency specified in Section 2(a) above, the applicable data shall be delivered by 9 a.m. eastern time 90% of the time, and before 10 a.m. eastern time 95% of the time, as measured on a calendar-monthly basis.
    c)      Data Accuracy: Although NewRiver strives for 100% data accuracy, the data provided to Company shall accurately reflect the content of a document filed with EDGAR or the MSRB (on or before the prior NYSE Business Day) 99.5% of the time, as measured on a calendar-monthly basis.

3.  EXCLUSIVE REMEDIES
    The following discounts shall be Company's sole and exclusive remedies in connection with any failure to perform in accordance with the provisions of this exhibit:
    a)      Any failure of NewRiver to meet the performance objectives outlined in Section 2(b) in a calendar month will be deemed a "Delivery Failure", and any failure of NewRiver to meet the performance objectives outlined in Section 2(c) in a calendar month will be deemed an "Accuracy Failure" (Delivery Failures and Accuracy Failures hereinafter referred to, collectively, as "Service Level Failures").
    b)      For each Service Level Failure accumulated during a calendar month, NewRiver shall waive five percent (5%) of the service fees payable under this Product License for such month. In no event shall the total discount exceed twenty-five percent (25%) of the service fees payable under this Product License for such month.

01/06/2010 WED 9:47  FAX 617 253 2000 Financial Research Corp.                    ⊠002/005

## RECIPROCAL CONFIDENTIALITY AGREEMENT

THIS AGREEMENT is entered into this __6th__ day of __January__ , __2010__ , by and between the undersigned company ("Company"), and NewRiver, Inc., ("NewRiver"), 200 Brickstone Square, Suite 504, Andover, Massachusetts 01810.

WHEREAS, Company has certain proprietary business information (the "Company Information"), and will only provide such information if Company's proprietary rights and the confidentiality of all Company Information is recognized and maintained by NewRiver;

WHEREAS, NewRiver has certain proprietary business information (the "NewRiver Information"), and NewRiver will only provide such information if NewRiver's proprietary rights and the confidentiality of all NewRiver Information is recognized and maintained by Company; and

WHEREAS, NewRiver and Company desire to exchange information (i) in order to internally evaluate certain proposed business dealings between the parties, and (ii) in order to fulfill the following additional purpose(s) (if any): ___N/A___
(such evaluation and/or additional purposes hereinafter referred to as the "Purpose").

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, the parties agree as follows:

(a)    Each party disclosing information to the other party shall be referred to as a "Disclosing Party", and each party receiving information from the other party shall be referred to as a "Receiving Party". The term of this Agreement shall be ninety (90) days from the date hereof, subject to termination by either party at any time upon five (5) days prior written notice. Notwithstanding the foregoing, all of the parties' obligations with respect to information disclosed during the term hereof, shall survive termination or expiration of this Agreement, return and/or destruction of the Confidential Information, and termination of any business relationship between the parties.

(b)    Company hereby recognizes the proprietary rights of NewRiver in and to the NewRiver Information. The NewRiver Information and all materials, information, and data, in whatever form or media (including without limitation forms, documents, specifications, system designs, intellectual property, products, processes, pricing, databases, strategies, structures, flow charts, screen formats, algorithms, and/or code) of NewRiver or NewRiver's subsidiaries, affiliates, vendors or clients, provided or disclosed to Company by NewRiver or any of its agents, employees, or representatives (hereinafter the "Agents") on or after the date of this Agreement (such NewRiver Information, materials, information, and data hereinafter referred to as the "NewRiver Confidential Information") shall remain the sole and exclusive property of NewRiver or NewRiver's subsidiaries, affiliates, vendors or clients. Company and its Agents shall hold the NewRiver Confidential Information in the strictest confidence and shall not disclose the NewRiver Confidential Information or any portion thereof to any person or entity. Company and those of its Agents to whom any of the NewRiver Confidential Information is disclosed shall use the NewRiver Confidential Information solely for the Purpose of this Agreement, and neither Company nor any of its Agents shall use the NewRiver Confidential Information for any other purpose. Company shall provide access to the NewRiver Confidential Information only to those Agents of Company having a need to know such information for Purpose of this Agreement.

01/06/2010 WED 9:47  FAX 617 263 2000 Financial Research Corp.                    Ø003/005

(c)   NewRiver hereby recognizes the proprietary rights of Company in and to the Company Information. The Company Information and all materials, information, and data, in whatever form or media (including without limitation forms, documents, specifications, system designs, intellectual property, products, processes, pricing, databases, strategies, structures, flow charts, screen formats, algorithms, and/or code) of Company or Company's subsidiaries, affiliates, vendors or clients, provided or disclosed to NewRiver by Company or any of its Agents on or after the date of this Agreement (such Company Information, materials, information, and data hereinafter referred to as the "Company Confidential Information") shall remain the sole and exclusive property of Company or Company's subsidiaries, affiliates, vendors or clients. NewRiver and its Agents shall hold the Company Confidential Information in the strictest confidence and shall not disclose the Company Confidential Information or any portion thereof to any person or entity. NewRiver and those of its Agents to whom any of the Company Confidential Information is disclosed shall use the Company Confidential Information solely for the Purpose of this Agreement, and neither NewRiver nor any of its Agents shall use the Company Confidential Information for any other purpose. NewRiver shall provide access to the Company Confidential Information only to those Agents of NewRiver having a need to know such information for Purpose of this Agreement.

(d)   Upon the Disclosing Party's request, the Receiving Party and its Agents shall (i) return to the Disclosing Party any and all of the Disclosing Party's confidential information (either the NewRiver Confidential Information or the Company Confidential Information, as the case may be) and any tangible materials relating thereto, and all tangible copies of such information or materials; (ii) destroy any and all other copies, information or materials in whatever form or media pertaining to such confidential information and/or its use or application; and (iii) provide to the Disclosing Party a signed written statement that all such confidential information and other information, copies and materials pertaining thereto have been returned to the Disclosing Party or destroyed in accordance with the terms hereof.

(e)   The obligations of confidentiality, non-use and nondisclosure set forth in this Agreement shall not apply to such portions of the NewRiver Confidential Information or the Company Confidential Information that the Receiving Party can show (i) are or became generally available to the public other than through the disclosure or other fault of the Receiving Party or its Agents; (ii) are or became available to the Receiving Party on a non-confidential basis from a third party (unrelated to NewRiver or Company) that is entitled to disclose it; (iii) were known to the Receiving Party on a non-confidential basis prior to its disclosure by the Disclosing Party; or (iv) were developed by the Receiving Party or its Agents without reference to the Disclosing Party's confidential information. Additionally, either party may disclose Confidential Information to the extent required by applicable law or regulation or an order of any court or governmental body. The Receiving Party shall use diligent efforts to provide the Disclosing Party with written notice of such requirement prior to any disclosure, and shall cooperate with the Disclosing Party, at Disclosing Party's expense, to seek a protective order or other remedy to protect the confidentiality of the Disclosing Party's Confidential Information. In any event, the Receiving Party shall disclose only those portions of the Confidential Information that are required to be disclosed by such law, regulation or order.

(f)   The Receiving Party acknowledges that any breach or threatened breach of this Agreement may cause the Disclosing Party substantial and irreparable harm for which remedies at law may be inadequate, and, in addition to any other remedies that may be available, the Disclosing Party

2

01/06/2010 WED 9:48  FAX 617 263 2000 Financial Research Corp.                    ☑004/005

shall be entitled to seek specific performance, injunctive relief, and any other equitable relief that may be appropriate.

(g)  NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER WRITTEN OR ORAL, UNDER THIS AGREEMENT OR IN CONNECTION WITH THE CONFIDENTIAL INFORMATION. THE CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" AND "WITH ALL FAULTS". ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED. NEITHER PARTY SHALL HAVE ANY RESPONSIBILITY OR LIABILITY OF ANY KIND ARISING FROM RECEIVING PARTY'S USE THEREOF OR RELIANCE THEREON.

(h)  This Agreement shall be governed and construed under the laws of the Commonwealth of Massachusetts without regard to conflict of law provisions. All claims brought by either party under this Agreement, or in connection with the subject matter hereof, shall be brought and resolved in the state or federal courts located in the Commonwealth of Massachusetts, and the parties hereby consent to the jurisdiction and venue of such courts. Any judgment of such courts may be enforced in any court of competent jurisdiction.

(i)  This Agreement contains the entire and exclusive agreement of the parties with respect to the subject matter hereof, and supersedes any and all prior agreements, discussions, communications, or understandings with respect thereto. This Agreement may not be modified except in a written instrument that expressly references and modifies this Agreement and that is signed in ink by both parties. If any provision of this Agreement is found to be invalid, illegal, or unenforceable, then to the fullest extent permitted by law, such provision shall be reformed to most nearly give effect to the intentions of the parties (as originally expressed in such provision and this Agreement) as may be possible, and all other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in order to give effect as nearly as may be possible to such intentions.

(j)  This Agreement may not be assigned by either party without the prior written consent of the other, and any assignment in violation of this section shall be void. Notwithstanding the foregoing, this Agreement shall be binding upon and inure to the benefit of each party's successors.

(k)  No failure on the part of either party to exercise, and no delay in exercising, any right, power, remedy or privilege under this Agreement (or that may be provided by statute, law, equity or otherwise), shall impair, prejudice or constitute a waiver of any such right, power, remedy or privilege, or be construed a waiver of any breach of this Agreement, or as an acquiescence therein. Nor shall any single or partial exercise of any such right, power, remedy or privilege preclude any other or further exercise thereof, or the exercise of any other right, power, remedy or privilege. All waivers must be expressly stated in writing, expressly reference this agreement, and be signed in ink by both parties. Any written waiver may be limited in scope, duration, or otherwise by the waiving party as specified in the waiver.

[Remainder of page intentionally blank]

3

01/06/2010 WED 9:48   FAX 617 263 2000 Financial Research Corp.                    ☑005/005

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal
by their duly authorized representatives as of the date first above written.

Company:

_Financial Research Corporation_

**NewRiver, Inc.**
By its Authorized Representative:                    By its Authorized Representative:

Signature: _Alex Magary_                    Signature: _Lawrence Petro_

Name: _Alex Magary_                    Name: _LAWRENCE PETRUNO_

Title: _General Counsel_                    Title: _SVP - Director of Research_

Date: _1/6/2010_                    Date: _1/6/2010_

4

Annex 1(c)(i) to EXHIBIT A
CoActiv Equipment Lease (#38934)

**COACTIV**
CAPITAL PARTNERS

## COACTIV CAPITAL PARTNERS INC
### Equipment Lease Agreement

Agreement #:
38934

| VENDOR/RESELLER: | LESSEE (Legal Name & Billing Address): |
|---|---|
| Axis Business Solutions | FRC, LLC |
| 538 Green St | 1 Faneuil Hall 3rd Floor |
| Portsmouth NH  03801-3755 | Boston MA  02109 |

**EQUIPMENT DESCRIPTION:**

| Qty | Model & Description | Serial Number |
|---|---|---|
| 1 | See attached Schedule A | |

**TRANSACTION TERMS:**

| Number of Payments: | Payment Amount: | LEASE TERM | | PAYABLE |
|---|---|---|---|---|
| 36 | $1,927.76 + Applicable Taxes | 36 months | | Monthly |
| | | Advance Payment: | Documentation Fee: | End of Lease Provision: |
| Pmt Sched (If Applic): Steps    #Pmts | + Applicable Taxes | $3,034.52 (First and Last Pmt In Advance + Applicable taxes) | $250.00 | Full Payout to Customer Amount: $1.00 |

| Equipment Location: | Lessee Contact Information: |
|---|---|
| 1 Faneuil Hall 3rd Floor, Boston, MA 02109-6174 | Phone Number: (613) 9400-     Fax Number: (613) 140-4410 |
| | (617) 742-2812    (617) 742-4410 |
| | E-Mail Address:    tteaconfeur@mercatuspartners |

We have written this Lease in plain language because we want you to understand its terms. Please read your copy of this Lease carefully and feel free to ask us any questions you may have. The words "you" and "your" mean the Lessee named above. The words "we", "us", and "our" refer to the Lessor named above.

IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LEASE (INCLUDING THOSE ON THE REVERSE SIDE) SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. TERMS OR ORAL PROMISES WHICH ARE NOT CONTAINED IN THIS WRITTEN LEASE MAY NOT BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS LEASE ONLY BY ANOTHER WRITTEN AGREEMENT BETWEEN YOU AND US. YOU AGREE TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS LEASE. THIS LEASE IS NOT CANCELABLE. YOU AGREE THAT THE SYSTEM WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.

YOU CERTIFY THAT ALL THE INFORMATION GIVEN IN THIS LEASE AND YOUR APPLICATION WAS CORRECT AND COMPLETE WHEN THIS LEASE WAS SIGNED. THIS LEASE IS NOT BINDING UPON US OR EFFECTIVE UNLESS AND UNTIL WE EXECUTE THIS LEASE. THIS LEASE AND ALL SCHEDULES WILL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. YOU SPECIFICALLY WAIVE ANY DEFENSE BASED UPON FORUM NON CONVENIENS AND YOU ADMIT THAT THE STATE AND FEDERAL COURTS LOCATED IN EASTERN DISTRICT OF PENNSYLVANIA ARE CONVENIENT FORUMS TO RESOLVE ALL DISPUTES UNDER THIS LEASE. You agree to submit the original lease documents with the security deposit to Lessor or its assignee via overnight courier the same day of the facsimile transmission at the lease documents. Should we fail to receive these originals, you agree to be bound by the faxed copy of this agreement with appropriate signature on the document. Lessee makes the right to challenge in court the authenticity of a faxed copy of this agreement and the faxed copy shall be considered the original and shall be the parties agreement for the purposes of any enforcement action under paragraph 14.

| LESSOR: CoActiv Capital Partners Inc. | LESSEE: FRC, LLC. |
|---|---|
| 655 Business Center Drive, Suite 250 Horsham, PA 19044 | BY: X _____ |
| BY: _____ | TITLE: X Vice President of Finance |
| TITLE: _____ | DATE: X 2/15/09    FED TAX ID: X 26-3495324 |
| DATE: _____ | |

**UNCONDITIONAL GUARANTY**

In consideration of Lessor entering into the above Lease in reliance on this guaranty, the undersigned, together and separately, unconditionally and irrevocably guarantee to Lessor, its successors and assigns, the prompt payment and performance of all obligations under the Lease. We agree that (a) this is a guaranty of payment and not of collection, and that Lessor can proceed directly against us without disposing of any security or seeking to collect from the Lessee, (b) we waive all defenses and notices, including those of protest, presentment, and demand, (c) Lessor may renew, extend or otherwise change the terms of the Lease without notice to us and we will be bound by such changes, and (d) we will pay all of Lessor's costs of enforcement and collection. This guaranty survives the bankruptcy of Lessee and binds our administrators, successors, and assigns. Our obligations under this guaranty continue even if Lessee becomes insolvent or bankrupt or is discharged from bankruptcy and we agree not to seek to be resold by Lessee in the event we meet our Lessee THIS GUARANTY WILL BE GOVERNED BY THE SAME STATE LAW AS THE LEASE. WE AGREE TO JURISDICTION AND VENUE IN THE STATE AND FEDERAL COURTS IN THE SAME STATE.

| GUARANTOR: X _____ | GUARANTOR: X _____ |
|---|---|
| By: Robert B. Hedges  Jr.          , Individually | By: Teresa Epperson          , Individually |
| Address: 11 Colonial Way, Weston, MA 02493-1937 | Address: 147 Orchard Ave, Weston, MA 02493-2254 |
| Social Security Number: 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 | Social Security Number: 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 |
| Witness: _____ | Witness: _____ |

## CORPORATE GUARANTY

**Lease Agreement No. 38034**

Lessor:  CoActiv Capital Partners, Inc.
Address: 655 Business Center Drive
Horsham, PA 19044

Lessee:  FRC, LLC
Address: 1 Faneuil Hall 3rd Floor

Boston MA 02109-6174

Date of Lease Agreement: _____, 20 ___     Date of Corporate Guaranty: _____, 20 ___

In consideration of Lessor entering into the Lease Agreement dated _____ with Lessee ("Lease Agreement"), the undersigned Limited Liability Company ("Guarantor") unconditionally guarantees to Lessor (and any assignee of Lessor) the (i) prompt payment of Lessee's indebtedness or balance of indebtedness to Lessor under the terms of the Lease Agreement, whether such indebtedness now exists or is incurred hereafter, (ii) the prompt performance of Lessee's obligations under the terms of the Lease Agreement and (iii) any and all expenses, including reasonable attorney fees, incurred by Lessor in enforcing its rights hereunder. Guarantor agrees that this Corporate Guaranty is an unconditional guarantee of payment and performance, and that Lessor may enforce the terms of this Corporate Guaranty even if the Lease Agreement is deemed to be invalid or unenforceable and without first proceeding against Lessee or the leased property.

Should Lessee be in default of the terms of the Lease Agreement, Lessor shall have the right to proceed against Guarantor at any time, without any notice and without any proceeding or action against Lessee. Guarantor agrees to be bound by and on demand to pay any deficiency established by a sale of the leased property, with or without notice to Guarantor, and to pay all attorney's fees and other expenses incurred by Lessor by reason of any default by Lessee or by Guarantor hereunder. Guarantor waives (i) notice of acceptance of this Corporate Guaranty; (ii) promptness and diligence; (iii) notice of the incurrence of any obligation by Lessee; (iv) notice of any actions taken by Lessor or Lessee under the Lease Agreement or any agreement relating thereto; (v) presentment, demand of payment, notice of nonpayment, default, dishonor, and/or protest by Lessee; (vi) any requirement that Lessor exhaust any right against Lessee, any other obligor or any collateral; and (vii) notice of any election by Lessor to sell any leased property and/or collateral at a public or private sale. Guarantor consents to any (i) extension or extensions of the time or times of payment of the indebtedness by Lessee, or any portion thereof, (ii) change in the form of such indebtedness, (iii) compromise or settlement of any obligations of Lessee, or (iv) release of any rights against Lessee or any other party at any time directly or contingently liable for the payment of Lessee's obligations under the Lease Agreement.

This Corporate Guaranty shall bind Guarantor's successors and assigns. Guarantor shall not be released or discharged, either in whole or in part by Lessor's failure or delay to perfect or continue the perfection of any security interest in the leased property or to protect such leased property. No payment by Guarantor shall entitle Guarantor, by subrogation or otherwise, to any payment by Lessee hereunder or out of Lessee's property.

Guarantor agrees to waive all rights to a trial by jury. This Corporate Guaranty shall be governed by the laws of the Commonwealth of Pennsylvania. Guarantor agrees to the jurisdiction and venue of the federal and state courts in Pennsylvania.

GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS LESSOR, BY ITS ATTORNEY, OR THE PROTHONOTARY OR THE CLERK OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR IN ANY JURISDICTION WHERE PERMITTED BY LAW, UPON THE OCCURRENCE OF A DEFAULT OR AN EVENT OF DEFAULT, AS DEFINED IN THE LEASE AGREEMENT, OR AT ANY TIME THEREAFTER, TO APPEAR FOR GUARANTOR AND CONFESS AND ENTER JUDGMENT AGAINST IT IN FAVOR OF LESSOR IN ANY JURISDICTION IN WHICH GUARANTOR OR ANY OF ITS PROPERTY IS LOCATED FOR THE AMOUNT OF ALL OBLIGATIONS, TOGETHER WITH COSTS OF SUIT AND WITH ACTUAL COLLECTION COSTS (INCLUDING REASONABLE ATTORNEYS' FEES), WITH OR WITHOUT DECLARATION, AND WITHOUT STAY OF EXECUTION, AND WITH RELEASE OF ERRORS AND THE RIGHT TO ISSUE EXECUTION FORTHWITH, AND FOR DOING SO THIS AGREEMENT OR A COPY VERIFIED BY AFFIDAVIT SHALL BE A SUFFICIENT WARRANT. GUARANTOR HEREBY WAIVES AND RELEASES ALL RELIEF FROM ANY AND ALL APPRAISEMENT, STAY OR EXEMPTION LAW OF ANY STATE NOW IN FORCE OR HEREAFTER ENACTED. THIS AUTHORITY AND POWER SHALL NOT BE EXHAUSTED BY THE EXERCISE THEREOF AND SHALL CONTINUE UNTIL THE OBLIGATIONS ARE FULLY PAID, PERFORMED, DISCHARGED AND SATISFIED.

BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND HEARING ON THE VALIDITY OF ANY CLAIMS THAT MAY BE ASSERTED AGAINST IT BY THE LESSOR UNDER THIS CORPORATE GUARANTY BEFORE JUDGMENT CAN BE ENTERED AND BEFORE ASSETS OF GUARANTOR CAN BE GARNISHED AND ATTACHED, GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO LESSOR, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, OR AT ANY TIME THEREAFTER, ENTERING JUDGMENT AGAINST GUARANTOR BY CONFESSION AND ATTACHING AND GARNISHING THE BANK ACCOUNTS AND OTHER ASSETS OF GUARANTOR, WITHOUT PRIOR NOTICE OR OPPORTUNITY FOR A HEARING.

A fax copy of this document shall be accepted as a legal binding agreement.

GUARANTOR: Mercatux, LLC

By: _____
(Signature)

Name: TERESA EPPERSON
(Print Name)

Title: MEMBER / PRINCIPAL

500 Corp Guaranty 8/05

TERMS AND CONDITIONS

*Certificate of Resolution and Authorization by Board of Directors – Corporate Guaranty*

Agreement No.:          38934
Corporate Guarantor:   Mercatus, LLC
Lessee:                FRC, LLC
Lessor:                CoActiv Capital Partners, Inc.

I, *TERESA EPPERSON* do hereby certify that I am the duly elected, qualified and acting Secretary of Mercatus, LLC ("Limited Liability Company") with its principal offices at 2 Faneuil Hall Marketplace Boston, MA  02109, a Limited Liability Company duly organized and existing under the laws of the State of __DE__; that I have custody of the corporate records, minutes and corporate seal; and that set forth below is a true and complete copy of certain resolutions duly adopted by the Board of Directors of the Limited Liability Company, at a meeting duly held on the date of _3/13/09_, at which time a quorum was present and acting throughout, and such resolutions have not been amended or rescinded, are in full force and effect on the date hereof, and are the only resolutions adopted by said Board of any committee thereof which relate to the matters referred to therein:

RESOLVED, that the following officers of this Limited Liability Company have been properly designated, elected and assigned to the office as indicated below; that such officers hold such office at this time and that the specimen signature appearing beside the name of such officer is his true and correct signature.

NAME _____    TITLE _Secretary_    SIGNATURE _____

RESOLVED, that being duly empowered to do so, the Board of Directors of the Limited Liability Company, hereby determines that it is necessary and desirable and in the best interests of the Limited Liability Company to execute a guaranty of the obligations of FRC, LLC to Lessor , and that the benefit which shall be derived by the Limited Liability Company as a result of the extension of credit to FRC, LLC is reasonably worth at least the sum of indebtedness incurred under the Guaranty.

RESOLVED, that the above named officers, or any one of them, and each such officer hereby is, authorized and directed to enter into and execute and deliver in the name of and on behalf of this Limited Liability Company corporate guaranty agreements and other evidences of indebtedness and any other documents or instruments between this Limited Liability Company and Lessor or its assignee or designee in the form presented to the meeting, the form, terms and provisions of which are hereby approved in all respects, together with such changes, additions and modifications thereof as may be approved by any such officer, such approval to be conclusively evidenced by any such officer's execution of such agreements, documents or instruments.

A fax copy of this document shall be accepted as a legal binding agreement.

IN WITNESS WHEREOF, I have hereunto set my hand as Secretary and affixed the corporate seal of this Limited Liability Company this _13th_ day of _March_, 20_09_.

x _____
Member

Certification of Resolution Corp Guarantor 9/04

AGREEMENT #: 38934

# CERTIFICATE OF ACCEPTANCE

| LESSOR: | LESSEE: |
|---|---|
| CoActiv Capital Partners, Inc. | FRC, LLC |
| 655 Business Center Drive, Suite 250 | 1 Fanuell Hall 3rd Floor |
| Horsham, PA 19044 | Boston, MA 02109-6174 |

| Quantity | Equipment Model & Description | Serial Number |
|---|---|---|
| 1 | See attached Schedule A | |

Lessee, through its authorized representative, hereby certifies to Lessor that:

1. The Equipment has been duly delivered to the location where it will be used, which is the Equipment Location set forth in the Lease Schedule attached to the Master Lease Agreement.

2. All of the Equipment has been inspected and is determined to be (a) complete, (b) properly installed, (c) functioning, and (d) in good working order and in compliance with all applicable specifications.

3. The Equipment is of a size, design, capacity and manufacture acceptable to Lessee and suitable for Lessee's purposes.

4. Lessee acknowledges that signature of this document (i) constitutes unconditional acceptance of the Equipment under and subject to the terms of the Agreement as of _____, 200___, (ii) that such acceptance is not on a trial basis and (iii) hereby authorizes the commencement of the Agreement.

5. Lessee is not in default under the Lease and all of Lessee's statements and promises set forth in the Lease are true and correct.

6. A fax copy of this document shall be accepted as a legal and binding Agreement.

LESSEE: FRC, LLC.

BY: X _____ (Signature of Authorized Signer)

Print Name: X _Leighann N Healicarrier_

Print Title: X _Vice President of Finance_

Date: X _3/13/09_ (Date of Signature)

500 Certificate of Acceptance 08/05

## Schedule A

This schedule supplements and is hereby incorporated by reference in Lease Schedule No. 38934, dated _____, 20 09  ("Schedule"), to Lease Agreement dated          by and between CoActiv Capital Partners, Inc. ("Lessor") and FRC, LLC ("Lessee").

| Qty | Description | Serial Number |
|---|---|---|

| Quantity | Description of Product | Code # | |
|---|---|---|---|
| | HP Server | | |
| 1 | Server - HP Proliant DL180 G5 - Quad-Core 2.5GHz | AXSQ18G33 | |
| 1 | 2GB RAM | AXSQ18G33 | |
| 1 | Server - Kingston 2GB RAM | AXSQ18G33 | |
| 1 | Server - HP 4500GB SAS Drive | AXSQ18G33 | |
| 1 | Server - HP Floppy Disk Internal USB | AXSQ18G33 | |
| 1 | Server - HP Redundant 750Watt PowerSupply | AXSQ18G33 | |
| 4 | Server - HP Power Cable for Hard Drives | AXSQ18G33 | |
| 1 | Server - HP Additional Network Card | AXSQ18G33 | |
| 1 | Server - HP Remote Management Card | AXSQ18G33 | |
| 1 | Server - HP 4 Hour 24/7 Same Day Hardware Support 3 Year | | |
| 1 | License - Windows Server 2008 Std OEM - Pro Install | AXSQ18G33 | |
| | Open Licensing | | |
| 30 | License - Microsoft Windows Server 2008 User CAL | AXSQ18G33 | |
| 34 | License - Microsoft Office 2007 Standard nOpen | AXSQ18G33 | |
| | Lenovo Laptop | | |
| 23 | Laptop - Lenovo T500 15.4 WXGA Screen - XP Pro - 2GB RAM - 160GB HD - 3 Year Onsite Warranty | AXSQ18G33 | |
| 34 | Docking Station - Optical Mount - Keyboard Monitor - Dell UltraSharp 1905FW 19 Inch Widescreen | AXSQ18G33 | |
| | HP Desktop | | |
| 1 | Desktop - HP DC7800 - 19inch Monitor - 1GB RAM - 160GB Hard Drive - 4 Year onsite NBD Support - Vista with XP Pro Downgrade - This is a Server Box and comes with the monitor. | AXSQ18G33 | |
| | Network Equipment | | |
| 4 | Double Sided Fixed Shelves | AXSQ18G33 | |
| 1 | UPS - Back up Power Supply - APC Smart UPS | AXSQ18G33 | |
| 1 | UPS - APC Extended Warranty Service Pack - 1 year NEXT | AXSQ18G33 | |
| 1 | KVM - 2 Port KVM switch | AXSQ18G33 | |
| 1 | Network Switch - 24 Port GB switch Managed HP | AXSQ18G33 | |
| 1 | UPS PRE JR28EMARA | AXSQ18G33 | |
| 1 | Firewall - SonicWALL TZ 190 | AXSQ18G33 | |
| 1 | Firewall - SonicWALL 1 Year Dynamic Support | AXSQ18G33 | |
| 1 | Wireless Access Point - SonicWALL SonicPoint G | AXSQ18G33 | |
| 1 | Monitor - Server Room Monitor Acer X173Wb | AXSQ18G33 | |
| 40 | Cables - Tripp Lite patch cable 3 feet | AXSQ18G33 | |
| 30 | Cables - Tripp Lite patch cable - 7 feet | AXSQ18G33 | |
| 10 | Cables - Tripp Lite patch cable - 20 feet | AXSQ18G33 | |
| 1 | Cable Organizer - Velcro Ties pack of 100 - Clock, Charles to pick up | | |

1/2

## Schedule A

This schedule supplements and is hereby incorporated by reference in Lease Schedule No. 38934, dated _____3/13_____, 20_09_ ("Schedule"), to Lease Agreement dated _____ by and between CoActiv Capital Partners, Inc. ("Lessor") and FRC, LLC ("Lessee").

| Qty | | Description | Serial Number |
|---|---|---|---|
| Quantity | Hours/per | Description of Service | |
| 1 | 1.00 | Inventory Check* | |
| | | Server Work | |
| 1 | 4.00 | Install and build OS on server | |
| 1 | 2.00 | Configure Domain and File Server | |
| 1 | 3.00 | Configure Users and Login Scripts | |
| 1 | 3.00 | Configure printers and add to network and login scripts | |
| 1 | 24.00 | Move with GRI to migrate the server data | |
| 1 | 2.00 | Configure Remote Access Card and Firewall for Remote Emergency use | |
| 1 | 8.00 | Hosted Email Work | |
| | | Configure Hosted Exchange for 24 users | |
| 1 | 2.00 | Configure Blackberries by sending activation requests - Assumes new BB's | |
| 1 | 12.00 | Install mail for 24 users into Hosted Exchange | |
| 1 | 5.00 | Work with GRI to migrate Exchange server data | |
| | | Desktop/Laptop Work | |
| 1 | 6.00 | Build base image with Office 2007 for 23 laptops and 1 desktops | |
| 1 | 10.00 | Deploy base image to 24 machines and join to domain | |
| 24 | 0.50 | Create an image base for users | |
| 8 | 4.00 | Deploy Remote Managed Anti-Virus to 25 Machines and 1 server | |
| 24 | 0.25 | Implement Remote PC Backup | |
| | | Network Work | |
| 1 | 2.00 | Configure and Build half Height Rack | |
| 1 | 5.00 | Implement Remote Total Data Protection Device | |
| 1 | 3.00 | Install and configure network switches | |
| 1 | 2.00 | Install and configure network switches | |
| 1 | 6.00 | Implement Remote Desktop Protection System w/ Customization | |
| 1 | 2.00 | Setup and Configure Wireless Access Point with WPA (if chosen) | |
| | | Post Project Support | |
| | | Assisting users with onsite support the 2 days after network has been deployed | |
| 2 | 4.00 | Documentation and Wrap Up | |
| 1 | 4.00 | Network Audit | |
| | | Training | |
| | | If requested | |

Equipment Location:

1 Fanueil Hall 3rd Floor

Boston MA 02109-6174

A fax copy of this document shall be accepted as a legal binding agreement.

| CoActiv Capital Partners, Inc. 655 Business Center Drive, Suite 250, Horsham, PA 19044 Phone (267) 960-4000 FAX (267) 960-4001 | Legal Name of Corporation FRC, LLC |
|---|---|
| Signature | Signature X _____ |
| Print Name          Title          Date | Eighann Heakeoma   Title VP Finance   Date 3/18/09 |

2/2

**INSURANCE LETTER**
**20____**

Date: _3/13/09_

**To Whom It May Concern:**

This is to advise you that _____ _Connie ____ / Weiner Co._

Insurance Agent                        Insurance Company

_I  MCKINLEY SQ      BOSTON      MA      02109_

Address                                City            State        Zip Code

_617 912 5603_ _____ is my authorized agent.

Area Code and Telephone Number

Please contact your agent and ask them to provide a binder or Certificate of
Insurance, followed by the original policy, showing the coverage provided, the
expiration date, policy number and the equipment covered.

**Our Insurance requirements are as follows:**

**INSURED:**
CoActiv Capital Partners, Inc. ("Lessor") and Its Assigns
655 Business Center Drive, Suite 250
Horsham, PA 19044
Phone: 267-960-4000
Fax: 267-960-4001

**LIABILITY INSURANCE:**
Lessor must be named as Additional Insured as its interests may appear.
$1,000,000 combined single limit for Bodily Injury and Property Damage.

**PHYSICAL DAMAGE INSURANCE:**
Lessor must be provided with a standard Lender's Loss Payable clause showing
the interest of Lessor as lessor and loss payee, and fire and extended coverage,
including theft, vandalism, malicious mischief, etc. This insurance is required in
amount equal to your equipment cost or replacement value, whichever is the
greater.
**NOTICE OF CANCELLATION:**
30 Days Notice of Cancellation is required.

**DESCRIPTION OF EQUIPMENT:**
A Description of Equipment Covered must be inserted in the Policy and Certificate.
Attach a copy of Schedule A, if applicable.

By signing below, we signify that we have contacted our insurance agent and will
provide the above coverage and evidence of same will be forwarded to you
immediately.

Lessee:  FRC, LLC

By:      x _____

Name:    x _Leighanne Alkatesmeer_
            (Print Name)

Title:   _V.P. Finance_

Insurance Letter 8/05

# ADVANCE PAYMENT INVOICE

**Date:**        March 10, 2009

**BILL TO:**     FRC, LLC
                 1 Fanuell Hall  3rd Floor
                 Boston MA  02109

**PLEASE REMIT PAYMENT TO:**        CoActiv Capital Partners, Inc.
                                    655 Business Center Drive
                                    Suite 250
                                    Horsham, PA  19044

**LEASE AGREEMENT:**                38934

ADVANCE RENTAL PAYMENT:             $6,168.46
SALES TAX ON ADVANCE PAYMENT:       $  0.00
DOCUMENTATION FEE:                  $250.00

**TOTAL DUE:**                      $6,418.46

**EQUIPMENT DESCRIPTION:**
See attached Schedule A

## PLEASE RETURN THIS COPY WITH YOUR PAYMENT

### THANK YOU

**Annex 1(c)(ii) to EXHIBIT A**
**CoActiv Equipment Lease (#39373)**

**COACTIV**
CAPITAL PARTNERS

**COACTIV CAPITAL PARTNERS INC**
Equipment Lease Agreement

Agreement #:
39373

| VENDOR/RESELLER: | LESSEE (Legal Name & Billing Address): |
|---|---|
| NetSuite | FRC, LLC |
| 2955 Campus Dr | 1 Faneull Hall Sq Ste 3 |
| San Mateo CA 94403 | Boston MA 02109-1610 |

**EQUIPMENT DESCRIPTION:**

| Qty | Model & Description | Serial Number |
|---|---|---|
| 1 | See attached Schedule A | |

**TRANSACTION TERMS:**

| Number of Payments | Payment Amount | LEASE TERM | PAYABLE |
|---|---|---|---|
| 36 | $2,604.99 + Applicable Taxes | 36months | Monthly |
| Pmt Sched (If Applic) Step ___ ___ Pmts | + Applicable Taxes | Advance Payment: $5,209.18 (First and Last Pmt in Advance + Applicable taxes) | Documentation Fee: $250.00 | End of Lease Provision: Full Payout to Customer Amount: $1.00 |

| Equipment Location: | Lessee Contact Information: |
|---|---|
| 1 Faneull Hall 3rd Floor, Boston, MA 02109-4374 | Phone Number: (617) 742-4450   Fax Number: (617) 742-4410 |
| | E-Mail Address: ___@mercatus.com |

We have written this Lease in plain language because we want you to understand its terms. Please read your copy of this Lease carefully and feel free to ask us any questions you may have. The words "you" and "your" mean the Lessee named above. The words "we", "us", and "our" refer to the Lessor named above.

IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS LEASE (INCLUDING THOSE ON THE REVERSE SIDE) SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. TERMS OR ORAL PROMISES WHICH ARE NOT CONTAINED IN THIS WRITTEN LEASE MAY NOT BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS LEASE ONLY BY ANOTHER WRITTEN AGREEMENT BETWEEN YOU AND US. YOU AGREE TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS LEASE. THIS LEASE IS NOT CANCELABLE. YOU AGREE THAT THE SYSTEM WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.

YOU CERTIFY THAT ALL THE INFORMATION GIVEN IN THIS LEASE AND YOUR APPLICATION WAS CORRECT AND COMPLETE WHEN THIS LEASE WAS SIGNED. THIS LEASE IS NOT BINDING UPON US OR EFFECTIVE UNLESS AND UNTIL WE EXECUTE THIS LEASE. THIS LEASE AND ALL SCHEDULES WILL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. YOU SPECIFICALLY WAIVE ANY DEFENSE BASED UPON FORUM NON CONVENIENS AND YOU ADMIT THAT THE STATE AND FEDERAL COURTS LOCATED IN EASTERN DISTRICT OF PENNSYLVANIA ARE CONVENIENT FORUMS TO RESOLVE ALL DISPUTES UNDER THIS LEASE. You agree to submit the original lease documents with the security deposit to Lessor or its assigns via overnight courier the same day of the facsimile transmission of the lease documents. Lessee waives the right to challenge in Court the authenticity of a faxed copy of this agreement and the faxed copy of the signature shall be considered an original and shall be the binding agreement for the purposes of any enforcement action under paragraph 14.

LESSOR: CoActiv Capital Partners Inc.
655 Business Center Drive, Suite 250 Horsham, PA 19044

BY: _____

TITLE: _____

DATE: _____

LESSEE: FRC, LLC

BY: X _____

TITLE: Vice President of Finance of Mercatus, LLC sole member of
FRC LLC

DATE: 3/23/09     FED TAX ID #: _____

**UNCONDITIONAL GUARANTY**

In consideration of Lessor entering into the above Lease in reliance on this guaranty, the undersigned, together and separately, unconditionally and irrevocably guarantee to Lessor, its successors and assigns, the prompt payment and performance of all obligations under the Lease. We agree that (a) this is a guaranty of payment and not of collection, and that Lessor can proceed directly against us without disposing of any security or seeking to collect from Lessee, (b) we waive all defenses and notices, including those of protest, presentment, and demand, (c) Lessor may renew, extend or otherwise change the terms of the Lease without notice to us and we will be bound by such changes, and (d) We will pay all of Lessor's costs of enforcement and collection. This guaranty survives the bankruptcy of Lessee and binds our administrators, successors, and assigns. Our obligations under this guaranty continue even if Lessee becomes insolvent or bankrupt or is discharged from bankruptcy and we agree not to seek to be repaid by Lessee in the event we must pay Lessor. THIS GUARANTY WILL BE GOVERNED BY THE SAME STATE LAW AS THE LEASE. WE AGREE TO JURISDICTION AND VENUE IN THE STATE AND FEDERAL COURTS IN THE SAME STATE.

GUARANTOR: X _____

By: Robert R. Hedges Jr. _____, Individually
Address: 11 Colonial Way, Weston, MA 02493-1937
Social Security Number: 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
Witness: _____

GUARANTOR: X _____

By: Teresa Emerson _____, Individually
Address: 142 Orchard Ave, Weston, MA 02493-2254
Social Security Number: 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
Witness: _____

**CORPORATE GUARANTY**

Lease Agreement No. 39373

Lessee: PRG, LLC
Address: 1 Fanueli Hall 3rd Floor

Boston MA 02109-6174

Lessor:  CoActiv Capital Partners, Inc.
Address: 655 Business Center Drive
         Horsham, PA 19044

Date of Lease Agreement: _March 24, 20 09_          Date of Corporate Guaranty: _March 24, 2009_

In consideration of Lessor entering into the Lease Agreement dated _____ with Lessee ("Lease Agreement"), the undersigned corporation ("Guarantor") unconditionally guarantees to Lessor (and any assignee of Lessor) the (i) prompt payment of Lessee's indebtedness or balance of indebtedness to Lessor under the terms of the Lease Agreement, whether such indebtedness now exists or is incurred hereafter, (ii) the prompt performance of Lessee's obligations under the terms of the Lease Agreement and (iii) any and all expenses, including reasonable attorney fees, incurred by Lessor in enforcing its rights hereunder. Guarantor agrees that this Corporate Guaranty is an unconditional guarantee of payment and performance, and that Lessor may enforce the terms of this Corporate Guaranty even if the Lease Agreement is deemed to be invalid or unenforceable and without first proceeding against Lessee or the leased property.

Should Lessee be in default of the terms of the Lease Agreement, Lessor shall have the right to proceed against Guarantor at any time, without any notice and without any proceeding or action against Lessee. Guarantor agrees to be bound by and on demand to pay any deficiency established by a sale of the leased property, with or without notice to Guarantor, and to pay all attorney's fees and other expenses incurred by Lessor by reason of any default by Lessee or by Guarantor hereunder. Guarantor waives (i) notice of acceptance of this Corporate Guaranty; (ii) promptness and diligence; (iii) notice of the incurrence of any obligation by Lessee; (iv) notice of any actions taken by Lessor or Lessee under the Lease Agreement or any agreement relating thereto; (v) presentment, demand of payment, notice of nonpayment, default, dishonor, and/or protest by Lessee; (vi) any requirement that Lessor exhaust any right against Lessee, any other obligor or any collateral; and (vii) notice of any election by Lessor to sell any leased property and/or collateral at a public or private sale. Guarantor consents to any (i) extension or extensions of the time or times of payment of the indebtedness by Lessee, or any portion thereof, (ii) change in the form of such indebtedness, (iii) compromise or settlement of any obligations of Lessee, or (iv) release of any rights against Lessee or any other party at any time directly or contingently liable for the payment of Lessee's obligations under the Lease Agreement.

This Corporate Guaranty shall bind Guarantor's successors and assigns. Guarantor shall not be released or discharged, either in whole or in part by Lessor's failure or delay to perfect or continue the perfection of any security interest in the leased property or to protect such leased property. No payment by Guarantor shall entitle Guarantor, by subrogation or otherwise, to any payment by Lessee hereunder or out of Lessee's property.

Guarantor agrees to waive all rights to a trial by jury. This Corporate Guaranty shall be governed by the laws of the Commonwealth of Pennsylvania. Guarantor agrees to the jurisdiction and venue of the federal and state courts in Pennsylvania.

GUARANTOR HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS LESSOR, BY ITS ATTORNEY, OR THE PROTHONOTARY OR THE CLERK OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR IN ANY JURISDICTION WHERE PERMITTED BY LAW, UPON THE OCCURRENCE OF A DEFAULT OR AN EVENT OF DEFAULT, AS DEFINED IN THE LEASE AGREEMENT, OR AT ANY TIME THEREAFTER, TO APPEAR FOR GUARANTOR AND CONFESS AND ENTER JUDGMENT AGAINST IT IN FAVOR OF LESSOR IN ANY JURISDICTION IN WHICH GUARANTOR OR ANY OF ITS PROPERTY IS LOCATED FOR THE AMOUNT OF ALL OBLIGATIONS, TOGETHER WITH COSTS OF SUIT AND WITH ACTUAL COLLECTION COSTS (INCLUDING REASONABLE ATTORNEYS' FEES), WITH OR WITHOUT DECLARATION, AND WITHOUT STAY OF EXECUTION, AND WITH RELEASE OF ERRORS AND THE RIGHT TO ISSUE EXECUTION FORTHWITH, AND FOR DOING SO THIS AGREEMENT OR A COPY VERIFIED BY AFFIDAVIT SHALL BE A SUFFICIENT WARRANT. GUARANTOR HEREBY WAIVES AND RELEASES ALL RELIEF FROM ANY AND ALL APPRAISEMENT, STAY OR EXENTION LAW OF ANY STATE NOW IN FORCE OR HEREAFTER ENACTED. THIS AUTHORITY AND POWER SHALL NOT BE EXHAUSTED BY THE EXERCISE THEREOF AND SHALL CONTINUE UNTIL THE OBLIGATIONS ARE FULLY PAID, PERFORMED, DISCHARGED AND SATISFIED.

BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND HEARING ON THE VALIDITY OF ANY CLAIMS THAT MAY BE ASSERTED AGAINST IT BY THE LESSOR UNDER THIS CORPORATE GUARANTY BEFORE JUDGMENT CAN BE ENTERED AND BEFORE ASSETS OF GUARANTOR CAN BE GARNISHED AND ATTACHED, GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO LESSOR, UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, OR AT ANY TIME THEREAFTER, ENTERING JUDGMENT AGAINST GUARANTOR BY CONFESSION AND ATTACHING AND GARNISHING THE BANK ACCOUNTS AND OTHER ASSETS OF GUARANTOR, WITHOUT PRIOR NOTICE OR OPPORTUNITY FOR A HEARING.

A fax copy of this document shall be accepted as a legal binding agreement.

GUARANTOR:  Mercatus, LLC

By:     x _____
             (Signature)

Name:   Teresa Epperson
             (Print Name)

Title:   Member

500 Corp Guaranty 8/05

*Certificate of Resolution and Authorization –LLC Guaranty*

Master Agreement No.:
Schedule Agreement No.:     39373
Corporate Guarantor:     Mercatus, LLC
Lessee:     FRC, LLC
Lessor:     CoActiv Capital Partners, Inc.

I, ~~Teresa Epperson~~ do hereby certify that I am the duly elected, qualified and acting Member, Manager, and/or Managing Member of Mercatus, LLC ("LLC") with its principal offices at 1 S Market St Ste 2 Boston, MA 02109-6173, a Limited Liability Company duly organized and existing under the laws of the State of _DE_; that I have custody of the records, minutes and LLC seal; and that set forth below is a true and complete copy of certain resolutions duly adopted.

RESOLVED, that the following Member, Manager, and/or Managing Members of this LLC have been properly designated and assigned to the office as indicated below; that such Member, Manager, and/or Managing Members hold such office at this time and that the specimen signature appearing beside the name of such Member, Manager, and /or Managing Members is his true and correct signature.

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Teresa Epperson | Member | |
| Robert Hedges | Managing Member | |
| Laghunna Holcombe | V.P Finance | |

RESOLVED, that being duly empowered to do so, the LLC hereby determines that it is necessary and desirable and in the best interests of the LLC to execute a guaranty of the obligations of FRC, LLC to Lessor , and that the benefit which shall be derived by the LLC as a result of the extension of credit to FRC, LLC is reasonably worth at least the sum of indebtedness incurred under the Guaranty.

RESOLVED, that the above named Members, Managers, and/or Managing Members, or any one of them be, is authorized and directed to enter into and execute and deliver in the name of and on behalf of this LLC guaranty agreement and other evidences of indebtedness and any other documents or instruments between this LLC and Lessor or its assignee or designee in the form presented to the meeting, the form, terms and provisions of which are hereby approved in all respects, together with such changes, additions and modifications thereof as may be approved by any such Member, Manager, and/or Managing Members, such approval to be conclusively evidenced by any such Member, Manager, and/or Managing Members execution of such agreements, documents or instruments.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Limited Liability Company this _____ day of _____, 20____.

(LLC Seal)

Member, Manager, and/or Managing Member

Date _____ 3/24/07

## Addendum to Equipment Lease Agreement
### (Software Only Lease)

Lessor:     CoActiv Capital Partners, Inc.
Vendor:     NetSuite
Lessee:     FRC, LLC
Lease No:   39373
Software:   NetSuite Mid Market Edition

This Addendum shall amend the Equipment Lease Agreement by and between CoActiv Capital Partners, Inc. ("Lessor") and the above Lessee ("Lessee") with reference to the above lease transaction ("Lease"). All terms and conditions of the Lease not inconsistent with this Addendum shall be and remain in full force and effect.

Lessor and Lessee hereby agree as follows:

1. All references to "Equipment" or "Leased Equipment" herein and in the Lease shall refer to the software license discussed herein below ("License") and the computer software described in the Lease and/or any schedule attached thereto.

2. Notwithstanding any contrary language in the Lease, Lessee understands that the above referenced vendor ("Vendor") shall continue to retain title to the Equipment. The Lessee hereby grants to Lessor a security interest in all of its right, title and interest in and to the Equipment, including the software, as same may be modified, corrected, supplemented or enhanced from time to time. Lessor shall have all the rights of a secured creditor under the Uniform Commercial Code (the "UCC") with respect to the Equipment. Lessee shall not be permitted to assign its interest hereunder or sublease said License or use of the Equipment to any other person or entity without both Lessor's and Vendor's prior written consent, which may be declined for any reason. Lessee shall have no right, title or interest in the Equipment or License except as expressly provided herein and in any license agreement with the Vendor.

3. All other terms and conditions of the Lease shall be and remain in full force and effect and shall not be altered by the fact that Lessee shall hold the License to the Equipment, including without limitation the provisions in the Lease which provide particularly or generally as follows:

(a) This is an irrevocable Lease for the full term and cannot be canceled for any reason.

(b) Lessee's obligation to make the Lease payments is absolute, unconditional and independent and is not subject to any abatement, set-off, defense or counterclaim for any reason whatsoever, including Equipment or systems failure, damage, loss or any other cause or problem.

(c) The Equipment is leased "as is"; Lessor makes no representation, guarantee, express warranty or implied warranty, including without limitation an implied warranty of merchantability or fitness for a particular purpose. If the Equipment does not operate as represented by the Vendor or is unsatisfactory for any other reason, Lessee shall make any such claim solely against the Vendor and not Lessor; and no representation, guaranty or warranty by the Vendor is binding on Lessor nor shall any breach thereof relieve Lessee of its obligations to Lessor hereunder or under the Lease.

4. Lessee hereby acknowledges receiving a copy of said license agreement, the terms of which are incorporated by reference herein. Lessee agrees to be bound by the terms and conditions of said License and agrees to indemnify and hold Lessor harmless from and against all claims, losses, liabilities, damages, judgment, suits and all legal proceedings and costs expenses in connection therewith, arising out of the possession, use and operation of the Equipment or arising out of Lessee's breach of the terms of the license agreement. This indemnity shall be in addition to that provided in the Lease.

5. The parties intend and agree that a carbon copy, photocopy, or facsimile of this document shall be deemed to be as binding, valid, genuine, and authentic as an original-signature document for all purposes, including all matters of evidence and the "best evidence" rules.

## Addendum to Equipment Lease Agreement
### (Software Only Lease)

ACCEPTED BY:  CoActiv Capital Partners, Inc.

LESSEE:    FRC, LLC

By:

_____    _____    ✗ 3/23/09
(SIGNATURE)            (DATE)            (SIGNATURE)            (DATE)

_____

(Print Name and Title)

Leighanne N. Hankenmeier
Vice President of Finance of Mercatus, LLC sole member
of FRC LLC
(Print Name and Title)

## Certificate of Incumbency and Authority - LLC

Agreement No.   39373
Lessee:         FRC, LLC
Lessor:         CoActiv Capital Partners, Inc.

I, *Teresa Epperson*, do hereby certify that I am the duly elected, qualified and acting Member of FRC, LLC ("Limited Liability Company"), a limited liability Company duly organized and existing under the laws of the State of DE___; that the person whose names, titles, and signatures appear below are duly elected (or appointed), qualified and acting members, managers and/or managing members (collectively "Members") of said limited liability Company and hold on the date of this Certificate the title set opposite their respective names, that the signatures below are the genuine signatures of such Members; that each of such Members is duly authorized for and on behalf of said Limited Liability Company to execute and deliver any lease agreement between said Limited Liability Company and Lessor, and all ancillary agreements, documents, and instruments, and, to the extent permitted under applicable law, warrants of attorney for confession of judgment, in connection therewith, including without limitation, schedules and delivery and acceptance certificates (collectively, the "Agreement"), and that the execution and delivery of the Agreement for and on behalf of said Limited Liability Company is not prohibited by, or in any manner restricted by the terms of said Limited Liability Company's Operating Agreement, its by-laws or of any loan agreement, indenture or contract to which said Limited Liability Company is a party under which it is bound. I do further certify that the forgoing authority shall remain in full force and effect, and Lessor (and any assignee of Lessor) shall be entitled to rely upon same, until written notice of the modification, rescission or revocation of same, in whole or in part, has been delivered to Lessor, but in any event, shall be effective with respect to any documents executed or actions taken in reliance upon the foregoing authority prior to the delivery to Lessor of said written notice of said modification, rescission or revocation.

A fax copy of this document shall be accepted as a legal binding agreement.

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Teresa Epperson | Secretary | |
| Robert Hodges | Managing Partner | |
| Lughanne Henkenius | V.P. Finance & Treasurer, sole member of FRC LLC | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Limited Liability Company this 25th day of March, 20 09.

Member _Teresa Epperson_

(Corporate Seal)

500 Cert Incumbency 9/06

AGREEMENT #: 39373

# CERTIFICATE OF ACCEPTANCE

LESSOR:

CoActiv Capital Partners, Inc.

655 Business Center Drive, Suite 250

Horsham, PA 19044

LESSEE:

FRC, LLC

1 Faneuil Hall 3rd Floor

Boston, MA 02109-6174

| Quantity | Equipment Model & Description | Serial Number |
|---|---|---|
| 1 | See attached Schedule A | |

Lessee, through its authorized representative, hereby certifies to Lessor that:

1. The Equipment has been duly delivered to the location where it will be used, which is the Equipment Location set forth in the Lease Schedule attached to the Master Lease Agreement.

2. All of the Equipment has been inspected and is determined to be (a) complete, (b) properly installed, (c) functioning, and (d) in good working order and in compliance with all applicable specifications.

3. The Equipment is of a size, design, capacity and manufacture acceptable to Lessee and suitable for Lessee's purposes.

4. Lessee acknowledges that signature of this document (i) constitutes unconditional acceptance of the Equipment under and subject to the terms of the Agreement as of _____ 200____, (ii) that such acceptance is not on a trial basis and (iii) hereby authorizes the commencement of the Agreement.

5. Lessee is not in default under the Lease and all of Lessee's statements and promises set forth in the Lease are true and correct.

6. A fax copy of this document shall be accepted as a legal and binding agreement.

LESSEE:   FRC, LLC

BY:   X _____
                    (Signature of Authorized Signer)
                    Leighanne H. Henkenmeier

Print Name: _____

Print Title: _____ Vice President of Finance of Mercatus, LLC sole member of FRC LLC

Date: _____
                    (Date of Signature)

500 Certificate of Acceptance 08/05

## Schedule A

This schedule supplements and is hereby incorporated by reference in Lease Schedule No.
39373, dated _____, 20____ ("Schedule"), to Lease Agreement dated _____ by
and between CoActiv Capital Partners, Inc. ("Lessor") and FRC, LLC ("Lessee").

| Qty | Description | Serial Number |
|-----|-------------|---------------|
| 1 | NetSuite Mid Market Edition includes<br>** ERP with G/L, Accounts Payable, Purchasing, Inventory, Order Entry, A/R, Expense Reporting, Advanced Shipping with integrated UPS or FedEx shipping<br>** NetSuite CRM Sales Force Automation with quote and order management, Marketing Automation with campaigns; Customer Service/Support<br>** Productivity tools including contacts/calendar/events<br>** NetCommerce publishing engine with integrated catalog, secure shopping cart and customer self-service<br>** Real-time Dashboards with key business metrics, report snapshots<br>** Customer Center and Partner Center logins<br>** 5 Employee Self-Service Users<br>** 30,000 integrated mail/merges per month<br>** 120,000 emails per year with no single blast exceeding 20,000 recipients<br>** 100 GB/month Webstore/Site Bandwidth<br>** 10 GB of data storage<br>** 500 integrated Web store items<br>** All Oracle Database & Application Server O/S, licenses | |
| 22 | General access user for NetSuite Mid Market Edition. | |
| 1 | Self-Service Support allows you to take advantage of our online tools 24 hours a day / 7 days a week. You may choose from: NetAnswers Knowledge Base, User Guides, Help, Glossary, Tips, NetSuite User Group, Free Training Clinics and more.<br>No e-mail or telephone support is included. | |
| | | |

1/2

Certification of Resolution Corp Guarantor 9/06

## Schedule A

This schedule supplements and is hereby incorporated by reference in Lease Schedule No. 39373, dated _____, 20____ ("Schedule"), to Lease Agreement dated _____ by and between CoActiv Capital Partners, Inc. ("Lessor") and FRC, LLC ("Lessee").

| Qty | Description | Serial Number |
|-----|-------------|---------------|
| | The items included in this Estimate are based on our understanding of your business application requirements. While you may have seen some of these features or discussed them with a NetSuite representative, the items below are NOT INCLUDED in this estimate. Should you have any questions about the items not included, please contact your NetSuite representative before returning the signed Estimate. | |
| | Advanced Billing - including Milestone Based Billing, Subscriptions and Periodic Billings | |
| | Advanced Financials - including Amortization, Expense Allocation, Multiple budgets | |
| | Advanced Inventory - including Bar Coding and Item Labels, Bin Management, Landed Cost, Lot Tracking, Matrix Items, Multiple Units of Measure, Pick, Pack and Ship, Serialized Inventory | |
| | Advanced Project - including Automatic Job Creation, Advanced Job Tracking | |
| | Incentive Management - including Alternate Sales Amount, Employee Commissions, Partner Commissions/Royalties | |
| | Issue Management - including Track and Manage Issues, Integration with Customer Support | |
| | Light Manufacturing - including Assemblies and Work Orders | |
| | Site Analytics - including Advanced Web Reports | |
| | ODBC - including ODBC Connections for Advanced Reporting | |
| | Revenue Recognition - including Revenue Recognition, Forecast Revenue, VSOE | |
| | Site Builder - including Advanced Site Customization, Advanced Web Search, External Catalog Site (WSDK), Web Hosting | |

**Equipment Location:**
1 Fanuell Hall 3rd Floor
Boston MA 02109-6174

A fax copy of this document shall be accepted as a legal binding agreement.

| CoActiv Capital Partners, Inc.<br>558 Buckeye Center Drive, Suite 250, Horsham, PA 19044<br>Phone (267) 960-4000 FAX (267) 960-4001<br>Signature<br><br>Print Name                Title                Date | Legal Name of Corporation<br>FRC, LLC<br>Signature<br>X<br>Print Name                Title    Vice President of Finance of NetSuite, LLC sole member of FRC<br>LLC                Date |

2/2

**Annex 1(d)(i) to EXHIBIT A**
**Rackspace Hosting Services Agreement**

01633986.DOCX\

## Rackspace Hosting Services Agreement Instructions

The subsequent pages contain the contract between your company and Rackspace. Please fill out all sections, and fax back when signed. You must sign within 30 days from today to receive the pricing and terms described in these pages. Do not make any changes to the Hosting Service Agreement. Rackspace is unable to accept such changes. Please contact your sales representative if you have any questions or concerns about this document.

### INSTRUCTIONS

| Hosting Service Agreement | |
|---|---|
| Agreement | This section outlines the agreement details between you and Rackspace. This includes links to Rackspace General Terms and Conditions, Acceptable Use Policy, Country Specific Terms and Conditions, and product specific addendum. All checked addendum pertain to your configuration. |
| Signature | Please sign and complete the information indicated in the signature block. Fax signed contract back to +1 210 312 5045. |

| Service Description | |
|---|---|
| Solution Detail | This section provides a detailed list of products and services in your configuration with accompanying pricing. |
| Deployment Commitment | This section is Rackspace's commitment to deploy your environment. |
| Bandwidth Overages | This section outlines Rackspace's fees for bandwidth overages. |

| Customer Contact Information | |
|---|---|
| Account Setup | This section contains customer information that is used to set up your Rackspace Account.<br>Legal Name – Provide the legal name of the company.<br>Tax ID (EIN) – Provide the tax id for the company.<br>Primary Domain – Indicate the primary domain that will be hosted at Rackspace.<br>Referred By – List any company that might have referred you to Rackspace. |
| Authorized Contacts | Rackspace will not authorize the release of any information or make any request changes from anyone not listed as authorized contact.<br>Primary Contact – List the main point of contact that Rackspace should contact regarding your environment.<br>Billing Contact – List the point of contact regarding financial issues.<br>Technical Contact – List the point of contact regarding technical issues.<br>Authorized Signatory – List any additional person/s authorized to sign documents on behalf of your company. |

| Customer Billing Information | |
|---|---|
| Method of Payment | Check the payment method you would like to use for your initial payment.<br>Check the payment method you would like to use for your monthly account payment. |
| Payment Details | Provide credit card information if choosing the credit card payment option and banking information if choosing ACH payment option.<br>**Please note that authorized signatures must be the same as signatures found on the Hosting Services Agreement.** |

MAR-18-2009  16:29    FORESIDE FINANCIAL GROUP    2078226666    P.002

Prepared by: ARIC PETERSON
For: CUSTOMER, # 883697
STANDARD CONTRACT # 500649
Pricing and Terms Valid Until 30 days from 3/18/2009

## Hosting Services Agreement

This Hosting Services Agreement (this "Agreement") is between Rackspace US, Inc. d/b/a Rackspace Hosting ("we" or "Rackspace") and the customer who signs below ("you" or "Customer"). Each of the following documents is hereby incorporated by reference in this Agreement:

i.   Service Description attached.

ii.  Rackspace's General Terms and Conditions found at http://www.rackspace.com/information/legal/genlermterms.php as of the date of your signature below, including any addenda referenced therein (the "General Terms and Conditions").

iii. Rackspace's product specific terms as selected below and found at the link indicated as of the date of your signature below, including any addenda referenced therein  (the "Product Terms and Conditions"):

   ☒ Managed Hosting Terms found at http://www.rackspace.com/information/legal/managedterms.php

   ☐ Managed Hosting Terms (Intensive) found at http://www.rackspace.com/information/legal/intensiveterms.php

   ☐ Mail Hosting Terms at http://www.rackspace.com/information/legal/mailterms.php

   ☐ Platform Hosting Terms at http://www.rackspace.com/information/legal/platformterms.php

iv.  Rackspace's Acceptable Use Policy found at http://www.rackspace.com/information/legal/aup.php as of the date of your signature below (the "Acceptable Use Policy");

v.   Rackspace's Country Specific Terms and Conditions as selected below (if any):

   ☐ United Kingdom at http://www.rackspace.com/information/legal/ukterms.php

   ☐ Hong Kong at http://www.rackspace.com/information/legal/hkterms.php

The individual signing represents to Rackspace that he or she is authorized to sign on behalf of Customer. Customer accepts the terms of the Service Description, the General Terms and Conditions, the Product Terms and Conditions, the Acceptable Use Policy, the Country Specific Terms (if any), and any other document or terms referenced above (collectively, the "Hosting Services Agreement"). Capitalized terms used and not otherwise defined in the documents shall have the meaning given to them in the General Terms and Conditions. The Agreement constitutes the complete and exclusive agreement between the parties regarding the subject matter and supersedes and replaces any prior understanding or communication, written or oral.

Accepted by Customer (All Fields Required)                Accepted by Rackspace US, Inc.

Signature:  _____              Signature:  _____

Printed Name:  John Cucuche                        Printed Name:  _____

Title:  President                                  Title:  _____

Company:  Channel mixing Sol                       Date:  _____

Date:  2/18/09

Attach:  Service Description
         Customer Contact Information
         Customer Billing Information

Document revision 6.11.24

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

experience fanatical support®

RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 78229
US SALES: 800.961.4690  |  WWW.RACKSPACE.COM


rackspace®
HOSTING

MAR-18-2009   15:30          FORESIDE FINANCIAL GROUP                    2078226655      P.003

Prepared by: ARIC PETERSON
For: CUSTOMER, # 883997
STANDARD CONTRACT # 500849
*Pricing and Terms Valid Until 30 days from 3/18/2009*

## Services Description

| Data Center: | DFW1 |
| --- | --- |
| Segment: | Managed Windows |
| Special Notes: | Waived Set Up Fee |

**MGD WIN Service Overview**

| Description | | Included | Setup |
| --- | --- | --- | --- |
| The Managed Windows Support Segment includes the following services:<br>24x7x365 Fanatical Support™<br>1 Hour Hardware Replacement Guarantee<br>The Rackspace Zero-Downtime Network™<br>Dedicated Account Manager and Business Development Consultant<br>Rackwatch Port Monitoring Service<br>Included Access to My.Rackspace Portal (Ticket Manager, DNS Manager, Bandwidth and Backup Reports, Data Center, Knowledgebase, Billing Options)<br>Automated Server Patching via Microsoft Automatic Update | | Included | Included |

**Bandwidth and Networking**

| Description | Monthly | Included | Setup |
| --- | --- | --- | --- |
| Aggregate Bandwidth – Monthly Data Transfer<br>Metered Outbound Transfer | 1000 GB | Included | Included |
| Unlimited Inbound Transfer | | Included | Included |
| IP Address Allocation:<br>1 Dedicated IP Address | 1 | | |

**Monitoring and Reports**

| Description | | Monthly | Setup |
| --- | --- | --- | --- |
| Rackwatch Platinum Port Monitoring<br>Ping and TCP Port 80<br>Choice of 6 Additional Ports to be Monitored (eg. FTP, SSH, DNS, POP3, MS SQL)<br>5 Minute Polling<br>Automated Ticket Creation and Response in Accordance with Support Policy | | Included | Included |

**Managed Backup – Retention Schedule**

| Description | | | |
| --- | --- | --- | --- |
| Managed Backup – Unmetered<br>Initial Setup, Configuration and Monitoring<br>Automatic Tape Rotation<br>2 Week On-site Retention | | | |

**Included Services**

| Description | | Monthly | Setup |
| --- | --- | --- | --- |
| My Rackspace Customer Portal<br>-Offers invaluable tools to assist our customers in the management of their hosting solutions; Manage DNS, Add and Remove Domains, Manage your billing, submit tickets, review hardware performance reports, bandwidth usage reports, managed backup reports, documentation resource center, customer forum, and much more - myrackspace.com | | Included | Included |
| Rackspace Account Team<br>-Dedicated Account Manager: your main point of contact at Rackspace<br>-Business Development Consultant: helps your hosting needs scale with your business needs<br>-Support & Billing Specialists: manage your technical and billing needs<br>-Senior Support Specialists: handle technical issues with the highest degree of complexity | | Included | Included |
| Automated Patching<br>Rackspace monitored automated patching feature, which installs all the latest critical OS patches and updates. | | Included | Included |
| Rackspace SLA<br>-100% Network Uptime Guarantee<br>-1 Hour Hardware Repair and Replacement Guarantee<br>-100% Infrastructure Uptime Guarantee | | Included | Included |

Document revision 8.11.24

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*

RACKSPACE, INC   |   9725 DATAPOINT DRIVE, SUITE 100   |   SAN ANTONIO, TX 78229
US SALES: 800.961.2888   |   WWW.RACKSPACE.COM

rackspace
HOSTING

MAR-18-2009  16:30   FORESIDE FINANCIAL GROUP                 2078226665    P.004

Prepared by: ARIC PETERSON
For: CUSTOMER, # 883997
STANDARD CONTRACT # 600649
Pricing and Terms Valid Until 30 days from 3/18/2009

Page 3/ 6

| Microsoft SQL Licensing | Quantity | Monthly | Setup |
|---|---|---|---|
| Microsoft SQL Server 2005 Workgroup Edition License<br>• Processor-based License Provided Under Terms of Microsoft SPLA<br>• Software Installation and troubleshooting included<br>• Additional Services Available | 1 CPU | $100 | WAIVED |
| Microsoft SQL Support<br>• Basic Best Practices Installation<br>• Configuration for Monitoring, Patching and Backups (if subscribed)<br>• Configuration for Standard Maintenance Plans<br>• Automated Escalation of Monitoring Alerts<br>• Troubleshooting for Connectivity Issues<br>• Troubleshooting for Service Issues | | Included | Included |

| Web Server | | Quantity | Monthly | Setup |
|---|---|---|---|---|
| <br>Microsoft Web<br>Server + Backups | OS Version / License<br>32 – bit Microsoft Windows Server 2000 Standard Edition<br>Hardware<br>Standard-built Rackmount (2U) Server<br>Single Processor, Dual Core Opteron 270<br>2 GB DDR2 SDRAM<br>1 x 250 GB (7200 RPM) SATA Drive(s)<br>100 Mbps<br>Standard Drive Partitioning<br>C\ - single partition<br>External Storage Connection(s)<br>Private Backup Network Connection<br>Managed Backup<br>Unmetered Backups<br>Weekly Full, Daily Differential | 1 | $376 | WAIVED |

| Database Server | | Quantity | Monthly | Setup |
|---|---|---|---|---|
| Microsoft<br>Database+<br>Backups | OS Version / License<br>32 – bit Microsoft Windows Server 2003 Standard Edition<br>Hardware<br>Standard-built Tower Server<br>Single Processor, Quad Core Opteron 1354HR<br>4 GB DDR2 SDRAM<br>2 x 250 GB (7200 RPM) SATA Drive(s), RAID 1<br>100 Mbps<br>Standard Drive Partitioning<br>/boot - 100 MB, swap - 1024 MB, /tmp – 2048 MB, / - remainder<br>External Storage Connection(s)<br>Private Backup Network Connection<br>Managed Backup<br>Unmetered Backups<br>Weekly Full, Daily Differential | 1 | $449 | WAIVED |

| Additional Security | Quantity | Monthly | Setup |
|---|---|---|---|
| Rackspace Managed Anti-Virus Powered by Sophos<br>Provides proactive protection against viruses, malware and rootkits<br>Uses Behavioral Genotype Protection™ to provide zero-day protection<br>Includes quarantine manager for deleting or disinfecting infected files<br>Automatic Updates | 1 | Included | Included |

Document revision 0.11.24

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*®

RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 76229
US SALES: 800.961.2888  |  WWW.RACKSPACE.COM

rackspace
HOSTING

MAR-18-2009  16:30       FORESIDE FINANCIAL GROUP              2078226666    P.005

Page 4/ 6

Prepared by: ARIC PETERSON
For: CUSTOMER, # 883997
STANDARD CONTRACT # 500649
*Pricing and Terms Valid Until 30 days from 3/18/2009*

Total

| Option/Term | Monthly | Setup |
|---|---|---|
| Month To Month | $925 | WAIVED |

## Deployment Commitment

1-3 Business Days beginning from the time that Rackspace has completed verification and credit check procedures and has received all required information from Customer. See Section 2.1 of the Product Terms and Conditions for more detail.

## Bandwidth Overages

The bandwidth amounts included in this Service Description constitute aggregate totals of use for the configuration described. This amount is independent of, and not increased directly by, the number of servers or other devices. Rackspace makes no promise that additional servers or devices will include the same amount or any additional amount of bandwidth. If you purchase pre-paid bandwidth in excess of the bandwidth included with your Services, charges for overages will be billed at the rate of your prepay bandwidth. If you do not purchase pre-paid bandwidth in excess of the bandwidth included with your Services you will be charged $1.25 per GB.

Document revision 8.11.24

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*


RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 78229
US SALES: 800.961.2888  |  WWW.RACKSPACE.COM


rackspace.
HOSTING

MAR-18-2009  15:30          FORESIDE FINANCIAL GROUP                    2078226555      P.006

Page 5/ 6

Prepared by: ARIC PETERSON
For: CUSTOMER, # 883997
STANDARD CONTRACT # 500649
Pricing and Terms Valid Until 30 days from 3/18/2009

## Customer Contact Information

### Account Setup

**Customer Information**

Legal Name: _____        Primary Domain: _____

Tax ID (EIN): _____        Referred By: _____

**Authorized Contacts**

*NOTE: Information and/or support won't be provided to any party not listed herein. The provided domain name will be only used for server naming purposes.*

**Primary Contact (Required)**

Name: *John Linneken*

Title: *President*

Telephone: *617-438-2521*

E-mail: *Jlinneham@channelminds?*

Address: *45 Sentinel Ct*
*Hingham, MA*
*02043*

**Billing Contact (Required)**

Name: *John Linneken*

Title: _____

Telephone: _____

E-mail: _____

Address: _____

**Technical Contact (Required)**

Name: *Pradeep Thadakara*

Title: *Sr. VP*

Telephone: *724-217-9514*

E-mail: *Pradeep@ChannelMinds?.com*

**Authorized Signatory (if Applicable)**

Name: *John Linneken*

Title: *President*

Telephone: *617-438-2521*

E-mail: _____

**Authorized Signatory (if Applicable)**

Name: _____

Title: _____

Telephone: _____

E-mail: _____

Document revision 8.11.24

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*

RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 78229
US SALES: 800 96- 7888  |  WWW.RACKSPACE.COM

**rackspace** HOSTING

MAR-26-2009  04:51PM  FROM-

Page 1/3

Prepared by: Marcus Benavidez
For: CUSTOMER, #883997
STANDARD CONTRACT #503958
*Pricing and Terms Valid Until 3/31/2009*

## Hosting Services Agreement

This Hosting Services Agreement (this "**Agreement**") is between Rackspace US, Inc. d/b/a Rackspace Hosting ("**we**" or "**Rackspace**") and the customer who signs below ("**you**" or "**Customer**"). Each of the following documents is hereby incorporated by reference in this Agreement:

i.  Service Description attached.

ii.  Rackspace's General Terms and Conditions found at http://www.rackspace.com/information/legal/generalterms.php as of the date of your signature below, including any addenda referenced therein (the "General Terms and Conditions").

iii.  Rackspace's product specific terms as selected below and found at the link indicated as of the date of your signature below, including any addenda referenced therein (the "Product Terms and Conditions"):

    ☒ Managed Hosting Terms found at http://www.rackspace.com/information/legal/managedterms.php

    ☐ Managed Hosting Terms (Intensive) found at http://www.rackspace.com/information/legal/intensiveterms.php

    ☐ Mail Hosting Terms at http://www.rackspace.com/information/legal/mailterms.php

    ☐ Platform Hosting Terms at http://www.rackspace.com/information/legal/platformterms.php

iv.  Rackspace's Acceptable Use Policy found at http://www.rackspace.com/information/legal/aup.php as of the date of your signature below (the "Acceptable Use Policy");

v.  Rackspace's Country Specific Terms and Conditions as selected below (if any):

    ☐ United Kingdom at http://www.rackspace.com/information/legal/ukterms.php

    ☐ Hong Kong at http://www.rackspace.com/information/legal/hkterms.php

vi.  Rackspace's BizSpark Addendum terms as selected below and found at the link indicated as of the date of your signature below (if any):

    ☐ BizSpark Addendum at http://www.rackspace.com/information/legal/bizsparkaddendum.php

The individual signing represents to Rackspace that he or she is authorized to sign on behalf of Customer. Customer accepts the terms of the Service Description, the General Terms and Conditions, the Product Terms and Conditions, the Acceptable Use Policy, the Country Specific Terms (if any), and any other document or terms referenced above (collectively, the "Hosting Services Agreement"). Capitalized terms used and not otherwise defined in the documents shall have the meaning given to them in the General Terms and Conditions. The Agreement constitutes the complete and exclusive agreement between the parties regarding the subject matter and supersedes and replaces any prior understanding or communication, written or oral.

**Accepted by Customer (All Fields Required)**

Signature: _____

Printed Name: _____

Title: _____

Company: _____

Date: _____

**Accepted by Rackspace US, Inc.**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

**Attach:** Service Description
Customer Contact Information
Customer Billing Information

Document revision 9.2.23

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*

RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 78229
US SALES: 800.961.2000  |  WWW.RACKSPACE.COM



**rackspace**
HOSTING

# Rackspace Hosting Services Agreement Instructions

The subsequent pages contain the contract between your company and Rackspace. Please fill out all sections, and fax back when signed. You must sign within 30 days from today to receive the pricing and terms described in these pages. Do not make any changes to the Hosting Service Agreement. Rackspace is unable to accept such changes. Please contact your sales representative if you have any questions or concerns about this document.

## INSTRUCTIONS

### Hosting Service Agreement

| | |
|---|---|
| Agreement | This section outlines the agreement details between you and Rackspace. This includes links to Rackspace General Terms and Conditions, Acceptable Use Policy, Country Specific Terms and Conditions, and product specific addendum. All checked addendum pertain to your configuration. |
| Signature | Please sign and complete the information indicated in the signature block. Fax signed contract back to +1 210 312 5031. |

### Service Description

| | |
|---|---|
| Solution Detail | This section provides a detailed list of products and services in your configuration with accompanying pricing. |
| Deployment Commitment | This section is Rackspace's commitment to deploy your environment. |
| Bandwidth and Backup Overages | This section outlines Rackspace's fees for bandwidth and backup overages. |
| Migration Server | This section outlines Rackspace's policy for migration servers. |

T-607  P.003/003  F-861

MAR-26-2009  04:51PM  FROM-

Prepared by: Marcus Benavidez
For: CUSTOMER, #883997
STANDARD CONTRACT #503958
Pricing and Terms Valid Until 3/31/2009

Page 2/3

## Services Description

Current Customer Information:

| | | | |
|---|---|---|---|
| Company Name: | **Channel Mining Solutions** | Type of Contract: | ☒ Upgrade |
| Data Center: | **DFW1** | | ☐ Migration |
| Segment: | **Managed** | Term: | **Month to Month** |
| Special Notes: | **None** | | |

**Solution Details:**

| Managed Service Overview - WIN | Monthly | Setup |
|---|---|---|
| **Description** | | |
| The Managed Windows Support Segment includes the following services: | | |
| • 24x7x365 Fanatical Support™ | | |
| • 1 Hour Hardware Replacement Guarantee | | |
| • The Rackspace Zero-Downtime Network™ | Included | Included |
| • Dedicated Account Manager and Business Development Consultant | | |
| • Rackwatch Port Monitoring Service | | |
| • Included Access to My.Rackspace Portal (Ticket Manager, DNS Manager, Bandwidth and Backup Reports, Doc Center, Knowledgebase, Billing Options) | | |
| • Automated Server Patching via Microsoft Automatic Update | | |

| Firewall (w/ VPN and DMZ options) | Quantity | Monthly | Setup |
|---|---|---|---|
| **Description** | | | |
| Cisco ASA 5505 Firewall | | | |
| • 100 Mbps Connectivity | | | |
| • 150 Mbps Aggregate and 25,000 Concurrent Connections | 1 | $200 | $0 |
| • Stateful packet inspection | | | |
| • Fully Managed Device, includes 24x7 Monitoring, Rule Changes and 1 Hour Replacement Guarantee | | | |
| Cisco VPN Access | 5 Clients | $100 | $0 |
| • 3DES Encryption | | Included | |
| • Fully Managed, Software Updates and Management Included | | | |

**New Device Total**

**$ 200**

**Setup**

**$ 0**

**Total Net Change***

**$ 200**

*NOTE: Pricing summary is based on estimated utility usage.

Document revision 5.2.23

THIS DOCUMENT IS CONFIDENTIAL AND PROPRIETARY

*experience fanatical support*

RACKSPACE, INC.  |  9725 DATAPOINT DRIVE, SUITE 100  |  SAN ANTONIO, TX 78229
US SALES: 800 961.2888  |  WWW.RACKSPACE.COM



**rackspace**
HOSTING

Rackspace Proprietary



**rackspace**

## Term Renewal Agreement

Account #: __883997__                     Effective Date: __06/01/09__

Customer Name: __Financial Research Corporation__

Current Term (# months): __Monthly__          New Term (# months): __12 Months__

Business Development Consultant: __Marcus Benavidez__     Account Manager: __Dominic Mendiola__

Customer's Billing Contact Name: __Leighanne Henkenmeier__

Telephone: __617-963-8967__     Fax: _____     Email Address: __L.Henkenmeier@mercatuspartn__

Address: __1 Faneuil Hall Marketplace, 3rd Floor__          City: __Boston__

Postal Code: __02109__     State/Province __MA__          Country: __US__

Rackspace and Customer agree to extend the term of the applicable Service Order(s) and/or Hosting Services Agreement(s), as the case may be, for the number of months in the New Term set forth above. New Monthly Fees take effect in the next invoice following the Effective Date and are not subject to change during the New Term .Except for the length of the New Term, the New Monthly Fee(s), and Additional Terms, if any, set forth below, all of the terms and conditions of such Service Order(s) and Hosting Services Agreement(s), and such other terms and conditions incorporated by reference therein, are hereby ratified and confirmed and continue in full force and effect. Customer is encouraged to review the Rackspace Acceptable Use Policy in effect and posted at http://www.rackspace.com/aboutus/acceptable_use.php as of the Effective Date.

Additional Terms:

| Servers Renewing # | Current Monthly Fee | New Monthly Fee | New Contract End Date (Term) | Notes |
|---|---|---|---|---|
| 217457 | $376.00 | $338.00 | 06/01/2010 | |
| 217458 | $549.00 | $495.00 | 06/01/2010 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total | $925.00 | $833.00 | | |

The persons signing below warrant and represent that they are authorized to sign on behalf of their respective parties to this Service Order Renewal.

Customer Name:                                    Rackspace US, Inc.

By: _Leigh A H_                                    By: _____

Printed Name: _Leighanne Henkenmeier_              Printed Name: _____

Title: _VP Finance_                                Title: _____

Date Signed: _5/7/09_                              Date Signed: _____

Owners: RackLaw, Support
HB #9711 v2

**Annex 1(d)(ii) to EXHIBIT A**
**CSF Quarterly Collection Data & Analysis Relationship**

01633986.DOCX\

Mar 11 10 11:58a    Kathy Hamor                    2022232634              p.1

# FRC

# Quote

One Faneuil Hall Marketplace
3rd Floor
Boston, MA 02109
617-963-8967
www.frcnet.com

| | |
|---|---|
| Estimate # | QT100249 |
| Date | 3/10/2010 |

| New Contact Information | Bill To |
|---|---|
| College Savings Foundation<br>1050 17th St NW<br>STE 1000<br>Washington DC 20036 | College Savings Foundation<br>1050 17th St NW<br>STE 1000<br>Washington DC 20036 |

| Rep | Good Until | Special Instructions | Start Date | End Date |
|---|---|---|---|---|
| Todd Haedrich | 3/12/2010 | | | |

| Item | Description | Quantity | Amount |
|---|---|---|---|
| FRC-CUSTPROJ | CSF Quarterly Data Collection & Analysis Relationship<br>- 4 Quarters: Q1-Q4 2010<br>- Billed quarterly | 1 | 40,000.00 |
| FRC-CUSTPROJ | Data Request Redesign Project | 1 | 8,500.00 |

| | | |
|---|---|---|
| | Total | $48,500.00 |

This quote requires your approval.

Please Sign and Fax Quote to 617-263-2000.

Payment Information: (please select one of the following payment options)

_X_ Bill me at the above address or at the following: _____

____ I will be paying by credit card.

Signature indicates authorization of purchase, request for an invoice to be sent to the name and address above and agreement to FRC Terms of Use.

Signature: *Kathy V. Hamor*          Date: *March 11, 2010*

Mar 11 10 11:59a    Kathy Hamor                           2022232634              p.2



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF Data Analysis Relationship
### Project Scope & Proposal

### Project Overview

FRC would like to continue and expand our partnership with the College Savings Foundation (CSF) to provide data analysis and support. Building upon the existing relationship, FRC proposes to support CSF's data collection expanding the data gathered and analyzed. As part of these efforts, FRC will modify the existing data collection templates to provide a more streamlined and efficient process. Our goal is to make it easier for CSF's members to complete the data requests resulting in more accurate and comprehensive information. FRC would also like to align the production of the quarterly report with CSF's messaging and agenda.

### Objectives

- Conduct third party analysis of College Savings Foundations member's 529 plan information

- Streamline the data submission process for CSF members by rebuilding the data collection templates and unifying with FRC efforts

- Expand the amount data collected and improve the completeness of the data

- Develop quarterly analysis aligned with CSF's messaging

**CSF Data Analysis Relationship**
**Project Scope & Proposal**

## Project Outline

1. Revise Data Collection Templates
   - Incorporate both new and existing data elements into a redesigned data template
     - Existing CSF proprietary data
       a. Assets, net sales, gross sales, accounts
       b. Types of portfolios
       c. Portfolios equity/fixed income allocations
       d. Purchasing methods (direct- versus advisor-sold)
     - New portfolio level data
       a. Automatic contribution data
       b. 529 Sales by distribution channel (i.e. B/D, FA's, Banks)
       c. New accounts
       d. CUSIP
       e. % Gross Sales from Auto Funding
       f. FI/Equity Balances
       g. Fees
       h. Performance
     - New plan level data
       a. Total Number of Unique Accounts
       b. Number of New Unique Accounts
       c. Number of Accounts Closed/Liquidated during Quarter
       d. Contribution Activity
          i. Accounts
          ii. Assets
       e. Distribution Activity (separated between qual and non qual)
          i. Accounts
          ii. Assets
       f. % Gross Sales from Auto Funding

   - Enhance the analysis of CSF data with additional value-added data points
     - Examine inclusion of detailed portfolio and plan level information for each college savings plan.

2. Manage Quarterly Data Collection
   - Conduct quarterly requests for data
     - Send out data collection requests
     - Manage distribution lists
     - Follow-up on data requests to optimize responses
   - Review data collected
     - Pursue quality assurance process to ensure data integrity and accuracy
     - Work to improve the completeness on the entire data collection process

# Quote

**FRC**

One Faneuil Hall Marketplace
3rd Floor
Boston, MA 02109
617-963-8967
www.frcnet.com

| Estimate # | QT100249 |
|---|---|
| Date | 3/10/2010 |

**Client Contact Information**
College Savings Foundation
1050 17th St NW
STE 1000
Washington DC 20036

**Bill To**
College Savings Foundation
1050 17th St NW
STE 1000
Washington DC 20036

| Sales Rep | Good Until | Special Instructions | | Start Date | End Date | | |
|---|---|---|---|---|---|---|---|
| Todd Haedrich | 3/12/2010 | | | | | Quantity | Amount |
| **Item** | **Description** | | | | | | |
| FRC-CUSTPROJ | CSF Quarterly Data Collection & Analysis Relationship | | | | | 1 | 40,000.00 |
| | - 4 Quarters: Q1-Q4 2010 | | | | | | |
| | - Billed quarterly | | | | | | |
| FRC-CUSTPROJ | Data Request Redesign Project | | | | | 1 | 8,500.00 |

| | Total | $48,500.00 |
|---|---|---|

This quote requires your approval.

Please Sign and Fax Quote to 617-263-2000.

Payment Information:  (please select one of the following payment options)

___X___ Bill me at the above address or at the following: _____

_____ I will be paying by credit card.

Signature indicates authorization of purchase, request for an invoice to be sent to the name and address above and agreement to FRC Terms of Use.

Signature: _Kathy V. Hamon_____    Date: _March 11, 2010_

**Todd Haedrich**

| | |
|---|---|
| **From:** | KATHY HAMOR [khamor1@verizon.net] |
| **Sent:** | Wednesday, March 10, 2010 2:41 PM |
| **To:** | Todd Haedrich |
| **Cc:** | 'Mazareas, Peter'; 'Mary Morris' |
| **Subject:** | RE: Updated Proposal |

Hi Todd,

Thank you and Bridget for taking time to talk with Lynthia and me this afternoon.

I added a comment about a question you had concerning the data. I think this clarifies what we are looking for.

With this, I think we have an agreement and are ready to go.

Please let me know what are next steps are so we can get this finalized.

Thanks again for working with us on this. We are excited about the improved efforts going forward and think the data can provide a great deal of information to our members and the press.

Kathy

**From:** Todd Haedrich [mailto:todd.haedrich@frcnet.com]
**Sent:** Friday, March 05, 2010 4:49 PM
**To:** KATHY HAMOR
**Cc:** Mazareas, Peter
**Subject:** RE: Updated Proposal

Hi Kathy,

Thank you for continue dialogue around the proposal and the work to get this finalized.

We will reduce the set-up fee to $8,500 and I will change the proposal to reflect that.

On the data questions, Bridget and I discussed this today and would like to some additional details. We are assuming that the requests are for CSF data providing members – can you confirm. As far as your specific queries:

-- Data about the percentage of 529s sold in the quarter and who they are being sold to?
  - Does % of 529s sold in the quarter refer to: accounts/account openings, assets or sales? In regards to who they are being sold to, we have broad distribution, e.g. load (advisor) vs. no load (direct). Are you looking for a more detailed distribution such as breakdown of advisor by channel--independent, wirehouse, regional, RIA, etc? Yes...that is important info which we have discussed several times.

-- Can FRC provide FI/Equity balances among all 529s or just the asset-allocated ones?
  - For CSF members, we can provide FI/Equity balances for all portfolios.
  - Yes, the data will accurately track inflows and outflows for CSF members. We will add auto-contribution to the collection efforts.

-- We would like you to provide historical data requests in agreed-upon data.

1

- Yes, we can provide historical data requests around the agreed upon data to support the quarterly analysis and CSF queries. Any historical requests that were outside the scope of the ongoing work efforts or could be considered a separate analytical project would be in addition, e.g. a historical analysis of data for a follow-up on the treasury report.

I look forward to CSF's thoughts on the above and moving this ahead.

Have a great weekend!

Todd

**From:** Todd Haedrich [mailto:todd.haedrich@frcnet.com]
**Sent:** Tuesday, February 16, 2010 5:18 PM
**To:** KATHY HAMOR
**Cc:** Mezareas, Peter
**Subject:** Updated Proposal

Hi Kathy,

It was good to speak with you on Friday. I appreciated the conversation and your feedback. Based on that discussion, I am pleased to present a revised proposal that captures the elements we have been talking about.

Please find it attached for your review. I look forward to your thoughts and hope we can move forward with this revised approach.

Regards,

Todd

=====
Todd Haedrich
SVP, Business Development
Financial Research Corporation
(v) 617-399-5625
(c) 617-571-7650
(f) 617-263-2000
(e) todd.haedrich@frcnet.com
(w) www.frcnet.com

**CSF Data Analysis Relationship**
**Project Scope & Proposal**

## Project Outline

1. Revise Data Collection Templates
   - Incorporate both new and existing data elements into a redesigned data template
     - Existing CSF proprietary data
       a. Assets, net sales, gross sales, accounts
       b. Types of portfolios
       c. Portfolios equity/fixed income allocations
       d. Purchasing methods (direct- versus advisor-sold)
     - New portfolio level data
       a. Automatic contribution data
       b. 529 Sales by distribution channel (i.e. B/D, FA's, Banks)
       c. New accounts
       d. CUSIP
       e. % Gross Sales from Auto Funding
       f. Fees
       g. Performance
     - New plan level data
       a. Total Number of Unique Accounts
       b. Number of New Unique Accounts
       c. Number of Accounts Closed/Liquidated during Quarter
       d. Contribution Activity
          i. Accounts
          ii. Assets
       e. Distribution Activity (separated between qual and non qual)
          i. Accounts
          ii. Assets
       f. % Gross Sales from Auto Funding

   - Enhance the analysis of CSF data with additional value-added data points
     - Examine inclusion of detailed portfolio and plan level information for each college savings plan.


2. Manage Quarterly Data Collection
   - Conduct quarterly requests for data
     - Send out data collection requests
     - Manage distribution lists
     - Follow-up on data requests to optimize responses
   - Review data collected
     - Pursue quality assurance process to ensure data integrity and accuracy
     - Work to improve the completeness on the entire data collection process



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF Data Analysis Relationship
### Project Scope & Proposal

### Project Overview

FRC would like to continue and expand our partnership with the College Savings Foundation (CSF) to provide data analysis and support. Building upon the existing relationship, FRC proposes to support CSF's data collection expanding the data gathered and analyzed. As part of these efforts, FRC will modify the existing data collection templates to provide a more streamlined and efficient process. Our goal is to make it easier for CSF's members to complete the data requests resulting in more accurate and comprehensive information. FRC would also like to align the production of the quarterly report with CSF's messaging and agenda.

### Objectives

- Conduct third party analysis of College Savings Foundations member's 529 plan information

- Streamline the data submission process for CSF members by rebuilding the data collection templates and unifying with FRC efforts

- Expand the amount data collected and improve the completeness of the data

- Develop quarterly analysis aligned with CSF's messaging

**CSF Data Analysis Relationship**
**Project Scope & Proposal**

3. Conduct Quarterly Data Analysis
   - Create quarterly written analytical report
     - o Analyze CSF proprietary data such as:
       - a. Assets, net sales, gross sales, accounts
       - b. Types of portfolios
       - c. Portfolios equity/fixed income allocations
       - d. Purchasing methods (direct- versus advisor-sold)
       - e. Automatic contribution data
       - f. 529 Sales by distribution channel (i.e. B/D, FA's, Banks)
       - g. New accounts
   - Incorporate additional industry asset data provided by FRC
   - Review report with CSF
     - o Provide clarity around data analysis
     - o Discuss analysis in report
     - o Make corrections on any data discrepancies
     - o Additional analysis is separate

## Additional Support

FRC will strive to communicate data and analysis in a clear and easy to understand format. As part of this relationship, FRC will provide clarification, corrections and explanations of the content within each quarterly report. Additional analysis is available on an ad-hoc basis as part of FRC's Direct Access Program:

   - Direct Access ($2,500 per 10 hour block)
     - o Our on-demand research service enables CSF access to FRC's subject matter experts and analysts to support to support internal business reporting, ad-hoc data requests and custom data cuts/graphs. Direct Access is oriented towards rapid response, short duration requests of less than one hour in nature.

## Research Guidelines

   - Data analyzed will be gathered from CSF data collection efforts
   - Any data utilized by CSF and not part of collection efforts will be FRC sourced
   - CSF will acknowledge FRC through reference in the press release with a description of FRC at the bottom of the release

**CSF Data Analysis Relationship**
**Project Scope & Proposal**

## Deliverables

- Quarterly 7-8 page report summarizing findings
- Includes analytical support with regards to any questions or clarification of quarterly data.

## Timeframe

- Annual relationship will include 4 quarters of data analysis (Q1, Q2, Q3, Q4)
- This agreement will automatically renew on an annualized basis at of the first of the year. CSF may opt out of this relationship with at least 45 days notice in advance of the renewal date.
- All other terms of the FRC / CSF contract apply.

## Investment

- Annual Data Relationship: $40,000
- Redesign data request to combine collection efforts: $12,000
- Additional Analysis/Support: $2,500 per 10 hours of support

**Total for 2010: $52,000**

**Bridget Bearden**

| | |
|---|---|
| **From:** | Kathy Hamor [khamor@capcondc.com] |
| **Sent:** | Friday, November 13, 2009 8:24 AM |
| **To:** | Bridget Bearden; Todd Haedrich |
| **Cc:** | kevin.mcmullen.lnyz@statefarm.com; peter.mazareas@alliancebernstein.com |
| **Subject:** | RE: Re: |

Bridget,

Thanks for providing this information.

Is it possible to determine the level of the difference so we understand it. Also, if you took these out of the calculation, what would the average balance be?  It may be a few $$ less, but it would be good for us to know.  Also, are you able to provide the total $$ amount in each of these accounts and the # of accounts?

THanks again,
Kathy

---

**From:** Bridget Bearden [bridget.bearden@frcnet.com]
**Sent:** Wednesday, November 11, 2009 5:05 PM
**To:** Kathy Hamor; Todd Haedrich
**Cc:** kevin.mcmullen.lnyz@statefarm.com; peter.mazareas@alliancebernstein.com
**Subject:** Re:

Hi Kathy,

Those accounts do not skew the data. They are considered insignificant statistically for the aggregate analysis.

-Bridget

Bridget Bearden
Research Analyst
Financial Research Corporation
P: 617-399-5620
bridget.bearden@frcnet.com

---

**From:** Kathy Hamor
**To:** Bridget Bearden; Todd Haedrich
**Cc:** Kevin McMullen ; Peter Mazareas
**Sent:** Wed Nov 11 15:59:27 2009
**Subject:** RE:
Bridget,

Another issue we need to look at concerns the accounts that have large balances.  Were these included in the data analysis and how much did they skew the data?  Do we need to have the data analyzed without these since most of them are scholarship accounts?

Thanks
kathy

**From:** Kathy Hamor
**Sent:** Wednesday, November 11, 2009 4:56 PM
**To:** 'Bridget Bearden'; 'Todd Haedrich'

1

*Refer to Section II + IV*

Here are the items that need clarification:

- The FRC Report refers to numbers and percentages of plans responding to Sections II and IV. We would like to see how FRC derived these numbers.
  - Section II – page 3 – we calculate 58 plans, not 59 plans
  - Section IV – page 16 – we calculate 43 plans representing 29 states (not 42 plans representing 26 states)

- Page 3 refers to Section II data providing information on percent of assets held by state residents. This is something Treasury requested but we haven't included any analysis on it in the Report. Can you tell us what the raw data shows?

- Is the information on Chart 1, page 3, based on the data collected from the states in connection with this inquiry or is this based upon FRC's industry data?
  - When we you refer to the 7.2 million accounts included in the Section II data as "79% of the entire 529 savings plan industry", how are we you measuring the industry?
  - Can we have access to the charts so that we can re-label them to show "Source" and "data as of [date]"? [NB—We will be happy to do this —- we just want to know if FRC is ok with it.]

- Are the percentages on Chart 2, page 4, based upon the entire industry – and thus market information FRC has separate and apart from this data collection – or do the percentages in that Chart reflect just those plans / states that provided information in connection with this Treasury inquiry?

- Section II, page 5, refers to cash movement as decreasing in the aggregate, but based on the data provided, it looks as if just contributions decreased. What does it mean to refer to aggregate activity? [See in particular Chart 3.]

- Please explain Chart 7 on page 5 (in Section II on average automatic funding). What do the percentages represent? Which account base are we talking about?

- On page 9, the Section III data refers to data for 6.7 million accounts.
  - As of what date?
  - How does this relate to the 5.2 million "active" accounts referred to later on this page?
  - How does this relate to the 9.1 million accounts referred to in the same paragraph?

- Page 9 refers to a majority of the plans in Section III as "direct-sold" – is this accurate? Can we compare the lists of respondents so that we are sure we are characterizing the data correctly?

- On page 9, the Section III data also refers to 9.1 million accounts (of which 6.7 million is 75%). What is the basis for the 9.1 million? How does that relate to the usually referred to 11 million accounts in the 529 market?

- In Chart 2 on page 10, you are showing 60 accounts with more than $300,000 as of December 31, 2008. Can you break this down further for us – showing the number of



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF Member 529 Data Analysis

### Option #1: Project Scope & Deliverables

**Objective**
- Conduct third party analysis of College Savings Foundations member's 529 assets and provide results/insights on the data

**Scope**
- Collection of member's data conducted by CSF
- Updating and maintenance of CSF database by FRC
- Includes analysis on CSF proprietary data:
  - o  Assets, net sales, gross sales, accounts
  - o  Types of portfolios
  - o  Portfolios equity/fixed income allocations
  - o  Purchasing methods (direct- versus advisor-sold)
- Additional industry asset data provided by FRC

**Research Guidelines**
- Data analyzed will be gathered from CSF data collection efforts
- Any data utilized by CSF and not part of collection efforts will be FRC sourced
- Press releases will be jointly-branded CSF / FRC

**Deliverables**
- Quarterly Word-based 7-8 page report summarizing findings
- Includes analytical support of 5 hours quarterly

**Fees**
- Requires 1-Year Commitment
- Priced at $40,000 per Year ($10,000 per Quarter)

CSF / FRC Relationship

December 16, 2009



Financial Research Corporation
One Faneuil Hall, 3ʳᵈ Floor
Boston, MA 02109

## CSF Member 529 Data Analysis & Collection

### Option #2: Project Scope & Deliverables

**Objective**
- Simplify the data submittal process of CSF members by unifying with FRC efforts
- Management of data collection by FRC on behalf of CSF, including maintaining email distribution list, requests for data email, and pursuing follow up
- Focus on working with CSF members not currently providing data to develop methods to add them to collection
- Conduct third party analysis of College Savings Foundations member's 529 assets and provides results/insights on the data

**Scope**
- Collection of member's data conducted by FRC including:
  - Management of distribution
  - Requests for data and follow-up
- Updating and maintenance of CSF database by FRC
- Includes analysis on CSF proprietary data:
  - Assets, net sales, gross sales, accounts
  - Types of portfolios
  - Portfolios equity/fixed income allocations
  - Purchasing methods (direct- versus advisor-sold)
- Additional industry asset data provided by FRC

**Research Guidelines**
- Data analyzed will be gathered by FRC data collection efforts
- Any data utilized by CSF and not part of collection efforts will be FRC sourced
- Press releases will be jointly-branded CSF / FRC

**Deliverables**
- Quarterly Word-based 7-8 page report summarizing findings
- Includes analytical support of 10 hours quarterly

**Fees**
- Requires 1-Year Commitment
- Priced at $60,000 per Year ($15,000 per Quarter)

CSF / FRC Relationship

December 15, 2009



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF / FRC Joint Consumer Awareness Initiative

### Option #3: Project Scope & Deliverables

**Objective**
- Gauge consumer awareness and understanding of College Saving Plans:
  - Assess utilization of 529 plans
  - Track consumer's familiarity of College Savings on an ongoing basis
  - Recognize changes in behaviors towards savings for college over time

**Scope**
- Conduct survey on a quarterly basis:
  - Field 10-minute survey to approximately 250 consumers
  - Capture adults with 0-18 year-olds in household
- Ask qualitative questions such as:
  - Are you saving for college?
  - How are you saving for college? (Rate utilization of 529)
  - Do you know what a 529 plan is? (Rate understanding)
- Collect demographic data elements including:
  - Age
  - Annual Household Income Level
  - Educational Attainment
  - Region / Location
- Develop qualitative and quantitative analysis of survey results

**Research Guidelines**
- Data will be gathered by FRC utilizing FRC's market research capabilities
- CSF will have access to data for additional analytics
- Analysis will be augmented by CSF/FRC industry data

**Deliverables**
- Deliver Quarterly 15-20 slide PowerPoint presentation
- Includes analytical support of 5 hours quarterly
- Jointly released press announcement

**Fees**
- Requires 1-Year Commitment
- Priced at $50,000 per Year ($12,500 per Quarter)

December 15, 2009                                                CSF / FRC Relationship



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF / FRC Joint Consumer Awareness Initiative

### Option #3: Project Scope & Deliverables

**Objective**
- Gauge consumer awareness and understanding of College Saving Plans:
  - Assess utilization of 529 plans
  - Track consumer's familiarity of College Savings on an ongoing basis
  - Recognize changes in behaviors towards savings for college over time

**Scope**
- Conduct survey on a quarterly basis:
  - Field 10-minute survey to approximately 250 consumers
  - Capture adults with 0-18 year-olds in household
- Ask qualitative questions such as:
  - Are you saving for college?
  - How are you saving for college? (Rate utilization of 529)
  - Do you know what a 529 plan is? (Rate understanding)
- Collect demographic data elements including:
  - Age
  - Annual Household Income Level
  - Educational Attainment
  - Region / Location
- Develop qualitative and quantitative analysis of survey results

**Research Guidelines**
- Data will be gathered by FRC utilizing FRC's market research capabilities
- CSF will have access to data for additional analytics
- Analysis will be augmented by CSF/FRC industry data

**Deliverables**
- Deliver Quarterly 15-20 slide PowerPoint presentation
- Includes analytical support of 5 hours quarterly
- Jointly released press announcement

**Fees**
- Requires 1-Year Commitment
- Priced at $50,000 per Year ($12,500 per Quarter)

December 15, 2009                                        CSF / FRC Relationship

**Todd Haedrich**

**To:**        KATHY HAMOR
**Cc:**        'Mazareas, Peter'
**Subject:**   RE: Updated Proposal

Hi Kathy,

Thank you for continuing the dialogue around the proposal and we look forward to moving ahead.

In regards to your note, we will reduce the set-up fee to $8,500 and I will change the proposal to reflect that.

On the data questions, Bridget and I discussed this today and would like to gain some additional details. We are assuming that the requests are for CSF data providing members – can you confirm. As far as your specific queries:

-- Data about the percentage of 529s sold in the quarter and who they are being sold to?
    - Does % of 529s sold in quarter refer to: accounts/account openings, assets or sales?
    - In regards to who they are being sold to, we have broad distribution, e.g. load (advisor) vs. no load (direct). Are you looking for a more detailed distribution such as breakdown of advisor by channel—independent, wirehouse, regional, RIA, etc?

-- Can FRC provide FI/Equity balances among all 529s or just the asset-allocated ones?
    - For CSF members, we can provide FI/Equity balances for all portfolios.
    - Yes, the data will accurately track inflows and outflows for CSF members. We will add auto-contribution to the collection efforts.

-- We would like you to provide historical data requests in agreed-upon data.
    - Does this refer to ongoing support of data? E.g. comparing this quarter to last quarter? If so, yes. Broader analysis with data outside of collection efforts would be outside this scope.

**From:** Todd Haedrich [mailto:todd.haedrich@frcnet.com]
**Sent:** Tuesday, February 16, 2010 5:18 PM
**To:** KATHY HAMOR
**Cc:** Mazareas, Peter
**Subject:** Updated Proposal

Hi Kathy,

It was good to speak with you on Friday. I appreciated the conversation and your feedback. Based on that discussion, I am pleased to present a revised proposal that captures the elements we have been talking about.

Please find it attached for your review. I look forward to your thoughts and hope we can move forward with this revised approach.

Regards,

Todd

=====
Todd Haedrich
SVP, Business Development

1



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF Member 529 Data Analysis

### Option #1: Project Scope & Deliverables

**Objective**
- Conduct third party analysis of College Savings Foundations member's 529 assets and provide results/insights on the data

**Scope**
- Collection of member's data conducted by CSF
- Updating and maintenance of CSF database by FRC
- Includes analysis on CSF proprietary data:
  - Assets, net sales, gross sales, accounts
  - Types of portfolios
  - Portfolios equity/fixed income allocations
  - Purchasing methods (direct- versus advisor-sold)
- Additional industry asset data provided by FRC

**Research Guidelines**
- Data analyzed will be gathered from CSF data collection efforts
- Any data utilized by CSF and not part of collection efforts will be FRC sourced
- Press releases will be jointly-branded CSF / FRC

**Deliverables**
- Quarterly Word-based 7-8 page report summarizing findings
- Includes analytical support of 5 hours quarterly

**Fees**
- Requires 1-Year Commitment
- Priced at $40,000 per Year ($10,000 per Quarter)

December 15, 2009                                    CSF / FRC Relationship



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF Member 529 Data Analysis & Collection

### Option #2: Project Scope & Deliverables

**Objective**
- Simplify the data submittal process of CSF members by unifying with FRC efforts
- Management of data collection by FRC on behalf of CSF, including maintaining email distribution list, requests for data email, and pursuing follow up
- Focus on working with CSF members not currently providing data to develop methods to add them to collection
- Conduct third party analysis of College Savings Foundations member's 529 assets and provides results/insights on the data

**Scope**
- Collection of member's data conducted by FRC including:
  - Management of distribution
  - Requests for data and follow-up
- Updating and maintenance of CSF database by FRC
- Includes analysis on CSF proprietary data:
  - Assets, net sales, gross sales, accounts
  - Types of portfolios
  - Portfolios equity/fixed income allocations
  - Purchasing methods (direct- versus advisor-sold)
- Additional industry asset data provided by FRC

**Research Guidelines**
- Data analyzed will be gathered by FRC data collection efforts
- Any data utilized by CSF and not part of collection efforts will be FRC sourced
- Press releases will be jointly-branded CSF / FRC

**Deliverables**
- Quarterly Word-based 7-8 page report summarizing findings
- Includes analytical support of 10 hours quarterly

**Fees**
- Requires 1-Year Commitment
- Priced at $60,000 per Year ($15,000 per Quarter)

December 15, 2009                                    CSF / FRC Relationship



Financial Research Corporation
One Faneuil Hall, 3rd Floor
Boston, MA 02109

## CSF / FRC Joint Consumer Awareness Initiative

### Option #3: Project Scope & Deliverables

**Objective**
- Gauge consumer awareness and understanding of College Saving Plans:
  - Assess utilization of 529 plans
  - Track consumer's familiarity of College Savings on an ongoing basis
  - Recognize changes in behaviors towards savings for college over time

**Scope**
- Conduct survey on a quarterly basis:
  - Field 10-minute survey to approximately 250 consumers
  - Capture adults with 0-18 year-olds in household
- Ask qualitative questions such as:
  - Are you saving for college?
  - How are you saving for college? (Rate utilization of 529)
  - Do you know what a 529 plan is? (Rate understanding)
- Collect demographic data elements including:
  - Age
  - Annual Household Income Level
  - Educational Attainment
  - Region / Location
- Develop qualitative and quantitative analysis of survey results

**Research Guidelines**
- Data will be gathered by FRC utilizing FRC's market research capabilities
- CSF will have access to data for additional analytics
- Analysis will be augmented by CSF/FRC industry data

**Deliverables**
- Deliver Quarterly 15-20 slide PowerPoint presentation
- Includes analytical support of 5 hours quarterly
- Jointly released press announcement

**Fees**
- Requires 1-Year Commitment
- Priced at $50,000 per Year ($12,500 per Quarter)

CSF / FRC Relationship

December 15, 2009

**Annex 1(d)(iii) to EXHIBIT A**
**Interactive Palette Hosting Arrangement**

**InteractivePalette**
Web Design • Hosting • Maintenance

| Bill To |
| --- |
| FRC |
| 1 Faneuil Hall, 3rd Floor |
| Boston, MA  02109 |

# Invoice

| | |
| --- | --- |
| **Date:** | 9/1/2011 |
| **Invoice #:** | 26138 |
| **Terms:** | 30 Days |
| **P.O. No.:** | |

| Description | Qty | Rate | Web Address | Amount |
| --- | --- | --- | --- | --- |
| Quarterly Hosting for the period 10/1/11 - 12/31/11 | 3 | 24.95 | frcnet.com | 74.85 |

*Thank you for your business!*

| | |
| --- | --- |
| Total | $74.85 |
| Payments/Credits | $0.00 |
| BALANCE DUE | $74.85 |

Interactive Palette accepts credit cards for invoices, simply fill out the form below and fax it to (781) 394-7959 and a receipt will be sent at the time of processing.  Please write "SAME" if your information is already on file.

Name on Credit Card: _____    Security Code: _____

Credit Card Number: _____    Expiration Date: _____

Credit Card Type (circle one):     Visa    Mastercard    American Express

P.O. Box 1007 - Fall River, MA 02722 - t: (781) 930 -3199 f: (781) 394-7959
billing@interactivepalette.com - www.interactivepalette.com

**EXHIBIT B**
**TOP 10 CUSTOMERS**

1.    Fidelity

2.    Legg Mason

3.    Columbia Management Group

4.    American Century

5.    Alliance Bernstein

6.    GE Asset Management

7.    T Rowe Price

8.    Principal Financial Group

9.    TIAA CREF

10.    Putnam Investment

## EXHIBIT 2

### LIST OF ASSUMED CONTRACTS

**[See Attached]**

**CUSTOMER CONTRACTS**

| SubEntity | Contract Number/Date Item | Product Line | Contr Amount |
|---|---|---|---|
| | SO100477 | | $0.00 |
| ING US Financial Services | 9/30/2010    CSV-QUPDATE | 529 | $0.00 |
| ING US Financial Services | 9/30/2010    FRC-MONITOR | Monitor Views | $0.00 |
| ING US Financial Services | 9/30/2010    MUF-LIFECYCLE | Investments | $0.00 |
| | SO100481 | | $0.00 |
| Credit Suisse | 10/4/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100483 | | $0.00 |
| Pershing | 10/19/2010    CSV-DUPDATE | 529 | $0.00 |
| Pershing | 10/19/2010    CSV-QUPDATE | 529 | $0.00 |
| | SO100484 | | $0.00 |
| Pacific Life Insurance Company | 10/20/2010    MUF-LIFECYCLE | Investments | $0.00 |
| | SO100519 | | $0.00 |
| Principal Financial Group | 12/6/2010    MUF-LIFECYCLE | Investments | $0.00 |
| Principal Financial Group | 12/6/2010    SUB-QUARTERLY | Investments | $0.00 |
| Principal Financial Group | 12/6/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100491 | | $0.00 |
| Nationwide Financial Services | 11/11/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100509 | | $0.00 |
| UBS Global Asset Management | 11/30/2010    FRC-MONITOR | Monitor Views | $0.00 |
| UBS Global Asset Management | 11/30/2010    MUF-LIFECYCLE | Investments | $0.00 |
| | SO100529 | | $0.00 |
| MFS Investment Management | 12/20/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100488 | | $0.00 |
| Vanguard Group Inc. | 11/2/2010    CSV-DUPDATE | 529 | $0.00 |
| Vanguard Group Inc. | 11/2/2010    CSV-QUPDATE | 529 | $0.00 |
| | SO100502 | | $0.00 |
| Upromise Investments, Inc. | 11/17/2010    CSV-DUPDATE | 529 | $0.00 |
| | SO100518 | | $0.00 |
| Calvert Group | 12/6/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100528 | | $0.00 |
| Hartford (The) | 12/20/2010    CSV-DUPDATE | 529 | $0.00 |
| Hartford (The) | 12/20/2010    CSV-QUPDATE | 529 | $0.00 |
| | SO100531 | | $0.00 |
| Wellington Management | 12/23/2010    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100534 | | $0.00 |
| T. Rowe Price | 1/6/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100535 | | $0.00 |
| DWS Investments | 1/7/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100537 | | $0.00 |
| Vanguard Group Inc. | 1/10/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100543 | | $0.00 |
| GE Asset Management : GE Investment Distributors Inc. | 1/20/2011    FRC-MONITOR | Monitor Views | $0.00 |
| GE Asset Management : GE Investment Distributors Inc. | 1/20/2011    SUB-MNDTCHG | Investments | $0.00 |
| GE Asset Management : GE Investment Distributors Inc. | 1/20/2011    SUB-QUARTERLY | Investments | $0.00 |
| | SO100547 | | $0.00 |
| Fidelity Consulting Group | 1/25/2011    CSV-DUPDATE | 529 | $0.00 |
| Fidelity Consulting Group | 1/25/2011    CSV-QUPDATE | 529 | $0.00 |
| Fidelity Consulting Group | 1/25/2011    FRC-MONITOR | Monitor Views | $0.00 |
| Fidelity Consulting Group | 1/25/2011    MUF-LIFECYCLE | Investments | $0.00 |
| | SO100549 | | $0.00 |
| TIAA-CREF | 1/26/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100538 | | $0.00 |
| ING US Financial Services : ING Investment Management Grc | 1/12/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100536 | | $0.00 |
| Merrill Lynch Retirement Group | 1/7/2011    CSV-DUPDATE | 529 | $0.00 |
| Merrill Lynch Retirement Group | 1/7/2011    CSV-QUPDATE | 529 | $0.00 |
| Merrill Lynch Retirement Group | 1/7/2011    CSV-VIEWS | 529 | $0.00 |
| | SO100542 | | $0.00 |
| Janus Capital Group | 1/19/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100555 | | $0.00 |
| BlackRock\iShares | 3/8/2011    CSV-DUPDATE | 529 | $0.00 |
| BlackRock\iShares | 3/8/2011    CSV-QUPDATE | 529 | $0.00 |
| | SO100561 | | $0.00 |
| First National Bank of Omaha | 3/28/2011    CSV-DUPDATE | 529 | $0.00 |
| First National Bank of Omaha | 3/28/2011    CSV-QUPDATE | 529 | $0.00 |
| | SO100563 | | $0.00 |
| State Farm Insurance Company | 3/1/2011    FRC-MONITOR | Monitor Views | $0.00 |
| | SO100567 | | $0.00 |
| Putnam Investments | 3/9/2011    CSV-DUPDATE | 529 | $0.00 |
| Putnam Investments | 3/9/2011    CSV-QUPDATE | 529 | $0.00 |
| | SO100569 | | |

| | | | | |
|---|---|---|---|---|
| AllianceBernstein Investment | 3/10/2011 | CSV-DUPDATE | 529 | $0.00 |
| AllianceBernstein Investment | 3/10/2011 | CSV-QUARTERLYFEE | 529 | $0.00 |
| AllianceBernstein Investment | 3/10/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100582 | | | $0.00 |
| John Hancock Funds, Inc. | 3/28/2011 | CSV-DUPDATE | 529 | $0.00 |
| John Hancock Funds, Inc. | 3/28/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100586 | | | $0.00 |
| Ohio Tuition Trust Authority | 4/4/2011 | CSV-DUPDATE | 529 | $0.00 |
| | SO100587 | | | $0.00 |
| Columbia Management Group | 4/6/2011 | CSV-DUPDATE | 529 | $0.00 |
| Columbia Management Group | 4/6/2011 | CSV-QUARTERLYFEE | 529 | $0.00 |
| Columbia Management Group | 4/6/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100517 | | | $0.00 |
| American Century Companies | 12/8/2010 | 529 Quarterly Qualitative Update | 529 | $0.00 |
| American Century Companies | 12/8/2010 | 529 Views on the News | 529 | $0.00 |
| American Century Companies | 12/8/2010 | Sub Advisory Quarterly Update | Investments | $0.00 |
| | SO100593 | | | $0.00 |
| OppenheimerFunds, Inc. | 5/6/2011 | CSV-QUARTERLYFEE | 529 | $0.00 |
| OppenheimerFunds, Inc. | 5/6/2011 | CSV-DUPDATE | 529 | $0.00 |
| OppenheimerFunds, Inc. | 5/6/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100604 | | | $0.00 |
| Legg Mason, Inc. | 5/23/2011 | CSV-DUPDATE | 529 | $0.00 |
| Legg Mason, Inc. | 5/23/2011 | CSV-QUARTERLYFEE | 529 | $0.00 |
| Legg Mason, Inc. | 5/23/2011 | CSV-QUPDATE | 529 | $0.00 |
| Legg Mason, Inc. | 5/23/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100595 | | | $0.00 |
| BMO Bank of Montreal | 5/9/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100597 | | | $0.00 |
| Transamerica Capital Inc. | 5/9/2011 | SUB-QUARTERLY | Investments | $0.00 |
| | SO100612 | | | $0.00 |
| Union Bank & Trust Company | 5/31/2011 | CSV-DUPDATE | 529 | $0.00 |
| Union Bank & Trust Company | 5/31/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100611 | | | $0.00 |
| Jennison Associates LLC | 6/27/2011 | SUB-QUARTERLY | Investments | $0.00 |
| | SO100605 | | | $0.00 |
| Capital Group Companies, Inc. | 5/23/2011 | CSV-DUPDATE | 529 | $0.00 |
| | SO100608 | | | $0.00 |
| Putnam Investments | 5/23/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100609 | | | $0.00 |
| Capital Group Companies, Inc. | 6/24/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100613 | | | $0.00 |
| Franklin Templeton Investments | 5/31/2011 | CSV-DUPDATE | 529 | $0.00 |
| | SO100624 | | | $0.00 |
| T. Rowe Price | 6/16/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100627 | | | $0.00 |
| T. Rowe Price | 6/16/2011 | MUF-LIFECYCLE | Investments | $0.00 |
| | SO100629 | | | $0.00 |
| T. Rowe Price | 6/16/2011 | CSV-DUPDATE | 529 | $0.00 |
| | SO100616 | | | $0.00 |
| Virginia College Savings Plan | 6/3/2011 | CSV-DUPDATE | 529 | $0.00 |
| Virginia College Savings Plan | 6/3/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100617 | | | $0.00 |
| Hatteras Funds | 6/6/2011 | ALTERNATIVES-QUPDATE | Alternatives / Not Acquired | $0.00 |
| | SO100639 | | | $0.00 |
| TIAA-CREF | 6/30/2011 | CSV-DUPDATE | 529 | $0.00 |
| TIAA-CREF | 6/30/2011 | CSV-QUPDATE | 529 | $0.00 |
| | SO100635 | | | $0.00 |
| Fidelity Consulting Group | 6/29/2011 | ALTERNATIVES-QUPDATE | Alternatives / Not Acquired | $0.00 |
| | SO100644 | | | $0.00 |
| First Trust Advisors L.P. | 7/13/2011 | ALTERNATIVES-QUPDATE | Alternatives / Not Acquired | $0.00 |
| First Trust Advisors L.P. | 7/13/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100650 | | | $0.00 |
| Hartford (The) | 7/21/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100653 | | | $0.00 |
| PNC Financial Services Group Inc. | 7/25/2011 | FRC-MONITOR | Monitor Views | $0.00 |
| | SO100665 | | | $0.00 |
| Pershing | 8/16/2011 | CSV-DUPDATE | 529 | $0.00 |
| Pershing | 8/16/2011 | CSV-QUPDATE | 529 | $0.00 |

DOCS-#807824-v1-FRC_LLC_Schedule_1_to_Sale_Notice.xlsx

## VENDOR CONTRACTS

| Vendor | Contract Number | Cure Amount |
|---|---|---|
| CoActive Capital Partners, Inc. | #38934 | $7,464.38 |
| CoActive Capital Partners, Inc. | #39373 | $8,635.45 |
| New River, Inc. | | $10,000.00 |
| Rackspace US, Inc. | | $957.00 |
| Interactive Paletteett | | $74.85 |